UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>CHRISTOPHER REESE,<br>     a/k/a "Christopher Eugene Thomas,"<br><br>          Defendant. | 24 Cr. 402 (VEC) |

## THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S PRETRIAL MOTIONS

EDWARD Y. KIM
Acting United States Attorney for the
Southern District of New York

T. Josiah Pertz
Kingdar Prussien
Derek Wikstrom
Assistant United States Attorneys
    *Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND .................................................................................................... 2

ARGUMENT ......................................................................................................... 8

I.     The Motion to Dismiss Counts One (Wire Fraud Conspiracy), Two (Wire Fraud) and Five (Money Laundering Conspiracy) Should Be Denied .................. 8

II.    The Motion to Dismiss Count Three (Unauthorized Practice of Law in a Federal Enclave) Should Be Denied ....................................................... 10

    A.    Count Three of the Indictment Properly Pleads a Criminal Offense ........ 10

        1.    Count Three Pleads Unauthorized Practice of Law in a Federal Enclave ....................................................... 10

        2.    New York State Judiciary Law Prohibits the Unauthorized Practice of Law in Federal Court .................................. 11

        3.    Federal Courts Retain the Power to Manage *Pro Hac Vice* Admissions, Defeating Reese's Analogy ...................................... 13

    B.    There Is No First Amendment Right to For-Profit Unauthorized Practice of Law ....................................................................... 15

        1.    The Court Should Apply Rational Basis Review to the New York State Statutory Provisions Referenced in Count Three ....... 15

        2.    The New York State Statutes Are Constitutional Under Any Level of Scrutiny ................................................. 19

    C.    Reese's Preemption Argument Fails ........................................... 21

III.    The Vindictive Prosecution Motion Should Be Denied ....................................... 25

    A.    Applicable Law ................................................................. 26

    B.    The Government Is Justified in Prosecuting Reese for His Crimes .......... 27

IV.    The Motion to Suppress Evidence Seized Pursuant to Search Warrants for Electronic Accounts and the Defendant's Residence Should Be Denied ............ 30

    A.    Reese Lacks Standing to Suppress the Evidence Seized from the Email Warrants and the Lafayette Avenue Premises ................................ 31

i

B.    The Warrants Are Supported by Probable Cause and Were Not
Overbroad ................................................................................................ 32

C.    The Good-Faith Exception Precludes Suppression.................................... 36

V.    The Motion to Suppress Reese's Voluntary Statements to Law
Enforcement Should Be Denied............................................................................ 37

CONCLUSION.................................................................................................................... 39

## PRELIMINARY STATEMENT

For years, the defendant Christopher Reese made it his business to practice law without a license, charging thousands of dollars to draft and file motions for criminal defendants in federal courts across the country, including in the United States District Court for the Southern District of New York and the United States Court of Appeals for the Second Circuit. Victims, who were often family members of criminal defendants, paid Reese for his services after Reese falsely promised that the motions would result in the victims' loved ones quickly getting out of prison. During the scheme, and while on federal supervised release in this District, Reese lied to the U.S. Probation Office, understating his income to keep from paying the restitution he owed, and funneled money through a coconspirator to conceal his earnings.

On June 24, 2024, a grand jury returned Indictment 24 Cr. 402 (VEC) (the "Indictment"), charging Reese for his participation in this scheme.

Reese now asks the Court to dismiss all counts against him, arguing the allegations do not amount to crimes, run afoul of the First Amendment, are preempted by federal law, and are a vindictive prosecution. In the alternative, Reese seeks to suppress evidence obtained from search warrants issued by United States magistrate judges, and statements he made to law enforcement during a voluntary, non-custodial interview.

But the law does not afford Reese the pretrial relief he seeks. When a charge contains the essential elements of the offense and gives notice of the core criminality at issue, as those in the Indictment do, nothing more is required to justify a trial on the merits. Reese's remaining arguments to dismiss the unauthorized practice of law charge fail across the board. So too does Reese's argument that this case is a vindictive prosecution, an utterly baseless claim that finds no support in the record.

Nor do Reese's suppression motions fare any better. Reese overlooks that both search warrants were authorized by magistrate judges who found probable cause to believe crimes had been committed based on detailed affidavits. Reese also overlooks that the Sixth Amendment right to counsel did not attach during his voluntary interview, which took place before Reese had been charged in this case.

The defendant's motions should be denied in their entirety.

## **BACKGROUND**

A. Factual Overview

Reese has no license to practice law in New York State or anywhere else. But between at least 2020 and 2023, acting without the supervision of a licensed lawyer, Reese offered services that only a lawyer was authorized to provide, including drafting and submitting legal filings on behalf of inmates in federal court. (Ind. ¶ 1.)[1] To hide his involvement, Reese disguised his authorship of the filings, submitting documents under an inmate's own name and identifying them as filed "*pro se*", i.e., by the litigant himself or herself. (*Id*.)

To convince federal inmates and their family members to pay him, Reese falsely claimed that the legal papers he could draft would dramatically reduce the inmates' prison sentences or result in their near-immediate release. (Ind. ¶ 7.) Reese further failed to disclose to his victims that he was prohibited by law from providing legal services, that he was prohibited by the terms of his federal supervised release from interacting with convicted felons or otherwise violating state or federal law, and that his filings were routinely unsuccessful. (*Id.*) Based on Reese's lies, Reese's

---

[1] "Dkt. __" refers to entries on the Court's docket in this case, unless a different docket number is provided. "Br." refers to the memorandum of law submitted in support of the defendant's motions (Dkt. 61). "Def. Ex." refers to an exhibit submitted with the defendant's motions. Unless otherwise noted, case text quotations omit all internal citations, quotation marks, and alterations.

victims agreed to pay him thousands of dollars to draft and file motions. (*Id.*) Court after court dismissed Reese's filings as meritless. Nonetheless, after failing to achieve the results he guaranteed, and at times after having initially promised that he would give a refund if a filing were unsuccessful, Reese kept the money he took. (Ind. ¶ 8.)

For instance, Reese promised a family member of Inmate-1 that the inmate "would be entitled to immediate release on bail pending the disposition of the motion," if Reese filed a motion on the inmate's behalf. (Ind. ¶ 11.) Reese promised a money-back guarantee if the family member paid Reese's $2,000 fee in full. Reese received the full fee, then filed a motion, which was denied. (Ind. ¶ 12.) The family member requested a refund, and Reese refused. (Ind. ¶ 13.)

Reese also promised a family member of Inmate-3 the possibility of "no jail term" for Inmate-3, "conceivably less than 5 years," and a 10-year maximum sentence, despite Inmate-3 pleading guilty to a charge with a five-year mandatory minimum and a 40-year maximum sentence. (Ind. ¶¶ 18-20.) Reese extracted $5,000 from Inmate-3's family member, and the court to which Reese sent the motion, in the Southern District of New York, did not docket it. Reese did not return the money. Inmate-3 was sentenced to 12 years' imprisonment. (Ind. ¶¶ 21-22.)

Reese made these filings in multiple federal courts, including in the United States Court of Appeals for the Second Circuit and before several judges of the United States District Court for the Southern District of New York. The Second Circuit, and certain of the Southern District judges to whom Reese submitted filings, are located in the Thurgood Marshall United States Courthouse, which is under the exclusive jurisdiction of the United States. (Ind. ¶ 9.) For example, Reese drafted and caused a legal brief to be filed before the Second Circuit on behalf of Inmate-2, and charged Inmate-2 and the inmate's family $1,350 for these unlicensed legal services. (Ind. ¶¶ 16-17, 39.)

Reese concealed his income from this scheme through financial transactions with a coconspirator ("CC-1").[2] CC-1 acted as Reese's agent, formatting legal documents authored by Reese, mailing and emailing the documents to federal courts for filing, and accepting thousands of dollars on Reese's behalf from those who paid for Reese's unlicensed legal services. CC-1 also received, held and moved the proceeds of Reese's fraud scheme at Reese's direction, all of which helped Reese hide his income and assets. (Ind. ¶ 3.)

For instance, in or about June 2021 and July 2021, through a mobile payment service, CC-1's account at a particular bank ("Bank-1") received multiple payments totaling thousands of dollars, with memos including "Legal Representation," "Retainer," and "Lawyer fee ([name])". CC-1 then withdrew funds for Reese. On or about August 13, 2021, CC-1 texted Reese, "I'm going to the mall near you. You wanna meet me at [Bank-1] for cash?" Reese responded: "What time?", and then, "Working on a motion." The same day, approximately $1,060 was withdrawn from CC-1's Bank-1 account from an ATM at a mall a few miles from Reese's residence. (Ind. ¶ 31.)

Reese engaged in this scheme while on supervised release following a prior federal conviction for bank fraud, bank fraud conspiracy, wire fraud conspiracy, and aggravated identity theft. *See United States v. Reese*, 12 Cr. 629 (VM) (S.D.N.Y.), Dkt. 178 (sentencing Reese to 108 months' imprisonment, three years' supervised release, and ordering payment of $66,985.55 in restitution in monthly installments of 15% of Reese's gross monthly income).

Reese began his first term of supervised release on August 21, 2020. On March 31, 2022, the U.S. Probation Office issued a violation report against Reese, amending it on May 4, 2022 and August 31, 2022 (the "Violation Report"). The Violation Report included specifications alleging that Reese violated the terms of his supervised release by failing to make restitution payments in

---

[2] It is clear from the search warrant affidavits discussed below that CC-1 is Assata Rhodes.

the amount of 15% of his monthly income, and having contact with known felons. (Def. Ex. A.) The contact involved Reese's provision of unlicensed legal services. (*Id.*)

On September 9, 2022, Reese entered admissions to two specifications in the Violation Report, charging him with associating with known felons. On September 16, 2022, Judge Marrero revoked Reese's supervised release and sentenced him to eight months' imprisonment, to be followed by an additional one-year term of supervised release. Reese filed an appeal, and on April 18, 2023, while the appeal was pending, Reese was released from custody and began his second term of supervised release.[3]

While on supervised release, Probation monitored Reese's restitution payments, periodically questioning Reese and requiring him to fill out a statement of net worth to determine what 15% of his gross monthly income would be. Reese repeatedly lied to Probation, telling them he had no income and emailing Probation a financial statement falsely claiming he had no assets. In truth, Reese's fraudulent legal-services business brought in hundreds of thousands of dollars, which Reese concealed from Probation. (Ind. ¶ 28.)

B. Investigation Overview, Warrants and Reese's Voluntary Interview

In 2022, the U.S. Attorney's Office for the Southern District of New York began investigating Reese and others for their involvement in a scheme to provide unlicensed, for-profit legal services to federal criminal defendants. As part of this investigation, law enforcement officers reviewed financial records from Cash App, numerous court filings, email communications, and communications with the Probation.

---

[3] The appeal was captioned *United States of America v. Green (Reese)*, 22-2184 (2d Cir. 2022). On January 31, 2023, the Second Circuit appointed Lawrence Gerzog to represent Reese in his appeal pursuant to the Criminal Justice Act. 22-2184, Dkt. 42-2. On March 26, 2024, the Second Circuit affirmed the judgment. 12 Cr. 629, Dkt. 118. The mandate issued on May 20, 2024. 12 Cr. 629, Dkt. 121.

Based on those investigatory steps and others, Special Agent Sean Smyth with the U.S. Attorney's Office submitted an agent affidavit in support of search warrants for electronic accounts, and for two premises containing evidence of the scheme. (*See* Def. Ex. B, Oct. 26, 2023 Affidavit of Special Agent Sean Smyth ("Email Warrants Affidavit"); Def. Ex. C, Apr. 9, 2024 Affidavit of Special Agent Smyth ("Apartment Warrants Affidavit").) On October 26, 2023, the Hon. Katherine H. Parker, United States Magistrate Judge for the Southern District of New York, issued a warrant and order for the search of several electronic accounts, finding that the affidavit set forth probable cause to believe the electronic accounts contained evidence, fruits, and instrumentalities of the unauthorized practice of law in a federal enclave, in violation of 18 U.S.C. §§ 7, 13 and 2, and N.Y. Jud. L. 484 and 485-a; conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; and wire fraud and wire fraud conspiracy, in violation of 18 U.S.C. § 1343 and 1349. (Def. Ex. B (referenced in the defendant's motion as the "Email Warrants").) On or about April 9, 2024, the Hon. Taryn A. Merkl, United States Magistrate Judge for the Eastern District of New York, issued a warrant and order for the search of the premises on Newbridge Road in East Meadow, New York (Reese's apartment), and Lafayette Avenue in Brooklyn, New York (the apartment of Assata Rhodes, a coconspirator of Reese), again finding that the affidavit set forth probable cause to believe the premises contained evidence, fruits, and instrumentalities of the same offenses as in the Email Warrants as well as false statements to Probation, in violation of 18 U.S.C. § 1001. (Def. Ex. C (referred to in the defendant's brief as the "Apartment Warrants").)[4]

Each warrant sought specific evidence of the scheme outlined in the accompanying affidavit, including, among other things, "[e]vidence concerning the drafting and filing of legal

---

[4] The Apartment Warrants also authorized the search of the persons of Reese and Rhodes.

papers by CHRISTOPHER REESE and his agents, and any money or other thing of value charged

for that service, and concerning the marketing of legal services by REESE, including but not

limited to communications between and among REESE and criminal defendants and their families

and friends." (*See, e.g.*, Def. Ex. B at 80; Def. Ex. C at 54.)

On April 10, 2024, investigators from the U.S. Attorney's Office executed the Apartment

Warrants. During the search, at his apartment, Reese gave a voluntary, non-custodial interview to

Special Agent Smyth. (Reese Decl., Def. Ex. E.) During that interview, Reese admitted, in

substance and in part, that he provides legal assistance to defendants, including research and

writing, and gets paid for his services. Reese also admitted that he was aware of a state law that,

in his estimation, suggested it was not permissible for a non-lawyer such as Reese to file legal

papers in New York State court.[5]

C.  The 2024 Violation Report and Indictment

On April 16, 2024, Probation filed a new violation report, based on Reese's continued

failure to pay restitution, association with felons, and false statements to Probation. (Violation

Report not docketed; *see* 12 Cr. 629, Dkt. 373 (Dec. 5, 2024 Gov. letter in support of preliminary

hearing, describing violation specifications).)

On June 24, 2024, a grand jury sitting in this District returned a five-count indictment

charging Reese with wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One); wire

fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Count Two); unauthorized practice of law in a

federal enclave, in violation of 18 U.S.C. §§ 7, 13 and 2, and N.Y. Jud. L. 484 and 485-a (Count

---

[5] Reese also claimed that Judge Marrero had found it was lawful for Reese to receive payment to
prepare legal documents to be filed in federal court. In fact, as described below, Judge Marrero
found the exact opposite. *United States v. Reese*, No. 12 Cr. 629 (VM), 2022 WL 4467049, at *3
(S.D.N.Y. Sept. 26, 2022).

Three); making false statements to Probation, in violation of 18 U.S.C. §§ 1001 and 2 (Count Four); and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Five). (Dkt. 2.)

## **ARGUMENT**

**I.     The Motion to Dismiss Counts One (Wire Fraud Conspiracy), Two (Wire Fraud) and Five (Money Laundering Conspiracy) Should Be Denied**

Reese moves to dismiss Counts One, Two and Five of the Indictment on the grounds that the counts are insufficiently pled. (Br. 19-22.) But these counts are sufficient as a matter of law because they track the language of the respective statutes and allege the approximate time and place of the alleged criminal conduct, which is all that is required.

A.     <u>Applicable Law</u>

"An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of facts." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (citing *Russell v. United States*, 369 U.S. 749, 763-64 (1962)). The Second Circuit has "consistently upheld indictments that 'do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.' " *United States v. Walsh*, 194 F. 3d 37, 44 (2d Cir. 1999) (quoting *United States v. Tramunti,* 513 F.2d 1087, 1113 (2d Cir. 1975)). Further, "in an indictment for conspiring to commit an offense – in which the conspiracy is the gist of the crime – it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy." *United States v. Wydermyer,* 51 F.3d 319, 325 (2d Cir. 1995) (quoting *Wong Tai v. United States,* 273 U.S. 77, 81 (1927)). "The indictment need only put the defendants on notice that they are being

8

charged with a conspiracy to commit the underlying offense or . . . apprise the grand jury in essential terms of the object of the conspiracy." *Id.* at 325-26.

B. Discussion

Counts One, Two and Five of the Indictment are sufficient on their face because they track the relevant language of the cited statutes and name an approximate time and location for the offenses. Specifically, Counts One and Two track the applicable language of the wire fraud statute, 18 U.S.C. § 1343, with Count One incorporating elements necessary to charge a conspiracy, per 18 U.S.C. § 1349, and Count Five tracks the applicable language of the money laundering statute, 18 U.S.C. § 1956. All three counts allege the dates (from in or about 2020 to at least 2023 for Counts One and Two, and from in or about 2021 through at least in or about 2022 for Count Five) and the location (in the Southern District of New York and elsewhere) of the criminal conduct. On those facts alone, the defendant's motion to dismiss Counts One, Two and Five should be denied.

Reese relies on *United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000), for the proposition that, in instances in which an indictment is generic, it must nonetheless set forth sufficient particulars to put defendant on notice and to charge a crime.[6] (Br. at 19-20.) Here, not only do the charges satisfy the minimum requirements, *Tramunti,* 513 F.2d at 1113, the Indictment also "descend[s] to particulars," *Pirro*, 212 F.2d at 93, providing additional information about the scheme. (Ind. ¶¶ 1-35.) Allegations detail the scheme's misrepresentations, monetary object, and use of the interstate wires. *See id.* Reese urges that each count should be read in a blinkered fashion, treating the rest

---

[6] *Pirro* is in any event distinguishable. *Pirro* was a tax case, not a wire fraud or money laundering case, and the issue was the indictment's failure to plead a specific fact—that the chairman of a company was also one of its shareholders, meaning he should have been listed on a tax form—which fact "made the omission in th[at] case criminal"; without it, there was no crime. *Id.* at 92-94. Reese does not claim, nor could he, that the Indictment fails to identify the facts of his conduct that make that conduct criminal. (*See, e.g.*, Ind. ¶¶ 1-35.)

9

of the Indictment as if it does not exist. Courts in this circuit do not take this approach. *United States v. Mostafa*, 965 F. Supp. 2d 451, 461 (S.D.N.Y. 2013) ("Indictments are to be read as a whole."); *see also United States v. Ansaldi*, 372 F.3d 118, 127 (2d Cir. 2004) (endorsing reading indictments as a whole). This motion should be denied.[7]

## II.    The Motion to Dismiss Count Three (Unauthorized Practice of Law in a Federal Enclave) Should Be Denied

### A.    Count Three of the Indictment Properly Pleads a Criminal Offense

#### 1.    Count Three Pleads Unauthorized Practice of Law in a Federal Enclave

Reese's conduct is punishable under N.Y. Jud. L. 484 and 485-a, as incorporated into federal law by the Assimilative Crimes Act ("ACA"), 18 U.S.C. § 13. The ACA allows federal courts to apply state criminal law to conduct "not made punishable by any enactment of Congress" which occurs within a federal enclave. 18 U.S.C. § 13(a); *United States v. Markiewicz*, 978 F.2d 786, 797 (2d Cir. 1992). Under New York State Judiciary Law, as relevant here, a defendant commits a felony when he (1) makes it a business to practice for another as an attorney in any court, (2) falsely holds himself out as a person who can provide services that only attorneys are authorized to provide, and (3) causes another person to suffer monetary loss or damages exceeding one thousand dollars or other material damage resulting from impairment of a legal right to which the other person is entitled. *See* N.Y. Jud. L. 484, 485-a. As Congress has not enacted a federal

---

[7] Reese's reliance on *United States v. Ashley*, 905 F. Supp. 1146 (E.D.N.Y. 1995), is no more persuasive. There, the district court dismissed two fraud counts where the Indictment failed to provide the defendant with any "facts and circumstances" that would "inform . . . [him] of the specific offence[s] coming under the general description, with which he is charged." *Id.* at 1159. But here, the "to wit" clauses of Counts One and Two more than adequately inform Reese that the charges relate to his scheme to lie to federal inmates to obtain money in connection with the provision of unlicensed legal services.

criminal statute punishing the same conduct, the ACA allows this Court to be a forum for prosecuting Reese's acts in the federal courthouse at 40 Foley Square, a federal enclave.

As alleged, Reese did what the law forbids. Count Three tracks the language of the relevant statutes, apprises the defendant of the nature of the accusation, and sets forth the approximate time and place where the offense was committed, which is all that is required (as further discussed in Section I, above). *See United States v. Flaharty*, 295 F.3d 182, 198 (2d Cir. 2002). Beyond this requirement, the Indictment sets forth specific details of Reese's unlicensed legal business, including his use of a business name, business letterhead, and form contract, as well as his repeated provision of legal services for money, including to Inmate-2, within the federal enclave. (Ind. ¶¶ 14-17, 21).

    2.  <u>New York State Judiciary Law Prohibits the Unauthorized Practice of Law in Federal Court</u>

Reese offers three arguments as to why Count Three is insufficiently plead: (1) the statutes do not cover practice in federal court; (2) Reese's conduct did not constitute "practice for another as an attorney"; and (3) Reese's services were not ones that "only attorneys are authorized to provide." (Br. 12-13.) Courts have already uniformly rejected each of Reese's arguments.

First, New York State law criminalizes the unauthorized practice of law in the state, regardless of whether the law being practiced is state or federal law. As the New York State Court of Appeals held, "[i]n dealing with the question as to what constitutes the unauthorized practice of law, we have not limited the practice of law to New York law. Thus persons or corporations engaging in the practice of Federal law have been found violating the [unauthorized practice] statute." *In re Roel,* 144 N.E.2d 24, 27 (N.Y. 1957) (citing cases); *see also id.* at 26 ("[W]hen legal documents are prepared for a layman by a person in the business of preparing such documents, that person is practicing law whether the documents be prepared in conformity with the law of

11

New York or any other law."). The Second Circuit has agreed. *Spanos v. Skouras Theatres Corp.,* 364 F.2d 161, 165 (2d Cir. 1965) (unauthorized practice "extends to advice involving federal law as well as New York law").

Similarly, courts have uniformly viewed New York State law as prohibiting the unauthorized practice of law in federal courts within the state. In *Solina v. United States*, the Second Circuit observed that an unlicensed lawyer who represented a client in federal court "was engaging in a crime," and that Sections 478 and 484 applied to "any court in the state." 709 F.2d 160, 164 & n.6 (2d Cir. 1983). Judge Marrero also ruled on this issue in Reese's first VOSR proceeding. There, Reese argued that Section 484 did not prohibit his drafting motions in federal courts, only state courts. Judge Marrero disagreed, holding that "Section 484 is broader than Reese's selective quotation and prohibits, among other things, making 'it a business to practice for another as an attorney *in any court*.'" *United States v. Reese*, No. 12 Cr. 629 (VM), 2022 WL 4467049, at *3 (S.D.N.Y. Sept. 26, 2022) (emphasis original), *reconsideration denied*, No. 12 Cr. 629 (VM), 2022 WL 7541864 (S.D.N.Y. Oct. 12, 2022), *certificate of appealability denied*, No. 12 Cr. 629 (VM), 2023 WL 2330195 (S.D.N.Y. Mar. 2, 2023), and *certificate of appealability denied*, No. 22-2683, 2024 WL 4543000 (2d Cir. July 29, 2024). Finally, in an unrelated civil case, Judge Marrero again similarly interpreted Section 484:

> Section 484 is incorporated by *federal* law via the Assimilative Crimes Act, which provides federal criminal jurisdiction over a person who commits an act on federal property that would be a crime if committed in the state in which the federal property sits. *See* 18 U.S.C. § 13(a). Thus the unauthorized practice of law in federal courts sitting in New York constitutes a federal crime notwithstanding Reese's argument about Section 484's use of the phrase "courts of record."

*SGM Holdings LLC v. Andrews*, No. 15 Civ. 8142 (VM), 2024 WL 3674820, at *25 (S.D.N.Y. Aug. 2, 2024).

As to Reese's second and third arguments, New York State law prohibits not only unlicensed courtroom appearances, but also the unlicensed provision of legal advice and drafting of legal documents, anywhere in the state. "It is settled that the practice of law forbidden in this State [by the predecessor statute to Section 484] to all but duly licensed New York attorneys includes legal advice and counsel as well as appearing in the courts and holding oneself out as a lawyer." *Spivak v. Sachs*, 16 N.Y.2d 163, 166-67 (N.Y. 1965); *see also Spanos,* 364 F.2d at 165 ("[U]nlawful practice includes counseling as well as court appearances."). The term "practice of law" is broad enough to encompass "the preparation of legal instruments of all kinds, and in general all advice to clients and all action taken for them in matters connected with the law." *In re Schwerzmann,* 408 N.Y.S.2d 187, 189 (App. Div. 1978).

In light of these rulings, this Court should reject Reese's arguments. By drafting and filing motions for profit in a federal court in New York State, Reese practiced law as an attorney for his victims: he provided advice, engaged in the "preparation of legal instruments," and took "action . . . for them in matters connected with the law." *In re Schwerzmann,* 408 N.Y.S.2d at 189. There is no exception for those who do not disclose their illegal acts to courts and omit their names on the filings they prepared.

3.  Federal Courts Retain the Power to Manage *Pro Hac Vice* Admissions, Defeating Reese's Analogy

In support of his claim that New York Judiciary Law cannot be enforced in federal courts, Reese warns that "if 'any court' [in Section 484] referred to federal courts, then federal court *pro hac vice* admissions would be banned in New York unless the person was already a New York lawyer." (Br. 12-13 & n.9.) Appellate precedent defeats this argument. There is a long-recognized exception to state licensing laws for *pro hac vice* admissions in federal court, based on federal

preemption. This allows state courts to enforce the prohibition on unlicensed federal practice without conflicting with federal courts' ability to control their bar membership.

While "the primary responsibility for the regulation of those who may practice law lies with the state," there is "an exception from such regulation for persons conducting federal litigation . . . because of the federal statute and rules of the district courts." *Spanos*, 364 F.2d at 167. This is so because federal law has preempted state law on this narrow issue. "[W]here federal law authorizes an agent to practice before a federal tribunal, the federal law preempts a state's licensing requirements to the extent that those requirements hinder or obstruct the goals of federal law." *See Surrick v. Killion*, 449 F.3d 520, 530 (3d Cir. 2006) (summarizing *Sperry v. State of Florida,* 373 U.S. 379, 385 (1963)); *see also In re Desilets,* 291 F.3d 925, 930 (6th Cir. 2002) ("When state licensing laws purport to prohibit lawyers from doing that which federal law entitles them to do, the state law must give way."). Thus, "an attorney who practices in the United States District Court for the Southern District of New York after being admitted to practice *pro hac vice* does not violate New York's prohibition against the unauthorized practice of law." *Erbacci, Cerone, & Moriarty, Ltd. v. United States*, 923 F. Supp. 482, 485 (S.D.N.Y. 1996).

Prosecuting Reese for the unlicensed practice of law in federal court is compatible with this rule. Because of preemption, attorneys admitted to practice in federal court will not face state punishment for practicing in federal court, but this does not prevent federal prosecution of a non-attorney who is admitted to *neither* state nor federal courts and violates a state criminal statute in a federal enclave. *See SGM Holdings LLC*, 2024 WL 3674820, at *25 (noting that "New York has the power to prohibit nonlawyer residents of the state from holding themselves out as attorneys and collecting payment in return for *advice* about federal law" and at the same time cannot

"regulate a federal court's policies with respect to the admission of attorneys to practice before [a federal court].").

      B.  <u>There Is No First Amendment Right to For-Profit Unauthorized Practice of Law</u>

As alleged, Reese ran an unlicensed, for-profit legal business. No court has found that the First Amendment protects such conduct, and, contrary to what Reese argues, there is no such protection. The specific provisions of the New York State Judiciary Law charged in the Indictment have not previously been subject to an as-applied First Amendment challenge. As described below, the Government submits that the Court should apply rational basis review, rather than strict scrutiny. However, ultimately, this Court need not decide the level-of-scrutiny issue because Reese's conduct is not protected under any applicable form of constitutional review.

      1.  <u>The Court Should Apply Rational Basis Review to the New York State Statutory Provisions Referenced in Count Three</u>

The parties contest the relevant standard of review for determining the constitutionality of statues Reese is charged with violating. The Government submits that rational basis review is appropriate, while Reese argues that the statutes are subject to strict scrutiny.

For a regulation to succeed under rational basis review, it must simply be "rationally related to legitimate government interests." *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997). In contrast, where a restriction regulates the content of speech, strict scrutiny is ordinarily appropriate, meaning the restriction must be "narrowly tailored to serve compelling state interests." *National Inst. of Fam. & Life Advocs. v. Becerra* (*NIFLA*), 138 S. Ct. 2361, 2371 (2018) ("*NIFLA*"). A law is "narrowly tailored" if it furthers the compelling interest by the "least restrictive means." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991). And, under intermediate scrutiny, a standard that falls in between the two, the

defendant must show "a substantial state interest" and a solution that is "sufficiently drawn" to protect that interest. *See NIFLA*, 138 S. Ct. at 2375.

"Commercial speech" is entitled to lesser First Amendment protection – "to a level of scrutiny resembling rational basis review." *CompassCare v. Hochul*, --- F.4th --- , No. 22-1076-CV, 2025 WL 15386, at *9 (2d Cir. Jan. 2, 2025) (citing *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985)). Advertising regulations, for instance, are subject to a low level of scrutiny, and "an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers," and the requirement is not "unjustified or unduly burdensome." *Id.* The Supreme Court has not precisely defined the contours of commercial speech, but has held that it includes "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980).

The statutes Reese is charged with violating target deceptive commercial conduct, punishing false advertising in connection with an illicit business and financial losses to victims that arise from that business. Each relevant provision has an expressly commercial focus. N.Y. Jud. L. § 484 makes it a crime to "make it a business" to practice as an attorney in a court. N.Y. Jud. L. § 485-a makes it felony for someone to violate section 484 while "falsely hold[ing] himself out as . . . a person who can provide services that only attorneys are authorized to provide" – i.e., engaging in false advertising – and "caus[ing] another person to suffer monetary loss." In each instance, the crime is not the mere unauthorized performance of legal services, but their unauthorized marketing and sale. Accordingly, this statutory scheme is of the type that the Supreme Court has afforded greater leeway. *See Cent. Hudson Gas & Elec. Corp.,* 447 U.S. at 563-64 ("[T]here can be no constitutional objection to the suppression of commercial messages

16

that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it, or commercial speech related to illegal activity.").

To the extent the New York State statutes at issue involve non-commercial speech, such involvement is incidental, and therefore subject to lesser scrutiny. The "States may regulate professional conduct" – including by prohibiting those without a required license from practicing that profession – "even though that conduct incidentally involves speech." *NIFLA,* 138 S. Ct. at 2372-73. While the Supreme Court has not explicitly announced the standard of review for regulations of professional conduct that "incidentally" involve speech, it noted that a lower degree of scrutiny was appropriate. *See id.* at 2372 (citing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456–57 (1978) (remarking that where "speech is an essential but subordinate component" of a transaction, "[w]hile this does not remove the speech from the protection of the First Amendment" altogether, "it lowers the level of appropriate judicial scrutiny")).

In accordance with steady Supreme Court precedent, the Second Circuit has previously rejected constitutional challenges to professional regulations in summary fashion, without applying heightened scrutiny. *See, e.g., Jacoby & Meyers, LLP v. Presiding Justs. of the First, Second, Third & Fourth Dep'ts, App. Div. of the Sup. Ct.*, 852 F.3d 178, 190-91 (2d Cir. 2017) (applying rational-basis review in rejecting challenge to New York's prohibition on nonlawyer investments in law firms); *see also Monroe v. Horwitch*, 820 F. Supp. 682, 683–86 (D. Conn. 1993) ("The prohibition against unauthorized practice of law does not violate plaintiff's First Amendment right to freedom of speech."), *aff'd*, 19 F.3d 9 (2d Cir. 1994) (table), (citing *Hackin v. State*, 102 Ariz. 218, 220, 427 P.2d 910, 912 (1967)). *Cf. T.W. v. New York State Bd. of L. Examiners*, 110 F.4th 71, 90 (2d Cir. 2024) (noting that, in the Fourteenth Amendment context,

17

"[p]rofessional licensing rules are subject only to rational basis review" (citing *Conn v. Gabbert*, 526 U.S. 286, 291-92 (1999))). No intervening Supreme Court ruling, including *NIFLA*, has disturbed that reasoning.[8] As there was no intervening change in the law, this Court should continue to apply rational-basis review to the statutes at issue.

For the proposition that the Court should instead apply strict scrutiny, Reese cites *Upsolve, Inc. v. James*, 604 F. Supp. 3d 97, 108 (S.D.N.Y. 2022) (appeal pending, 22-1345); Br. 14-15. *Upsolve* was an as-applied challenge to New York's unauthorized practice of law statutes by a non-profit organization, which sought to provide free legal services answering debt collection complaints filed in New York City Civil Court. Unlike Reese, the *Upsolve* plaintiffs did not seek to file pleadings, act for clients in court, or handle client funds. 604 F. Supp. 3d at 112. The court found that they "sought to give pure verbal speech." *Id.* at 113. It further clarified that it "does not question the facial validity of New York's [unauthorized practice of law] rules to distinguish between lawyers and non-lawyers in most settings," and that "the issue here is a narrow one: whether the First Amendment protects the precise legal advice that Plaintiffs seek to provide, in the precise setting in which they intend to provide it." 604 F. Supp. 3d at 111–12.

Reese's circumstances are fundamentally different from those in *Upsolve*. Reese is not charged with advising individuals as to how to fill out forms *pro bono*; he marketed himself as a

---

[8] The Fourth Circuit has determined, while acknowledging a lack of firm precedent, that, post-*NIFLA*, "intermediate scrutiny is the appropriate standard for reviewing conduct regulations that incidentally impact speech." *Capital Associated Industries, Inc. v. Stein*, 922 F.3d 198, 209 (4th Cir. 2019). However, neither of the cases it cites in support, *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978), and *Goldfarb*, *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975), announce that rule. Rather, each case merely affirms the strong interest the state has in regulating the practice of law, and neither describes the degree of tailoring required to meet that strong interest. *See id.* In its analysis, the *Capital Associated Industries* court started from the foundation that "the standard for conduct-regulating laws can't be greater than intermediate scrutiny" – a conclusion that is on firm ground. *Id.* at 208-10.

paid legal adviser and took money from litigants and their family members in exchange for drafting and filing papers in federal criminal cases. *Upsolve*'s as-applied challenge simply does not apply to Reese. *See id.* at 107 ("an as-applied challenge only seeks to hold those rules unconstitutional as to Plaintiffs' own activities."). Heightened scrutiny is not appropriate.

      2.   The New York State Statutes Are Constitutional Under Any Level of Scrutiny

Regardless of which level of scrutiny applies, the regulations at issue pass muster as applied to Reese. The Supreme Court has established that the governmental interest in restricting unauthorized professional practice is more than legitimate; it is compelling. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975) ("States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions."); *see also Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Departments*, 852 F.3d 178, 191 (2d Cir. 2017) (New York has a "well-established interest in regulating attorney conduct and in maintaining ethical behavior and independence among the members of the legal profession"); *New York Cnty. Lawyers' Ass'n v. Dacey*, 28 A.D.2d 161, 168, *rev'd on other grounds sub nom. New York Lawyers' Assn. v. Dacey*, 21 N.Y.2d 694 (1967) ("[I]t is nonsensical to suggest that a layman, without the qualifications of an attorney, should be permitted to carry on such activities free of the control of the court."). Such rules are designed to protect the public "from the dangers of legal representation and advice given by persons not trained, examined and licensed for such work, whether they be laymen or lawyers from other jurisdictions." *El Gemayel v. Seaman*, 72 N.Y.2d 701, 705 (N.Y. 1988).

The statutory provisions with which Reese is charged are narrowly tailored to achieve that interest. As noted above, they specially target the commercial aspect of unauthorized law practice,

prohibiting profits, not speech. To further the compelling interest of preventing non-lawyers from taking financial advantage of vulnerable members of the public, there is no means less restrictive than banning the business of unauthorized practice of law and the false advertising thereof.

The tailoring requirement would be even more easily satisfied under intermediate scrutiny. Under that standard, a regulation is sufficiently tailored so long as the "burden imposed" on speech rights is "congruent to the benefits [that the regulation] affords." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 215-16 (1997). Here, the unauthorized-practice statutes do not burden speech to a greater extent than necessary to serve compelling interests. While Reese may not practice law for money, or advertise that unauthorized practice, he remains free to speak and write on legal topics. *See Matter of Rowe*, 80 N.Y.2d 336, 342 (N.Y. 1992).

Reese is off-base in arguing that "the government's interpretation of the statute seems more concerned with preventing Reese from 'Attack[ing] the Attorney Client Relationship.' Ind. at 9, i.e. protecting licensed attorneys from having to answer well-informed complaints from their clients." (Br. 16.) Rather, Count Three arises from Reese's unauthorized "business," meaning, the unlicensed sale of legal services. Reese sought to destroy criminal defendants' relationships with their attorneys as a means of creating demand for that business. But the charged crime is not verbally attacking defense lawyers, it is falsely holding himself out as someone who is able to provide legal services, and taking money in exchange for those services. Contrary to Reese's suggestion (Br. 14), it is also unimportant whether it was pleadings (specifically mentioned elsewhere in the statute) or motions (not expressly mentioned, but judicially recognized as covered legal practice) that Reese was selling, as each is a violation of the statute, *In re Schwerzmann,* 408 N.Y.S.2d at 189, and each affects the rights of a victim who loses money to the unlicensed practitioner.

No court has granted the relief Reese seeks, despite years of enforcement of New York's unauthorized practice regulations, and for good reason. If Reese's conduct were granted First Amendment protection, the longstanding licensing system for lawyers, instituted to protect the public from the unscrupulous and unqualified, would be upended. Granting such a protection would also directly clash with precedent holding that unlicensed practice in a criminal case strikes at the defendant's Sixth Amendment right to counsel.[9] *See Solina*, 709 F.2d 160 (a criminal defendant is denied the Sixth Amendment right to effective assistance of counsel when, unbeknownst to the defendant, the defendant is represented by unlicensed counsel).

The Court should reject Reese's First Amendment claim.

C.   Reese's Preemption Argument Fails

Reese also contends that the ACA does not assimilate N.Y. Jud. L. 484 and 485-a, because it is preempted by the federal contempt statute, following the standard in *Lewis v. United States*, 523 U.S. 155, 164 (1998). (Br. 16-19.) However, under *Lewis*, the ACA properly assimilates the New York State statutes.

*Lewis* provides a two-step test for determining whether a state crime may be assimilated under the ACA. 523 U.S. 155, 164 (1998). First, a court must ask, "is the defendant's act or omission made punishable by any enactment of Congress." *Id*. If the answer is no, then the state criminal law may be assimilated pursuant to the ACA. *Id*. The question is focused on a defendant's underlying conduct, not necessarily the crime for which he is charged. *Id*. at 168-69.

---

[9] Courts have declined to find a Sixth Amendment violation where counsel was unlicensed merely for a "technical defect" in licensed status. For instance, a defense attorney's failure to timely pay bar dues did not violate his client's right to counsel. *Kieser v. People of State of New York*, 56 F.3d 16, 17 (2d Cir. 1995).

At step two, if the relevant underlying conduct is criminalized by federal law, a court asks whether the applicable federal law precludes application of the state law for any one of three reasons: "because [1] its application would interfere with the achievement of a federal policy[;] ... [2] the state law would effectively rewrite an offense definition that Congress carefully considered[;] ... or [3] ... federal statutes reveal an intent to occupy so much of a field as would exclude use of the particular state statute at issue." *Id.* at 164-65. In other words, even if federal law punishes the same conduct as the state statute, the Government may still bring a charge under the ACA if there is no interference with federal policy, the state statute does not rewrite a federal offense definition, and Congress has not occupied the field.

Under the first step of the *Lewis* test, while it may be possible to prosecute Reese under other federal criminal statutes (e.g. as alleged in Count Two of the Indictment, Reese committed wire fraud in connection with his unauthorized law business), there is no direct federal analogue to the state unauthorized practice of law statute.[10] Other statutes may not on their own encompass Reese's specific individual conduct as it relates purely to unauthorized practice, i.e., taking money from victims outside of court, drafting motions under others' names some but not all of which end

---

[10] A federal court may punish the unauthorized practice of law under its inherent powers, *see United States v. Johnson*, 327 F.3d 554, 561 (7th Cir. 2003) (imposing monetary sanctions on "paralegal" business that provided legal advice without attorney supervision), but this falls outside the *Lewis* analysis. The ACA fills gaps in federal criminal statutes for acts or omissions "not made punishable *by any enactment of Congress*." 18 U.S.C. 13(a) (emphasis added). In contrast, a court's inherent powers are "governed not by rule or statute but by the control necessarily vested in the courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO*, 501 U.S. 32, 43 (1991). As the Seventh Circuit explained, the court's inherent powers coexist with statutory remedies: the "existence of controlling statutory or constitutional authority alone, however, does not preclude the court's invocation of its inherent powers. So long as the inherent powers are exercised in harmony with applicable statutory or constitutional alternatives, then the latter need not displace the former." *Johnson*, 327 F.3d at 561.

up docketed in federal cases (some of which are in the pretrial stage, some of which are post-conviction), and never personally appearing in the courtroom.

Reese's brief suggests that his conduct could be punished under 18 U.S.C. § 401(1), the federal direct contempt statute, taken in tandem with 28 U.S.C. § 1654[11] – a suggestion that is incorrect. Under 18 U.S.C. § 401(1), courts may punish the "[m]isbehavior of any person in its presence or so near thereto as to obstruct the administration of justice." *Id.* The elements of contempt are "(1) contemptuous misbehavior, (2) committed in the actual presence of the court, (3) which obstructs the administration of justice." *United States v. Giovanelli*, 897 F.2d 1227, 1230 (2d Cir. 1990) (outlining the three elements of § 401(1)); *see also United States v. Rangolan*, 464 F.3d 321, 324 & n.2 (2d Cir. 2006) (citing *Giovanelli*).

This statute does not punish those who, like Reese, only provide unlicensed legal advice while physically outside the courtroom. In *Rangolan*, the Second Circuit reversed the conviction of a party to a civil trial who handed papers to one of the civil trial's jurors during a meal break, despite its potential impact on the trial, because "conduct taking place in a public cafeteria ten floors away from the courtroom at a time when the court is not in session was not conduct that occurred 'in or so near the presence' of the court as required by § 401(1)." 464 F.3d at 328. Thus, as long as Reese did not physically appear in a courtroom, despite his disruption of the judicial process through his meritless for-profit filings, he would escape prosecution under section 401(1).

Reese's reliance on *United States v. Peterson*, 550 F.2d 379, 384 (7th Cir. 1977), a case that predates *Lewis*, is misplaced. (Br. 18). In *Peterson*, the Ninth Circuit found that Wisconsin's

---

[11] Section 1654 provides that in federal courts, "the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein." This section does not specifically punish anything, and must be read in conjunction with other enactments. *United States v. Peterson*, 550 F.2d 379, 385 (7th Cir. 1977).

law banning unauthorized practice of law was not punishable under the ACA. 550 F.2d at 384. But the defendant in *Peterson* practiced law in the courtroom, and thus the case did not engage with the proximity issue the Second Circuit decided in *Rangolan*, which, as applied to Reese's conduct, rules out application of Section 401(1). In contrast, post-*Lewis*, the Ninth Circuit upheld a prosecution for unauthorized practice of law under the ACA and California's state statute, though that decision analyzed challenges other than of the type Reese raises. *United States v. Clark*, 195 F.3d 446, 448 (9th Cir. 1999).

Even if Reese's conduct were punishable under a federal statute, the second step of *Lewis* makes clear that the ACA appropriately fills a specific gap. Reese points to no federal policy that would be impeded by application of state law – merely allowing the "federal court's assessment of conduct in federal court" (Br. 19) does not preclude application of a statute intended to punish financial malfeasance and protect victims. Indeed, the federal courts rely on state attorney licensing as a requirement for court bar membership, *see, e.g.*, Local Civil Rule 1.3, so federal policy already harmonizes with state law.

Nor is there any evidence that Congress carefully considered and rejected the offense definition set out in the state law. In *Nye v. United States*, 313 U.S. 33 (1941), the Supreme Court discussed the history of the federal contempt statute,[12] explaining that it was a response to a federal judge imprisoning and disbarring a lawyer for criticizing one of the judge's opinions. *Id.* at 45-48. The statute represented "a drastic delimination by Congress of the broad undefined power of the inferior federal courts under the Act of 1789." *Id.* at 45. Punishing the unauthorized practice of law did not factor into that discussion. *See generally, id.*

---

[12] The relevant statute at that time was section 268 of the Judicial Code, a predecessor to section 401, which prohibited "misbehavior of any person in [the court's] presence, or so near thereto as to obstruct the administration of justice." *Nye*, 313 U.S. at 45 n.10.

Finally, there is no indication of any intent by Congress to "occupy so much of the field" as to exclude use of the state statute at issue here. *See Lewis*, 523 U.S. at 164-66. Such an interpretation corresponds with historical respect for the role of states in licensing the professions, along with the concurrent ability of federal courts to determine their own bar membership. *Spanos*, 364 F.2d at 167.

*Lewis* recognized that "Congress did not intend the relevant words—'any enactment'—to carry an absolutely literal meaning," so the ACA can still assimilate "a highly specific state law aimed directly at a serious, narrowly defined evil," even if an act were technically covered by a federal statute that is "broad and . . . clearly aimed at a different kind of harm." 523 U.S. at 161-62. *Lewis* made clear, by example, that a federal prohibition on assault would not preempt a state law punishing murder. *Id.* Such is the case here. Even if Reese's conduct could fall under a broad federal statute, such as obstruction or fraud, these are "clearly aimed at a different kind of harm," while unauthorized practice of law is "highly specific." Ultimately, no federal statute is intended to punish conduct such as the defendant's to the exclusion of the state statute at issue. 523 U.S. at 166.

As the unauthorized practice of law count is properly charged under the ACA, the motion to dismiss Count Three should be denied.

## III.    The Vindictive Prosecution Motion Should Be Denied

The defendant seeks dismissal of the Indictment on the basis that the Government has engaged in vindictive prosecution. (Br. 22-28.) In the alternative, the defendant seeks to disqualify two AUSAs assigned to the case on the basis of their purported personal interest in the outcome of this case. (*Id.*) Both arguments are meritless, and the motion should be denied without further fact-finding.

A. <u>Applicable Law</u>

A vindictive prosecution is one that "punish[es] a person because he has done what the law plainly allows him to do," i.e., such a prosecution "penalize[s] a person's reliance on his legal rights." *See Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978). "Accordingly, an indictment will be dismissed if there is a finding of 'actual' vindictiveness, or if there is a presumption of vindictiveness that has not been rebutted by objective evidence justifying the prosecutor's action." *United States v. Sanders*, 211 F.3d 711, 716 (2d Cir. 2000). "To establish an actual vindictive motive, a defendant must prove objectively that the prosecutor's charging decision was a direct and unjustifiable penalty that resulted solely from the defendant's exercise of a protected legal right." *Sanders*, 211 F.3d at 716-17. "Put another way, the defendant must show that (1) the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse,' and (2) the defendant would not have been prosecuted except for the animus." *Id*. at 717. "A finding of actual vindictiveness requires direct evidence, such as evidence of a statement by the prosecutor, which is available only in a rare case." *United States v. Johnson*, 171 F.3d 139, 140 (2d Cir. 1999) (per curiam).

"To establish a presumption of prosecutorial vindictiveness, the defendant must show that the circumstances of a case pose a realistic likelihood of such vindictiveness." *Sanders*, 211 F.3d at 717. "The circumstances must present a realistic likelihood of vindictiveness that would be applicable in all cases, and any such presumption may be overcome by objective evidence justifying the prosecutor's action." *United States v. Stewart*, 590 F.3d 93, 122 (2d Cir. 2009). The Second Circuit has "consistently adhered to the principle that the presumption of prosecutorial vindictiveness does not exist in a pretrial setting." *Id*.

B.  <u>The Government Is Justified in Prosecuting Reese for His Crimes</u>

Ample evidence justifies Reese's prosecution, which arises not from "vengeance," as Reese falsely alleges, but from Reese's own criminal conduct. The Indictment details the false promises Reese made to his victims, the money he received because of those false promises, and the steps he took to hide his income from Probation. The Indictment was returned after Reese had admitted violating the terms of his supervised release by associating with felons in the context of providing them unlicensed legal services, served a prison sentence for that conduct, and then, as alleged, continued offending after release.

Nonetheless, in sum and substance, Reese argues that his prosecution is vindictive because it is a response to filings that the "[G]overnment believes" he made on behalf of other defendants. (Br. 23.) Specifically, he offers that he has been prosecuted because (i) an Assistant U.S. Attorney "believed Reese called [the AUSA] a liar in the *pro se* filing submitted on behalf of Wayne Hicks" on February 3, 2022, in respect to the existence of plea negotiations (Br. 23, 28) (citing *United States v. Wayne Hicks*, 21 Mag. 9511, ECF No. 18 at 2 (S.D.N.Y. Feb. 3, 2022); ECF No. 20 at 2 (S.D.N.Y. Feb. 9, 2022)); and (ii) "a non-lawyer" (presumably Reese) filed a motion to withdraw a plea on behalf of defendant Jermaine Lightfoot, thereby "disrupting a carefully negotiated guilty plea that was most likely efficient and favorable to both parties" (*see* Br. 24-26, citing *U.S. v. Jermaine Lightfoot*, 21 Cr. 463 (CS), Dkt. No. 70 (S.D.N.Y. Aug. 22, 2022)). Neither of these circumstances give rise to an inference of actual vindictiveness, the appearance of vindictiveness, or a presumption of vindictiveness.

As an initial matter, neither instance involves Reese exercising a protected legal right. The short declaration Reese submits with his motion contains no allegations regarding his vindictive prosecution claim. Reese does not assert that he was the one who drafted or filed either Hicks's

27

motion to dismiss or Lightfoot's motion to withdraw his guilty plea, both of which were supposedly "*pro se*." Thus, even if this activity were protected, the record is not sufficient to attribute it to Reese for purposes of this motion.[13]

Even assuming Reese were to concede he was the author of these filings, both implicate Reese in criminal activity, namely (1) violating his supervised release through association with felons,[14] and (2) acting in furtherance of the scheme ultimately charged by providing unlicensed legal advice. As set forth above, Reese has no right to practice law, which includes drafting and filing motions to dismiss charges or withdraw pleas on behalf of others. And by the terms of his supervised release, Reese had no right to associate with felons at all. *See* 12 Cr. 629 (VM), Dkt. 178 at 4 (S.D.N.Y. Jul. 29, 2014) (Amended Judgment in a Criminal Case against Reese, containing condition prohibiting association with felons); *United States v. Reese,* 22-2184-cr, 22-2628-cr (2d. Cir. Mar. 26, 2024) (summary order) (affirming judgment revoking Reese's supervised release for associating with known felons). Indeed, Reese's contact with Lightfoot was the basis for one of the specified violations of supervised release that Reese admitted on September 9, 2022. (*See* Def. Ex. A at 5, 6-7; Tr. of Sept. 9, 2022 VOSR Guilty Plea at 8-9.) These filings do not support a finding of prosecutorial animus, and Reese has pointed to no other evidence to support such a claim.

---

[13] The Government believes—and intends to prove at trial—that Reese is the author, but for purposes of this motion, Reese has not submitted evidence of his authorship. Reese's unsworn brief goes beyond Reese's declaration, asserting that "Mr. Reese accused [the AUSA] of misconduct" (Br. 24), and "is alleged to have accused the assigned U.S. attorneys of misconduct" (Br. 22)). It references Reese's unsworn assertion in a *pro se* docket filing in this case that in "early 2021" he "began providing assistance to a number of inmates at the Westchester County Jail." (Dkt. 9 at 3, 7 (Jul. 11, 2024).) That filing references Hicks and Lightfoot, without directly claiming that Reese wrote the "pro se motions subsequently filed in those cases." (*Id.*)

[14] Hicks had five prior felony convictions. (*See* Hicks Sentencing Tr. 25:20-23, Dkt. 156, *United States v. Hicks*, 22 Cr. 293 (CS) (S.D.N.Y.) Lightfoot had four prior felony convictions. (*See* Gov. Sentencing Submission at 5, Dkt. 154, *United States v. Lightfoot*, 21 Cr. 463 (CS) (S.D.N.Y.))

Even assuming Reese had a protected legal right to make these filings, the timing of the investigation refutes Reese's theory that the prosecution was the result of these filings. Probation began warning Reese about his conduct before Hicks's February 2022 filings. The March 31, 2022 violation report notes that Probation had directed Reese twice in mid-2021 to not have contact with felons. (Def. Ex. A at 3.) Probation also notified Judge Marrero in 2021 about Reese's failure to pay restitution, which figures prominently in the Indictment, but Probation requested no action after Reese claimed he was not paying because of his own health issues. (*Id.* at 5.) With regard to Lightfoot's motion to withdraw his plea, it was docketed on August 22, 2022, months after Probation filed its March 31, 2022 violation report and May 4, 2022 amended violation report against Reese. (Def. Ex. A at 3.)

Finally, the prosecution cannot be vindictive because ample objective evidence justifies it. Reese was indicted almost two years after the Hicks and Lightfoot filings. In the interim, the Government obtained two search warrants, and, as set forth in the agent affidavits in support of those warrants, the Government also obtained financial records, court filings, email and text communications, among other evidence. (*See* Def. Exs. B, C.) The Indictment is detailed as to the charged crimes, outlining conduct spanning years, containing direct quotes from the defendant's communications, specifying the financial harm he caused to his victims.

Other individuals independent from the U.S. Attorney's Office likewise evaluated Reese's conduct and found it wrongful. The 2022 violation specifications were drafted and submitted by a U.S. Probation Officer, then approved (including twice as amended) by a Supervisory U.S. Probation Officer – Reese presents no reason to believe they had an "axe to grind against the defendant." (*Cf.* Br. 26.) Reese then admitted two of the specifications in a plea agreement with the Government, each involving associating with known felons without the permission of the

United States Probation Office. On April 16, 2024, again before the Indictment was filed, Probation brought a new petition, alleging additional violations of supervised release. (Dkt. 340, *United States v. Reese*, 12 Cr. 629 (VM) (S.D.N.Y.).)

Accordingly, there is no evidence to suggest that the Government engaged in anything but "bringing a defendant to justice with respect to the crime with which he is charged." *Wright v. United States*, 732 F.2d 1048, 1056 (1984). Given that Reese repeatedly committed crimes while under the supervision of the U.S. Probation Office, and in connection with cases involving the U.S. Attorney's Office, it is unsurprising that he would ultimately face legal consequences for his actions. The prosecution is an objectively justified response to Reese's criminal conduct. This motion should be denied without a hearing.

## IV.    The Motion to Suppress Evidence Seized Pursuant to Search Warrants for Electronic Accounts and the Defendant's Residence Should Be Denied

The defendant moves to suppress evidence from the execution of two search warrants, one for various electronic accounts (the "Email Warrants") and one for the search of premises at 115 Newbridge Road and 309 Lafayette Avenue (the "Apartment Warrants"), claiming, in substance, that the warrants were not supported by sufficient facts to establish probable cause for the Subject Offenses, and were overbroad. (Br. 28-40.) The motion is meritless. The warrants authorizing the searches and seizures were valid and sufficiently particularized, and even if they were otherwise, the evidence seized should not be suppressed because of the good-faith exception. Moreover, Reese's declaration did not establish any Fourth Amendment interest in either the electronic accounts or 309 Lafayette Avenue, and so Reese lacks standing to challenge the fruits of those searches.

A.  Reese Lacks Standing to Suppress the Evidence Seized from the Email Warrants
    and the Lafayette Avenue Premises

Reese's motion to suppress evidence seized pursuant to the Email Warrants fails on a threshold issue: he has not established that he has standing to challenge the searches and seizures at issue. "Fourth Amendment rights are personal rights that may not be asserted vicariously." *Rakas v. Illinois,* 439 U.S. 128, 133 (1978). In order to challenge a search or seizure, a defendant "bears the burden of proving . . . that he had a legitimate expectation of privacy" in the account searched or seized. *United States v. Watson*, 404 F.3d 163, 166 (2d Cir. 2005). Specifically, "a defendant must submit an affidavit from someone with personal knowledge demonstrating sufficient facts to show that he had a legally cognizable privacy interest" in the property searched or seized. *United States v. Ruggiero,* 824 F. Supp. 379, 391 (S.D.N.Y. 1993), *aff'd sub nom. United States v. Aulicino,* 44 F.3d 1102 (2d Cir. 1995).

Here, Reese did not submit a sworn declaration claiming ownership of or any cognizable interest in any of the accounts. Rather, Reese's counsel submitted a memorandum of law with the conclusory assertion that the Email Warrants were executed on "Mr. Reese's accounts." (Br. 29.) The unsworn assertions are inadequate because they are not based on personal knowledge; for the purpose of establishing standing, it is also insufficient to cite the hearsay recitations in the Government agent's affidavit, even if these facts point to the defendant's interest. *See United States v. Guzman Loera*, 24 F.4th 144, 157 (2d Cir. 2022) (defendant failed to establish standing where he "relied on the affidavit of an agent lacking personal knowledge that [computer] servers belonged to [the defendant]"); *United States v. White,* No. 17-cr-611 (RWS), 2018 WL 4103490, at *8 (S.D.N.Y. Aug. 28, 2018) (holding that defendant did not have standing to challenge search of Facebook account where defendant failed to show a property or possessory interest, and observing, "[t]his Circuit has routinely rejected efforts by defendants to establish Fourth

31

Amendment standing based on the Government's allegations or evidence."); *United States v. Pizarro,* No. 17 Cr. 151 (AJN), 2018 WL 1737236, at *7 (S.D.N.Y. Apr. 10, 2018) ("The anticipated argument by the Government at trial that some of the phone numbers belonged to the Defendants does not lend them standing.").

With no sworn allegations in support, Reese has failed to establish that he has Fourth Amendment interests in the accounts. His motion to suppress the Email Warrants should be denied on that basis alone. Reese likewise lacks standing to suppress evidence from 309 Lafayette Avenue. Reese makes no showing of any cognizable interest in the other premises searched, which is identified in the agent affidavit as the residence of Assata Rhodes. (Def. Ex. C at 5).

B.    The Warrants Are Supported by Probable Cause and Were Not Overbroad

In deciding whether probable cause exists for a search warrant, a court must determine, based on the "totality of the circumstances," whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 230-31, 238 (1983). So long as the magistrate had a "substantial basis" for concluding that a search would uncover evidence of wrongdoing, "the Fourth Amendment requires no more." *Id.* at 236. Courts accord "great deference" to a judge's determination that probable cause exists, and resolve any doubt about the existence of probable cause in favor of upholding the warrant. *See United States v. Jakobetz,* 955 F.2d 786, 803 (2d Cir. 1992). Affidavits submitted to obtain warrants are "presumed reliable," *United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008). Even if warrants contain erroneous information or material omissions, "[t]he ultimate inquiry is whether . . . there remains a residue of independent and lawful information sufficient to support a finding of probable cause." *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013).

In each affidavit, whose allegations with respect to probable cause substantially overlap, Special Agent Smyth described the investigative steps taken and materials reviewed. This included a review of financial records from Cash App, numerous court filings, email communications, and communications with the U.S. Probation Office. (*See generally* Email Warrants Affidavit at ¶¶ 13-40; Apartment Warrants Affidavit at ¶¶ 12-44.) The facts alleged established probable cause for each of the Subject Offenses.[15]

First, the facts alleged provided probable cause for a conspiracy to defraud the United States under 18 U.S.C. § 371. Reese's submissions used fundamentally dishonest means, as they were purportedly signed by the defendants and labeled as "pro se" ("for oneself"), when in fact they were written and counseled by Reese, who was not licensed to draft them. *See United States v. Johnson*, 327 F.3d 554, 561 (7th Cir. 2003) (in the context of the court's inherent authority to punish unauthorized practice, noting that "[a]ny unauthorized practice of law impacting federal court proceedings necessarily raises the specter of interference with that court's function in a manner effectively indistinguishable from fraud or deceit."). One filing, for which Reese received money, was frivolous, and another cited a case that did not support the motion. (Def. Ex. B ¶18(a).) There was probable cause to believe that such dishonesty obstructed the lawful function of the courts, because, if a court had known the truth, it could have invoked its inherent authority to punish Reese for unauthorized practice. *Id*. By hiding his identity, Reese avoided court scrutiny for his association with felons and failure to pay restitution, a violation of his supervised release. (Def. Ex. B. ¶¶ 19(c), 20.) Reese had the assistance of a coconspirator, Rhodes, in the scheme. (Def. Ex. B, ¶¶ 32-40.)

---

[15] While contesting that probable cause existed for the Subject Offenses, the motion does not substantially contest that the locations searched (the Subject Accounts and Subject Premises) were likely repositories for the evidence sought.

The facts also established probable cause for the wire fraud offenses. Reese was not an attorney, but made legal filings, and received payments on Cash App labeled as "attorney fees," indicating that his victims were deceived as to his status. (Def. Ex. B, ¶¶ 14-18.) Further, Reese made false statements to Probation, understating the income he was receiving over Cash App in order to withhold funds owed in restitution to victims of a previous scheme. (Def. Ex. B, ¶ 15, 19.) The Apartment Warrants Affidavit also discusses Reese's fraudulent conduct toward inmate Yong Wang. It can be inferred from their communications and financial records that Reese had already filed a motion on Wang's behalf. (*See* Def. Ex. C, ¶ 36 (noting memo on 2021 payment to Reese, "for yong wang' motion"), 37 (2022 email from Wang, stating, "my motion got denied . . . . Looks like the argument you mentioned ain't good enough").) With that motion having already been denied, Reese wrote, "We can appeal, or initiate a new motion which will result in the vacatur of the conviction." (*Id.* ¶ 37.) Reese's rosy promise that his filing "*will* result in the vacatur of the conviction" was false, as Reese had no ability to guarantee vacatur with either a new motion or an appeal. The end result proves the point: after Reese made the promise, Wang paid Reese, after which Reese filed the appeal, which was denied. (Def. Ex. C. ¶ 37(b)-(c).)

The facts alleged established probable cause for the offense of unauthorized practice of law in a federal enclave. Allegations describe a business drafting and filing legal papers, involving multiple payments above $1,000 from multiple defendants for multiple filings (Def. Ex. B, ¶¶ 16-40), including before the Second Circuit (Def. Ex. B. ¶¶ 17, 21, 26), run by someone who is not licensed to practice law. (Def. Ex. B, ¶ 14.)

In addition to the Subject Offenses in the Email Warrants, the Apartment Warrants add making false statements to Probation in violation of 18 U.S.C. § 1001 as a Subject Offense. Reese concedes that the Apartment Warrants Affidavit sets out probable cause for this offense (Br. 37),

though Reese argues that the warrants permitted the overbroad seizure of evidence of other Subject Offenses. There was a sufficient factual basis for each of these offenses, so Reese's severance analysis (Br. 37-39) is unnecessary.

Nor were the warrants overbroad. "[A] warrant is legally invalid for overbreadth to the extent it permits officers to search or seize items without probable cause that they contain evidence of a crime." *United States v. Kidd*, 386 F. Supp. 3d 364, 374 (S.D.N.Y. 2019); *cf. United States v. Ulbricht*, 858 F.3d 71, 102 (2d Cir. 2017) (a "warrant may be broad, in that it authorizes the government to search an identified location or object for a wide range of potentially relevant material"); *id.* at 100 (warrants "have always entailed the exposure of records that are not the objects of the search to at least superficial examination in order to identify and seize those records that are. And in many cases, the volume of records properly subject to seizure because of their evidentiary value may be vast."). In determining whether a warrant is overbroad, courts must focus on "whether there exists probable cause to support the breadth of the search that was authorized." *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 464 (S.D.N.Y. 2013). As outlined above, there was ample probable cause to support the warrants, and each sought evidence of the specific scheme outlined in the accompanying affidavit. (*See, e.g.*, Def. Ex. B at 80; Def. Ex. C at 54.)

Reese makes a passing argument that the warrants also lacked particularity, raising and attacking the application of the "all records exception" to the Apartment Warrants. (Br. 35-36). To satisfy the Fourth Amendment's particularity requirement, a warrant must (1) "identify the specific offense for which law enforcement have established probable cause," (2) "describe the place to be searched," and (3) "specify the items to be seized by their relation to designated crimes." *United States v. Purcell*, 967 F.3d 159, 178 (2d Cir. 2020). As already described, the warrants satisfied each of these requirements. Even if they lacked particularity, "[u]nder certain, limited

circumstances, a warrant lacking in particularity can be saved by the so-called 'all records exception,'" under which "all records of a business may be seized if there is probable cause to believe that the entire operation is permeated with fraud.'" *Zemlyansky*, 945 F. Supp. 2d at 460. Even if it were necessary to apply the exception to the seizure of the records of Reese's business, the exception would clearly apply, because the business was completely illegal. Reese's for-profit legal practice violated federal and state law, as described above, and had no lawful component.

Because the warrants were both sufficiently particular and supported by sufficient sworn allegations to make out probable cause, Reese's motion to suppress should be denied.

## C. The Good-Faith Exception Precludes Suppression

Even if there were some defect in the language of the affidavits or warrants, it would not follow that suppression is appropriate. The Court would have to find that a "reasonably well-trained officer should have known that [the judge's] warrant was impermissibly broad." *United States v. Buck,* 813 F.2d 588, 592 (2d Cir. 1987). "[T]he 'good-faith exception' to the exclusionary rule applies when the officers executing a search warrant act with an objectively reasonable good-faith belief that their conduct is lawful." *United States v. Jones,* 43 F.4th 94, 111 (2d Cir. 2022). The Supreme Court has recognized that police reliance on a warrant is not objectively reasonable if, among other things, the warrant application is "so lacking in indicia of probable cause as to render reliance upon it unreasonable." *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (citing *United States v. Leon*, 468 U.S. 897, 923 (1984)).

To the extent the warrants were defective, the good-faith exception would apply. There is no evidence before the Court to support the conclusion either that the warrants were impermissibly broad, or based on insufficient detail, or that agents should have thought so. As explained above,

the application for each warrant presented ample indicia of probable cause. Thus, the agents' reliance on the warrants in conducting the searches was reasonable and in good faith.

## V. The Motion to Suppress Reese's Voluntary Statements to Law Enforcement Should Be Denied

On April 10, 2024, Reese voluntarily agreed to speak with law enforcement after agents executed a search warrant at his premises. He was not in custody—nor does he claim to have been—and there was no pending Indictment at the time. Reese nonetheless moves to suppress his statements under the Sixth Amendment, arguing that his right to counsel had attached at the time of his interview. Reese is wrong, and the motion should be denied.

### A. Applicable Law

"To show a violation of the Sixth Amendment, [the defendant] must establish that his Sixth Amendment right had 'attached' at the time of its claimed violation." *United States v. Gumaer*, 765 F. App'x 608, 613–14 (2d Cir. 2019), *as amended* (Apr. 19, 2019). The Sixth Amendment right to counsel attaches "only when formal judicial proceedings are initiated against an individual by way of indictment, information, arraignment, or preliminary hearing." *Id.* The right to counsel is "offense specific" and does not attach until after adversary criminal proceedings have begun with respect to a particular offense. *Texas v. Cobb*, 532 U.S. 162 (2001); *United States v. Moore*, 670 F.3d 222, 233 (2d Cir. 2012). It is not enough that an offense under investigation is "closely related factually" to an offense that has already been charged. *Cobb*, 532 U.S. at 164. Rather, to determine whether two crimes constitute a single "offense," the offenses must satisfy the test established in *Blockburger v. United States*, 284 U.S. 299 (1932): "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of

a fact which the other does not." *Cobb*, 532 U.S. at 173 (quoting *Blockburger*, 284 U.S. at 304; *see also Moore*, 670 F.3d at 235.

B. Discussion

Reese's suppression motion should be denied because he had no constitutional right to counsel at the time of his interview. When Reese was interviewed by law enforcement on April 10, 2024, the Indictment had not yet been returned against Reese; it would not be returned until June 24, 2024. The only proceeding arguably pending against Reese was the appeal of his violation of supervised release.[16] But Reese had no Sixth Amendment right to counsel in connection with his underlying supervised release proceeding. *See Borrego v. United States*, 975 F. Supp. 520, 523 (S.D.N.Y. 1997) ("[N]o 'constitutionally guaranteed right to counsel' exists at a supervised release revocation hearing." (quoting *United States v. Meeks*, 25 F.3d 1117, 1123 (2d Cir. 1994))). "It follows that no right to counsel attaches to an appeal of a supervised release revocation hearing." *Borrego*, 975 F. Supp. at 523.

Even if Reese had a constitutional right to counsel in connection with the supervised release proceeding (which he did not), those proceedings would not trigger a Sixth Amendment violation in this case because the violation specifications involved different offenses than the Indictment under *Blockburger*. The specifications, for instance, required proof only that Reese associated with known convicted felons without permission from the U.S. Probation Department. (*See* Def. Ex. A at 4-5.) But Count Three requires proof that Reese, in the special maritime and territorial jurisdiction of the United States (i.e., 40 Foley Square), made it a business to practice for another as an attorney in any court, and falsely held himself out as a person who can provide services that

---

[16] By the time of Reese's interview on April 10, 2024, the Second Circuit had already denied his appeal, though the mandate would not issue until May 20, 2024. 12 Cr. 629 Dkt. 118, 121. Probation did not issue a new violation report until April 16, 2024.

only attorneys are authorized to provide; and caused another person to suffer monetary loss exceeding one thousand dollars. Moreover, the specifications for which Reese had been sentenced involved association with felons on various dates in or about 2022 (Def. Ex. A at 4-5), while Count Three charges that Reese committed unauthorized practice of law in or about 2023 (Ind. ¶ 39). Thus, Reese's "offense specific" Sixth Amendment right to counsel did not attach until the grand jury returned the Indictment on June 24, 2024, and even then it attached only as to the charges in that Indictment. Reese's motion to suppress his lawfully conducted interview should be denied.

## **CONCLUSION**

For the reasons stated herein, the Court should deny the defendant's motions.

Dated:  New York, New York
        January 16, 2025

                                       Respectfully submitted,

                                       EDWARD Y. KIM
                                       Acting United States Attorney for the
                                       Southern District of New York

By:      /s                      
                                         T. Josiah Pertz
                                         Kingdar Prussien
                                         Derek Wikstrom
                                         Assistant United States Attorneys
                                         Tel: (212) 637-2246 / 2223 / 1085