P3JsREE1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,              New York, N.Y.

 4              v.                          24 CR 402 (VEC)

 5   CHRISTOPHER REESE,                     Trial

 6              Defendant.

 7   ------------------------------x

 8                                          March 19, 2025
                                            10:05 a.m.
 9

10   Before:

11                  HON. VALERIE E. CAPRONI,

12                                          District Judge
                                            - and a Jury -
13
                             APPEARANCES
14
     MATTHEW PODOLSKY
15        Acting United States Attorney for the
          Southern District of New York
16   BY:  T. JOSIAH PERTZ
          KINGDAR PRUSSIEN
17        JAMES MCMAHON
          Assistant United States Attorneys
18
     ZACHARY MARGULIS-OHNUMA
19   TESS COHEN
          Attorneys for Defendant
20
     ALSO PRESENT:
21   JADA FOOTE, USAO Paralegal Specialist
     ANNE AYOTTE, Paralegal Specialist
22   SEAN SMYTH, Special Agent

23

24

25
```

P3JsREE1

1          (Trial resumed; jury not present)

2          THE DEPUTY CLERK:  Counsel, please state your

3     appearance for the record.

4          MR. PERTZ:  Good morning, your Honor.  For the

5     government, Josiah Pertz, Kingdar Prussien, Jay McMahon, Sean

6     Smyth, Jada Foote.

7          THE COURT:  Good morning, everybody.  The front table

8     can sit down.

9          MR. MARGULIS-OHNUMA:  Zach Margulis-Ohnuma, Tess

10    Cohen, Paralegal Anne Ayotte, with the defendant, Christopher

11    Reese, who is here in court today.

12          Good morning, your Honor.

13          THE COURT:  Good morning, everybody.

14          Good morning, Mr. Reese.

15          THE DEFENDANT:  Good morning, your Honor.

16          THE COURT:  Please be seated.

17          The alternate juror is late.  She just called to say

18    she was at 42nd Street.  That means she's at least 15 minutes

19    away.

20          Anybody want to be heard?

21          MR. PERTZ:  The government has no real position.  We

22    don't mind waiting 15 minutes, if need be.

23          MR. MARGULIS-OHNUMA:  I do mind waiting, but I will

24    waive that objection because we should wait for her.

25          THE COURT:  I mean, it's tempting.  If we hadn't heard

 1   from her, I was prepared to relief her and just hope for the

 2   best with 12.  But she's fifteen minutes away probably.

 3           So my inclination is to wait as well.  So chew on your

 4   fingers a little longer, Mr. Margulis.  As soon as we have a

 5   full jury, I'll be back.

 6           (Recess)

 7           Everybody ready?

 8           ALL PRESENT:  Yes, your Honor.

 9           THE COURT:  Let's get the jury.

10           (Jury present)

11           OK.  Please be seated.  Good morning, everybody.

12           THE JURY:  Good morning.

13           THE COURT:  All right.  As I told you, we're now up to

14   the defense summations.

15           Mr. Margulis.

16           MR. MARGULIS-OHNUMA:  Good morning, everyone.

17           My name is Zach Margulis-Ohnuma, if I haven't had a

18   chance to address you directly.  I want to, first of all, thank

19   you for being here, for paying attention in this incredibly

20   important matter.

21           THE COURT:  OK.  You're either going to need to speak

22   up or put the microphone closer to you.

23           We've only had a half an hour to get the courtroom set

24   up for you.

25           MR. MARGULIS-OHNUMA:  It was ready at 9:30.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1       THE COURT:  OK.

2       MR. MARGULIS-OHNUMA:  So, I'm working with Tess Cohen.

3   You met her at the beginning, and a brilliant paralegal, and

4   Mr. Reese is our lawyer.  It is an exceptional honor for all us

5   to represent Mr. Reese in an American courtroom, just as

6   Ms. Cohen told you at the beginning, where the burden is on the

7   government to prove its case beyond a reasonable doubt.  They

8   haven't done that, and I'm going to spent the next 45 minutes

9   or hour going through the evidence to explain to you why,

10   despite this 20 pages of exhibits and days and days of

11   testimony and a full day or maybe a little more of

12   cross-examination, they haven't proven their case beyond a

13   reasonable doubt.

14       So we heard from four, what the government calls

15   victims, what Mr. Reese calls clients, what I prefer to call

16   customers, but people who had interacted with Mr. Reese.  Tony

17   Stasieluk talked about his from Peter, Peter Misiolek.  Peter

18   was 25 years old.  25 years old.  He didn't kill anybody.  He

19   didn't rape anybody.  And in 2005, he was sentenced to 45 years

20   in prison.  45 years in prison for stealing cars and selling

21   drugs as a young man.  45 years in prison.

22       That was a decision made by the court at the

23   government's urging.  Not this team, but the government.  That

24   is a symptom of -- a broken system that Mr. Reese came and

25   tried to do his best to help.  Of course, and we'll get much

P3JsREE1                    Summation - Mr. Margulis-Ohnuma

1    more into this particular case, of course, with Mr. Misiolek,

2    he thought, how could you possibly plead guilty, take

3    responsibility, and get 45 years for a non-violent, non-sexual

4    crime.

5            And the same story is true for everybody that

6    Mr. Reese talked to.  And when Mr. Reese made those statements

7    to people's families, he believed every single one of them.

8    And they are hard to believe and they are amazing and tough,

9    because you have to understand, you got a taste of it, how the

10   system treats people with criminal convictions.  The people

11   that he's not allowed to talk to.

12           So Mr. Pertz said yesterday -- and I'm not going to

13   address everything he said, but I'm going to get to the heart

14   of it -- he said there is really three points that what he was

15   doing, the business was illegal, that he kept losing, and that

16   he didn't hide it.  None of those things is true.  Being a

17   jailhouse lawyer is not only legal, it's a mitzvah.  It's

18   something that we all should do.  Teaching yourself the law in

19   prison and helping your fellow inmates is not illegal.

20           Now, obviously they are claiming other things happened

21   that pushed it over the line into a crime.  But the basic

22   texture of it, it's something that Mr. Reese told you that he's

23   been doing for 30 years.  And he's not just any jailhouse

24   lawyer.  He's a genius.  You heard him testify, right.  And the

25   government insinuated, you prepped him overnight, you met with

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P3JsREE1                    Summation - Mr. Margulis-Ohnuma

1     him overnight, and insinuated I prepped him.  I couldn't prep

2     him to memorize those hundreds of case.  You heard him go for

3     hours and hours and hours, back and forth with Mr. Pertz, and

4     he had answers to every question.

5          And, look, he got a little long-winded towards the end

6     of the cross-examination, like Maurer, when he got nervous and

7     tired.  When he was on it, he was answering the questions

8     directly.  And the government got to ask everything they wanted

9     to ask him, just like they had done when they met in front of

10    his house.

11         Jailhouse lawyering is legal, and that is the mindset

12    that Mr. Reese was coming from.

13         He didn't keep losing.  Mr. Pertz told you yesterday,

14    well, if 90 percent of the cars crash, they don't have the

15    right safety equipment, you would take them off the road.  This

16    is not cars.  This is every single time Mr. Reese won, it was

17    because there was an injustice, an injustice caused by the

18    government and by a court who made the decision.  Not this

19    court, not this government, but it was because he was righting

20    a wrong.

21         So every time he won, it was a thumb in the eye of the

22    government.  And it doesn't happen very often.  Mostly our

23    government gets it right.  We don't indict -- I mean, in this

24    case, yes.  But, in general, they try not to indict innocent

25    people, right.  So when he gets something overturned, and when

P3JsREE1                    Summation - Mr. Margulis-Ohnuma

1    I get him acquitted, it's because they made a mistake.  It's a

2    thumb in their eye.  When they say he kept losing, that's

3    natural.  That's what happens in criminal defense is you lose a

4    lot of motions.  You know, I couldn't get these two bozo

5    criminal defense lawyers to say -- and I'll get to that in a

6    second.

7            But let me get to the third thing.  He didn't hide it.

8    He used his own e-mail with his own name throughout this

9    scheme.  And we'll get into that in a minute.  He never gave a

10   false name.  Yeah, he blocked some people because, I don't

11   know, sometimes you have to block clients.  Sometimes people

12   are anguished and there is nothing you can do for them.

13   Sometimes you block people.  That doesn't mean he hid it.

14   Doesn't mean they couldn't find him or didn't know where he

15   was.  He was a guy operating himself out of a prison for part

16   of the time.  He didn't hide anything.

17           I mean, this just came up because we're talking about,

18   um, Deborah Recinos who says, you know, my husband is sick and

19   it's COVID times.

20           Let's go back to that slide with the sentence.

21           Yeah.  He got 103 months.  That's a staggering amount

22   of time for a young man.  Staggering amount of time.  He is

23   sick and it's COVID time.  We've just got to get him out

24   quickly.  You know, that's so important.

25           And Mr. Reese was optimistic about that because he had

1    been sick and it had been COVID times and he had gotten himself

2    out on a pro se motion that he brought and the government

3    opposed.  Right.  So, so, now, did you say everything material

4    to your clients?  Did you say everything so they could make a

5    fair decision about whether you were a good jailhouse lawyer or

6    a bad jail house lawyer?

7            In that case, I don't think he did tell Ms. Recinos

8    that he himself had been sick and had gotten out on a COVID --

9    on a COVID compassionate release motion.  But it sure would

10   have made her more likely to hire him, wouldn't it?  So, yeah,

11   he told them -- he didn't not tell them anything that pushed

12   this into fraud.  And that's an example.

13           So, again, jailhouse lawyering is more than legal.

14   It's laudable, especially in this case.  He did keep winning.

15   He had a high percentage.  He didn't hide anything.

16           Well, I shouldn't say that.  I shouldn't say that.

17   There is those texts that were read ad nauseum with Assata

18   Rhodes.  Looks like -- I'm not ready to concede the point, but

19   it looks like he was moving money around and was trying to hide

20   money, for whatever reason.  Nothing to do with the fraud.  He

21   was on probation.  He had restitution obligations.  He moved

22   money around.

23           That's not hiding what he was doing with his clients.

24   He brought hope.  He brought hope, and his clients recognized

25   that.  When someone's going away for -- I mean, I'm thinking of

P3JsREE1                    Summation - Mr. Margulis-Ohnuma

1    Peter's example because, unlike him, I can't keep all these

2    facts in my head.  But when someone is going away for 45 years,

3    yeah, it's natural to say, gosh, that's unfair.  And, gosh, I

4    want to bring you hope.

5         I mean, this is just an example from one of the

6    exhibits where -- this is defense -- I think that's a mistake.

7    I think it's a government exhibit.  It's numbered, not

8    lettered.  It's Government Exhibit 3026.  One of the exhibits

9    they put in is someone saying, Thank you for the hope that you

10   brought me.

11        All right.  So, so let me -- let me do a little bit

12   more of a deep dive whether you win or lose motions.  Here is

13   what I want you to take away from this, which is that Mr. Reese

14   is not here because he's a bad jailhouse lawyer.  He's here

15   because he's a good jailhouse lawyer.  Because he wins motions.

16   Because most defense motions fail.

17        And Mr. Davis was willing to tell us that on

18   cross-examination.  He said a large percentage.  There is no

19   number of them.  But every time, like I said before, every time

20   a defense motion succeeds, something has gone wrong.  Something

21   unjust has happened.  And, therefore, we make a lot of motions

22   and we lose a lot of motions.  And you can't really -- I mean,

23   look, there is something like 1,000 motions on that computer

24   and we've pointed out seven or eight that won.  It's not a bad

25   percentage.  It doesn't tell you anything about whether -- it

P3JsREE1                    Summation - Mr. Margulis-Ohnuma

1   doesn't -- it doesn't tell you that he was on notice that

2   motions would lose that weren't going to lose.  It is typical

3   in the world we work in.  And you have to look at each one on

4   its merits, and I urge you to look at the four where we have

5   full information on them on their merits.

6           I mean, look at what Maurer said about this.  He

7   hemmed and hawed and said, you know, admitted to losing every

8   single motion in that Craig Levin case, and he brought them

9   all.  But, you know, he didn't want to say as clearly as Davis

10  did that most defense motions fail.  That is no evidence that

11  Mr. Reese is a bad jailhouse lawyer.  He's a good jailhouse

12  lawyer.

13          So we haven't talked much about the investigation in

14  this case.  I'm here to tell you that there was a massive

15  investigation.  I put out a little timeline of it.

16          What's happening on the left is Mr. Reese wins motion

17  after motion after motion.  And what's happening on the right

18  is that the government is obtaining search warrants for records

19  after records after records.  Now, we didn't show you this.  We

20  showed the product of the search warrants, right, because we

21  didn't want to waste your time with a lot of stuff about search

22  warrants and where these -- where these records come from.  We

23  just showed you the end result.  But it's in evidence, and you

24  can look at it.

25          Each one of those records, the business records that

P3JsREE1                    Summation - Mr. Margulis-Ohnuma

1    we saw, has what's called a business records certification.

2    You can find it in the government's witness list and you can

3    line it up -- I'm sorry, exhibit list -- and you can line it up

4    against what was happening out in the world where Mr. Reese was

5    winning motion after motion, and the investigation was getting

6    more and more and more intense day by day.

7           So it really comes to a head in the summer of 2022,

8    just before he goes to jail, right.  Remember, he was violated

9    in the spring of '22.  And then in the summer of '22, he keeps

10   winning motions.  And they keep doing search warrants and they

11   keep talking to him.  And they can't get Marrero to say, Hey,

12   cut it out.  They tried to, but they couldn't.  So they keep

13   investigating and they keep investigating.

14          So why didn't we hear much about the investigation?

15   Well, Mr. Smyth, he's right there.  He didn't testify, right.

16   We can't speculate on what he would have said or wouldn't have

17   said.  Instead, we had the guy from the state police come in

18   and he didn't know anything.  He just did what they told him.

19   And he explained to you, though, if you remember this slide,

20   that this investigation was Agent Smyth's investigation.  Right

21   over there.

22          So what would he say?  Don't know.  What we do know is

23   we have the paperwork that was obtained through the

24   investigation, and it was more than just paperwork.  There were

25   searches of iCloud, of Apple.  There were electronic devices

P3JsREE1                    Summation - Mr. Margulis-Ohnuma

1    seized.   The famous laptop, his phone that was under the bed at

2    his house when they came in.   There were records from the

3    probation department.   There were records from Cash App.

4    That's not the name of the company, it was his Cash App

5    records.   There were tax records for both him and his niece

6    Assata.   And for years.   There was the search of his Long

7    Island home.   There was a search of his cousin Assata's home.

8    There was the laptop they got, which you did see quite a large

9    percentage of.   There was the interview that was recorded, that

10   we will hear a snippet of later.   And there was witness

11   preparation, where they went and found witnesses after all this

12   was going on.   We'll talk about that.

13          So have a look at this slide.   I'm sorry if it strains

14   your eyes.   It's really a summary of what's here in the

15   government witness list.   That is the 16, 17, 18, 19 different

16   search warrants of electronic devices and electronic services,

17   financial services that were offered into evidence here.   Look

18   at the timing.   Line it up against what Mr. Reese was doing.

19          So, with that said, that's an overview.   I'm trying to

20   stay organized here.   It's not easy.   It's an overview, and

21   it's a little bit about the investigation that really hasn't

22   come to light yet.

23          I said in five minutes what would have taken days and

24   days, if we had witnesses on every one of those 19 search

25   warrants.   So I hope you guys got it.

P3JsREE1                    Summation - Mr. Margulis-Ohnuma

1          I'm going to talk a little bit about the law and the

2     most important legal principle here, which I will scream from

3     the rafters, which is the American way, is that the government

4     has the burden of proof beyond a reasonable doubt on every

5     single element.

6          Mr. Pertz went over with you, in some detail, I'm not

7     going to do the same thing.  He was very careful to repeat what

8     the judge will say about what the law is.  He didn't add the

9     words beyond a reasonable doubt to every element.  And I'm

10    going to ask you, you have to think, in terms of every

11    element -- there is five charges and each charge there is three

12    or four elements -- from two to four elements -- two to five

13    elements -- each one of those as to be proven beyond a

14    reasonable doubt for you to find Mr. Reese guilty on that

15    charge.

16         So the one that we've been talking about the most, I

17    will really be coming back to over and over, did he act with

18    fraudulent intent or did he act in good faith?

19         And, again, it's not just a question of what happened.

20    It's a question of whether the government has proved it beyond

21    a reasonable doubt.  Now, Mr. Reese got up there on that

22    witness stand and he told you, I did not intend to defraud

23    anybody.  I did not intentionally lie to anybody.  I'm sorry if

24    I was too optimistic with some of my clients.

25         That, ladies and gentlemen, without more, is

1  reasonable doubt.  It's reasonable doubt because he knows what

2  in his head.  If you credit any of his testimony, then there is

3  reasonable doubt in this case.

4         But, of course, there is a lot more basis for that

5  which we'll go over with respect to his intent.  How could he

6  have intended, because, you know, the government says he's

7  lying.  They cross-examined him for a day and a half.  How

8  could we know that he didn't act with fraudulent intent.  And

9  that's sort of what most of the rest of the presentation is

10  about.  Let me go into the other legal points.

11         Has the government proven beyond a reasonable doubt

12  the two conspiracies.  It's bitten off two conspiracies.  It

13  says, one, he had a conspiracy to defraud.  That means he

14  didn't just run this, sort of, fake lawyer scheme by himself,

15  but he got others into the scheme and reached an agreement, a

16  meeting of the minds, with -- I don't know who, I guess his

17  cousin, who helped him with the money, helped him hide the

18  money from probation.  not a good fact for us, but it is what

19  it is.

20         You listened to all of those hours and hours of text

21  messages going back and forth.  Did he conspire with her -- not

22  to hide money from probation -- but to defraud?  Did she know

23  that he was knowingly lying to the customers?  Or did she just

24  know he was a jailhouse lawyer, who was taking money for being

25  a jailhouse lawyer?  That, by itself, as I submit to you, is

P3JsREE1                    Summation - Mr. Margulis-Ohnuma

1    not a crime and not a reason to think that she had criminal

2    intent that would cause a meeting of the minds for a

3    conspiracy.

4          Same with the money laundering.  We haven't talked

5    about it very much.  Again, if there is money laundering,

6    meaning hiding the proceeds, it has to be of specified illegal

7    activity.  So, if it's a money laundering conspiracy, it's not

8    money laundering to launder money away from probation.  It's

9    laundering money that is to hide the proceeds of a fraud

10    scheme.  So you can't have the money laundering without the

11    fraud scheme.

12          And did he agree with someone else to do that?  No.

13          OK.  So with respect to the false statements charge,

14    you have to decide on a particular false -- I mean, in order to

15    convict -- you'll have to decide on a particular false

16    statement -- and I'm going to get to this at the end, because

17    there is a tricky legal principle here -- and that it was

18    capable of influencing a decision of the probation department.

19          And then, because of something called venue, that has

20    to happen in Manhattan, not where he actually was, which was

21    Brooklyn.  I'm going to get back to that, of course, at the

22    end.

23          Again, I want you to think as we go whether these were

24    really materially false statements, statements that have any

25    real influence, or whether the probation officers already knew

P3JsREE1                    Summation - Mr. Margulis-Ohnuma

1    this stuff because he was already under investigation.

2            So, and then with respect to whether he violated the

3    law about unauthorized practice of law.  You know, the idea is

4    that it has to happen on a federal enclave, and a specified

5    federal enclave in this case, is the building across the

6    street, 40 Foley Square.  So did he actually run, intentionally

7    willfully run a law business, at 40 Foley Square.  He never set

8    foot in 40 Foley Square.  Did we hear any testimony?  We heard

9    about an elevator ride in this building, but we didn't hear

10   anything about that federal enclave.  And it has to be -- it

11   has to be there that he ran this business, that he committed

12   the crime.

13           So, in their opening -- I'm sorry, I didn't update

14   this much for the closing -- but I think it was basically will

15   the same thing.  The government said a bunch of things that

16   were wrong.  I'm going to run through them quickly.

17           The government was just wrong about Mr. Reese hiding

18   his identity.  He was using the same e-mail, at least as late

19   as October 2023, that showed his name, which was his real name.

20   It was the Yahoo e-mail.  That was what they said in the

21   opening.  The evidence showed otherwise.  He didn't try to hide

22   his identity.

23           Then there is the whole thing about mailing the

24   letters.  Let me just say for a minute about that.  The same

25   system that gives Peter 45 years for stealing cars and drugs is

1    the system that says, oh, you e-mailed me the brief.  I'm going

2    to send it back.  I'm going to send it back.  To try to keep

3    people in jail.  And it's not fair.  And the fact that he put a

4    fake return address doesn't mean he's the fraudster.  It means

5    we have a problem where he's trying to help people get access

6    to a court because they don't want to spend their entire life

7    in prison when it's patently unfair.

8         So that's not hiding his identity.  He used his name

9    Christopher -- look, he's used it in the past, and they will

10   probably pick on this some more.  He used fake names in the

11   past.  He had fraud claims in the past.  But in this case, he

12   never hid who he was.  He was Christopher Reese, Reesesearch.

13        And, you know, they showed you -- I'm not going to do

14   this right.  He was in prison from September '22 to April 2023.

15   So, obviously, he was struggling to maintain his law practice

16   at that time, but he successfully did it.  And this was a case

17   where he told you, with respect to this letter, or this e-mail,

18   that it was something from where he was sitting next to the

19   person when he sent him the e-mail to see if it would work.

20        Look, he was running his law practice from a phone.

21   Yeah, he might have been breaking prison rules in, you know, in

22   BOP, but he wasn't breaking any laws.  And he certainly wasn't

23   hurting any of the people who asked him for their help.

24        The government was wrong about him making promises to

25   Antuanet Velazco.  When she -- I don't want to mix her up with

P3JsREE1                Summation - Mr. Margulis-Ohnuma

1   Debbie Recinos.  In the opening, they said this man -- they

2   said "this man," they didn't want to use his name.  Mr. Reese

3   promised her that all he had to do was write and submit some

4   legal papers for her and her husband, and her husband would be

5   released right away.

6           Now, if I -- I'm trying to remember what the issue was

7   for Antuanet.  Give me one second.  Again, Mr. Reese can do

8   this off the top of his head, but I can't.

9           So Antuanet was the one where her husband, Henry

10  Echarte-Rivero, was in for 188 months for a drug crime.  And

11  she was desperate to get him out, and he wanted his plea back.

12  So he made overly optimistic statements, no question about it,

13  in that situation to Antuanet, and raised what turned out to be

14  false hopes.  But those were in good faith.  What he did not

15  do, what he did not do is make her a promise, and that came out

16  in the testimony.  He said that it was likely -- it was likely

17  that the case would be dismissed.

18          You know, whether that's true or not, I don't know.

19  But it wasn't, ultimately.  So, Monday morning quarterback, you

20  know, I guess the government wins on that.  But he didn't lie

21  to her about how likely it would be -- he didn't say how likely

22  it would be to be dismissed.  So they are wrong about that.

23          They are wrong about him making guarantees to his

24  clients.  The guarantee was that you don't have to pay -- you

25  pay me a little up front, and then I'm gonna get the guy out

P3JsREE1                    Summation - Mr. Margulis-Ohnuma

1    pending arrest, and it was, well, you don't have to pay if I

2    don't get him out.  That's not the same as promising someone

3    you'll get out or breaking your word on a guarantee.

4            And Debbie Recinos, I mean, there was a lot of back

5    and forth.  But at the end of the day, when you look at her

6    e-mails, they were wrong.  He didn't guarantee her anything.

7    He lowered the price and then when -- you know, when it didn't

8    work out, he didn't ask for more money.  He didn't give her a

9    money-back guarantee.  And that came out in the testimony.

10           They were wrong about some of the technicalities.  I

11   don't want to dwell on this.  We've seen it, whether he

12   reported his Cash App.  He reported his Cash App account to the

13   dollar -- and that's in M-3 and M-2, if you want to have a look

14   at it again -- on two occasions in the probation reports.

15           Everybody knew that Reese was not a lawyer.  Now, I

16   don't know what happened in preparing Antuanet Velazco, but

17   when -- this is important.  When she came and testified, she

18   testified that she didn't know whether or not he was a lawyer.

19   I'm sorry.  She's a nice lady.  But that was a lie.  I don't

20   know where it came from.  It was a lie.  It was overzealousness

21   in her preparation, I suspect, but it wasn't true.

22           Because when she prepared, Agent Smyth took notes.

23   And while we didn't have his testimony, we did have a

24   stipulation.  And when she prepared, she was very clear that he

25   had -- that Christopher Reese did not present himself as a

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1    lawyer.  He presented himself as a paralegal, but someone who

2    could help.  And that they hired him even though he wasn't a

3    lawyer because he would be cheaper than an actual licensed

4    lawyer.  She was very clear about that in her prep.  And I

5    submit to you that is more worthy of belief than what her

6    testimony was on that.

7            There's not a single person, not a single e-mail,

8    where he tries to claim to be an actual lawyer.  He's a

9    jailhouse lawyer.  He's a jailhouse lawyer, and he's on trial

10   for being a great jailhouse lawyer.  Actually, a legendary

11   jailhouse lawyer.  That's how he got so much business because

12   people knew he had all of these successes.

13           Another very important point.  The idea of fraud is

14   that you're greedy and take money at any expense and you don't

15   do the work.  That's not what happened here.  First of all, all

16   of his fee agreements -- and we saw lots of them -- identified

17   him as being a legal assistant, as doing legal work, but not

18   practicing law.  And he would do the work whether or not he got

19   paid.  He worked for lots of people for free.

20           In these cases that we focused on, at least two of

21   them, he didn't demand payment up front.  He was supposed to be

22   paid $2,000.  And if you look at the sequence of it, this is in

23   the documents, he's paid -- he's paid on June 11, $1,000.  He

24   sends -- he works for a week on the motion.  He sends it in.

25   And then he's not actually paid the rest until almost two weeks

P3JsREE1                    Summation - Mr. Margulis-Ohnuma

1    later.  He does --

2            And then the court sits on the motion.  I understand

3    Antuanet Velazco was confused about that.  I understand.  It's

4    not like she can call up the prosecutor who put her husband in

5    prison and say, Sir, what's going on with my husband?  Oh, I'm

6    happy to help you.  You are a family of a criminal.  No

7    problem.  No.  She needs somebody like Mr. Reese, because she

8    couldn't afford someone more qualified with an actual legal

9    education.  But he, in terms of intellect, was qualified to

10   figure out what to do.  So the court is sitting on her motion

11   for a year and she's, like, what's going on.  Reese says, of

12   course, there is nothing I can do.  Courts take their time.  We

13   know how slowly it can move.  But there is this mandamus thing

14   I can do for you.  It will be another 750 because it's work.

15   And that -- I mean, look, it didn't -- it didn't work to get

16   her husband out, but it did work to get the judge to make a

17   decision.  And then he went on and continued to appeal for no

18   additional money.

19           So, he's not it for the money, for the money.  He's in

20   it for freedom.  For freedom, to get people out of these

21   absurdly long prison sentences like the ones that you saw in

22   that first slide, and that are suffered by every single person

23   who came to testify here.

24           Same thing with Ismael Serrano and Debbie Recinos.  He

25   lowered the fee to $2,000.  That wasn't low enough for her.

1   She wanted it back.  I don't blame her, but it was still a very

2   small amount of money.  And he actually did the work before she

3   paid him.  And he continued and did -- if I'm not mistaken,

4   this is the reply, if you look at GX 1102-2.  It's a really

5   long document with a lot of documentation about the horrors --

6   and Mr. Reese had been through them himself -- the horrors of

7   being in prison during COVID.  Government wanted her husband to

8   stay there.  He wanted -- Mr. Reese wanted him out, and wrote a

9   long thing and put his heart and soul in it.  Have a look at

10  it.  It's interesting stuff.

11          All right.  So, again, we just talked a little bit

12  about the investigation for the first time in this whole trial.

13  Where does all this come from, right?  Why are we here?

14          The fact the matter is, I don't know the answer to

15  that question.  At some level, you can't really consider it.

16  But what we do know is this:  Not a single person filed any

17  complaint at any point at any time ever about Christopher

18  Reese.  And we got testimony about that from all four

19  witnesses.  I'm not going to read it to you.  I put it on a

20  slide.  Read it to yourself if you have any doubt about that.

21  Nobody complained.  Nobody felt defrauded.

22          The government got search warrants and investigated,

23  but nobody complained.  There are no victims here.  Nobody was

24  hurt by Mr. Reese.  People were hurt by the system, I would

25  submit.

P3JsREE1                    Summation - Mr. Margulis-Ohnuma

1          There is the last one of Deborah Recinos.  They flew

2     her in.  They prepped her.  Like all the witnesses, they flew

3     them in, they prepped them, got them from out of town, and

4     except for Theresa, I think, was from New Jersey.  But none of

5     them ever came forward and said, Mr. Reese hurt me.  He took my

6     money.

7          OK.  So this is probably the most important slide.

8     You heard it on unfold from Mr. Reese.  He probably explained

9     it better than I can.  But in every one of the cases where we

10    heard testimony, he had a good faith basis for his predictions.

11    He was, in my view, like, as a lawyer, I probably wouldn't say,

12    yeah, your husband is going to be out if you hire me.  That's

13    not the way we talk.  He's not a lawyer.  He's a jailhouse

14    lawyer.  He's not a lawyer, a damn good jailhouse lawyer.

15         And for every one of those statements he had, he had a

16    basis for it, and that's proof that -- and I'm not just

17    trumpeting his wings now.  I'm saying, in every specific case,

18    he had a reason to think that person was going to get out.  So,

19    let me run through those and you can, obviously, look back at

20    the testimony if you have questions about them.

21         So, the first one is Antuanet Velazco.  And, again, I

22    have to get my head around this.  So the question -- that was

23    the 188 months for drugs.  Staggering sentence.  And the issue

24    there was what would be the benefits of pleading guilty.  And

25    what happened -- and unfortunately this happens all the time --

P3JsREE1                  Summation - Mr. Margulis-Ohnuma

1    what happened was that Henry, through third parties, had

2    communicated to Mr. Reese that he hadn't been properly informed

3    when he took the guilty plea that led him to 188 months.  And

4    that turned out to be a lie, according to the judge in the

5    case.  That's GX 407 is the decision in the case.

6         So, Mr. Reese's problem when he was optimistic was

7    that he counted on what his client was saying to be true, and

8    it turned out not to be true.  If your lawyer lies to you about

9    what's going to happen if you plead guilty, that's not a good

10   guilty plea, right.  It's not a voluntary, knowing, and

11   intelligent guilty plea, and it is a ground for relief.  It

12   wasn't in this case because it wasn't believed.  And the lawyer

13   contradicted what the client had said.

14        The point, though -- and I'm sorry this is a little

15   tangled -- but the point is that, when Mr. Reese was overly

16   optimistic, it was because it was based on what Henry had told

17   him.

18        So, Ismael Serrano.  This is what I was thinking

19   about.  COVID.  2020, going into 2021.  Horrifying in the

20   prisons.  Mr. Reese, Ismael Serrano's wife, said, My husband is

21   sick and we've got to get him out because he shouldn't be in

22   there with COVID raging.  Mr. Reese said, I think I can do

23   that.  The reason he thought he could do that is because he had

24   just gotten himself out on a compassionate relief motion, a

25   3582.

1          He was his own first client in this alleged

2     conspiracy, where he filed -- he has health problems.  He told

3     you a little bit about.  Frankly, they are embarrassing.  I

4     won't get into them.  But they were not something you want to

5     have in prison.  This was in the summer or the spring of 2020

6     that he filed his motion, in April, so when COVID was going

7     crazy in New York.  It took a little longer to get to

8     California, which is when Ismael approached him.

9          He filed his own motion.  The government opposed and

10    said, No, we don't care that you're sick.  We don't care that

11    COVID can kill you.  We're going to let you stay in.  And he

12    was -- the judge ordered him released to a halfway house first

13    in June 2020, and then about a month later he was, if I'm not

14    mistaken, he was released altogether, which is when the

15    government says this conspiracy began.

16         That was on a motion for compassionate relief for

17    being an ill person during COVID.  Exactly the same.  Not

18    exactly.  Very, very, very similar facts as Ismael Serrano

19    presented to him.  So when he told Debbie, he thought he could

20    get her husband out, he meant it.  Because he knew.  Because he

21    had gotten himself out that way.

22         And then a couple of months later, he gets this guy

23    Fernandez out.  There's the court decision in Fernandez where

24    his prison sentence was reduced during COVID for illness.

25         All right.  Let's move on.  This Marco Caso is a

P3JsREE1                    Summation - Mr. Margulis-Ohnuma

1    little more complicated.  Totally different situation.  So,

2    Marco had a lawyer and had a guilty plea that he didn't like

3    because it was jacking up his potential sentence because he was

4    considered to be a career offender.  And, now, this gets really

5    complicated because a career offender means you have two

6    underlying crimes in the state.  And it's complicated what

7    counts as an underlying crime and what doesn't.

8           Mr. Reese explained it, probably better than I could,

9    and I think accurately, that there was some question about

10   whether the underlying crime in Marco's case would count as a

11   career offender.  So he spoke, and they talked on the phone.

12   And you heard about it.  And yes, Reese was overconfident.

13   Mr. Maurer or Mr. Davis or I would not present that kind of

14   confidence.  It would hedge, like you keep hearing me hedge,

15   because he's not a lawyer, he's a jailhouse lawyer.

16          But he was truthful, in the sense of, he was not

17   trying to defraud Marco to get him to hire him.  He really

18   believed that Marco was not a career offender.  And he had

19   every reason to believe that, because he had just won the same

20   argument in the Martin Torres case.

21          So, this is the letter from the court-appointed

22   lawyer.  I don't want to be accused of testifying.  Let's just

23   say he's a member of the New York CJA panel, he's a great

24   court-appointed lawyer, Avi Moskowitz.  It's a letter from Avi

25   Moskowitz to Judge Kaplan making the argument that Reese had

P3JsREE1                   Summation - Mr. Margulis-Ohnuma

1    flagged in this other case, Martin Torres, that came up before

2    Marco Caso's case.

3           He makes the argument.  The lawyer adopts it.  The

4    judge accepts it.  He doesn't get -- he doesn't get career

5    offender -- or, actually, I'm not sure how this one came out.

6    I do know, because we have the letter in front of us, that a

7    lawyer adopted the same argument that Marco was asking him to

8    make.

9           We do know the outcome in Vanderhorst, where he made

10   the same argument.  And I believe in that one, it was part of a

11   compassionate relief motion where he said, look, it's COVID.

12   It's dangerous.  And, by the way, the underlying sentence was

13   unfairly long because the guy shouldn't have been a career

14   offender in the first place.  That is what -- that was the same

15   legal issue coming up in a different context.

16          And what did Mr. Reese do with Marco Caso?  Is he went

17   through the lawyer to try to get -- make the argument that

18   Marco Caso should not be sentenced as a career offender because

19   it was a presentencing situation.  Everything he said,

20   Mr. Reese said, he believed in it.  It Wasn't part of a scheme

21   to defraud.  It was part of jailhouse lawyering.

22          When Marco Caso, stuck in jail in Westchester County,

23   couldn't get the attention that he wanted from his own

24   lawyer -- who, by the way, I don't think there is any evidence

25   was a member of the CJA panel, unlike Avi -- Mr. Reese steps

1    in.  It's annoying to that lawyer.  I'll talk about that again

2    in a minute.  I will put it on paper.  But it's in the cause of

3    getting fair sentencing for people, sentences that reflect the

4    law and that are not overly Draconian.  Just like he had done

5    in a different context for Mr. Vanderhorst.

6          There was some talk about another issue -- I'll go

7    through this really quickly -- a technical issue about what

8    kind of drug he was being charged with.  Again, Mr. Reese made

9    very precise statements and those -- on the recording, you have

10   the transcript -- and those were based on something that he saw

11   in the federal register.  He did not make that up.  He believed

12   it in good faith.  And in that case, he didn't even directly

13   approach the court about it.  He approached the guy's lawyer

14   about it, who I don't know if he ended up using the argument or

15   not.  The point is, it was done in good faith.  It had a basis.

16         So, you know what, I -- I made a mistake about whose

17   lawyer was who.  The Avi Moskowitz was one was Barrow.  I

18   apologize for that.  Again, we need Mr. Reese to give this

19   closing.

20         So, with Peter's sentence, it was, however, the same

21   issue about whether Peter -- now, that's the guy, remember,

22   Tony, his high school friend, the very compelling witness, I

23   thought.  I mean, he was -- I don't think he was lying to us.

24   I think he was a little confused about a few things.

25         Peter had taken a -- there is a lot of evidence in

P3JsREE1                   Summation - Mr. Margulis-Ohnuma

1   this case.  Bear with me.  I apologize.  I think I did say

2   right about Avi.  This is the mistake.

3           What we're looking at is Mr. Reese's work.  I think I

4   have -- it is Defense Exhibit F-1, which is Mr. Reese's work,

5   in a case very similar to Peter's.

6           OK.  So what happens with Peter.  This, by the way, is

7   all until the record.  There's a bunch of documents the

8   government put in as exhibits relating to Peter's case that

9   tell the story.  And you can look at the decision about that on

10  Government Exhibit 1218 in evidence.

11          So what happened in Peter's case is that, as a young

12  man when he committed these crimes, he pled guilty with

13  sentencing exposure, is the term we use.  So he had two counts.

14  One was relating to selling stolen cars and the other was

15  related to drugs.  And he pled guilty to those on a deal,

16  hoping for a low sentence because he was pleading guilty.

17          What would be appropriate in that situation?  I mean,

18  I can't do a show of hands, but, like, four years, five years,

19  seven years, nine years.

20          So, but, between when he pled guilty and when he was

21  sentenced, he fled to Poland.  And he was captured in

22  Czechoslovakia and brought back.  And the government, the

23  government, the government and the court, didn't like that.

24  And they gave him 45 years, even though there was no violence,

25  no sex crime.  They gave him the 45 years to teach him a lesson

1    for trying to run to Poland.  And if -- you know, you'll see

2    some stuff in the docket about how he tried constantly to try

3    to get that reduced because it was so patently unfair.

4           And it was unfair because he had no idea, when he

5    fled, that he could get 45 years.  He thought he was going to

6    get six, seven, eight, nine years.  A fair sentence.  So, and

7    anybody looking at that, anybody who is, you know, a wife calls

8    up and said, you know, my husband got 45 years for a nonviolent

9    offense.  Oh, let's have a look at that.

10           The claim was exactly the claim that Mr. Reese had

11   prevailed on in the Barrow case, which is that he didn't know

12   how long the sentence was going to be.  So his lawyer didn't

13   serve him well at the time of the plea.

14           Now, again, was he overly optimistic?  Yes.  Was he

15   right to be confident?  Sure.  It was in good faith because he

16   had just gotten the same thing accomplished for another client.

17   So there is the outcome in the Barrow case.  I think we

18   trumpeted this before.  I think it was, like, 18 life sentences

19   and it was reduced to the 25 years, because of this same issue

20   about sentences running consecutive versus running

21   concurrently.

22           He had won other -- at least one other motion relating

23   to a consecutive sentence.  It's something called aggravated

24   identity theft.  It's not an issue here, of course.  But when

25   you use someone else's identity in a fraud case, you add two

P3JsREE1                    Summation - Mr. Margulis-Ohnuma

1    years' mandatory minimum onto the end of the sentence.  It's a

2    little complicated when it applies.  And there was an attorney

3    error in that case about whether it would be consecutive, as

4    well in the -- sorry -- DX 3, which is the Onamuti case.

5           So that, yeah, that only got two years off.  And the

6    government said, What's the big deal?  He only got two years

7    off.  He's not a good jailhouse lawyer.  In fact, he's a

8    brilliant jailhouse lawyer because he got two years off and

9    because it was an illegal sentence that the government had

10   imposed.

11          The other thing about Peter's case, I think, is proof

12   that Mr. Reese was always acting in good faith is that the

13   records in the docket actually do show that Peter himself was

14   an experienced jailhouse lawyer.  That he made pro se filings.

15          Government Exhibit -- I can't read it, it's too

16   small -- 1217 is Peter's pro se filing.  That was just a few

17   weeks after Reese's pro se filing.  And the decision about

18   whether to hire Mr. Reese to help Peter wasn't really Tony's

19   decision.  It was Peter's decision.  Peter introduced them.

20   Peter asked him do this.  It was Tony's money, it sounds like,

21   and Peter's family members.  But Peter thought he could help

22   because of the communications.  And hopefully they weren't

23   direct, because that would be a violation of probation.  But

24   not a fraud.

25          But because of the communications Peter had with

P3JsREE1                    Summation - Mr. Margulis-Ohnuma

1   Reese, he was in a position, having been in prison already for

2   20 years by this time, or more, to assess -- sorry, a little

3   less, 16 years -- whether Mr. Reese could help him and

4   whether -- how likely the motion would be.  And, sort of,

5   continued it and approached himself.  Again, it was COVID

6   times.  He had already been in jail a damn long time.  It was

7   fair for Mr. Reese to be optimistic.

8           Here is some more about the pro se motions.  Again, we

9   have 20 pages of names of exhibits.  Each exhibit, some of them

10  went into the thousands of pages.  This is all evidence that

11  the government has submitted for you to review.  And you can

12  find more about Peter in there, if you're not persuaded by what

13  I'm saying now.  More about Peter himself, and more about the

14  other cases that we submitted, which are, you know, seven or

15  eight, which give rise to the inference that -- God, that was a

16  fancy lawyer way to say it -- that made Reese think he could

17  win, because he had won other similar cases.  And you can look

18  at the details of those.

19          Another one with -- sorry.  That was the one I just

20  talked about.  That was Onamuti, the two years' consecutive,

21  same issue as in Peter's case.

22          OK.  But, so, that's why everything he said to the

23  clients, potential clients, was justified.

24          I'm going to now pivot and talk about why he thought

25  he was allowed to do this.

1          Do we need a stretch break?  I'm just changing topics.

2     I'm sorry it's long.  No?  OK.  I do.

3          So, look, there was a lot of back-and-forth and you

4     saw it.  You saw two of his three probation officers testify.

5     You saw and heard court testimony.  And you heard lots and lots

6     of cross-examination about why he thought this was OK.  And,

7     yeah, it's cute.  Because what he was told over and over again

8     is don't have contact with felons.  And he, for the most part,

9     tried to obey that, maybe not 100 percent.  He was told to pay

10    his restitution.  He, for the most part, tried to avoid that by

11    those -- hiding the money, right -- by those conversations with

12    Assata Rhodes.

13         But he was never told you can't practice law and he

14    can't file briefs.  You can't have -- give legal advice.  That

15    was not something that he was told.  So let's look quickly at

16    the record on that.

17         I think this, unlike some of the other stuff, was

18    coming in.  So we have his two letters to probation.  I'll just

19    call your attention to the dates.  One is in 2020 to Jingeleski

20    and the other is March 2022, just as he's being violated, to

21    Famularo, who was the officer who testified.

22         At the bail on the violation, Judge Marrero told him

23    he could keep working.  His lawyer argued for that.  The

24    government opposed it.  The government lost.  There was a

25    meeting a couple days later where Famularo reiterated he just

P3JsREE1                    Summation - Mr. Margulis-Ohnuma

1   can't have direct contact with people who have been convicted

2   already, but you can continue working.  Like, you heard her

3   say, They want you to work, they just want you to do it

4   legally.  He was never told you can't draft briefs, you can't

5   file briefs, you can't give advice, you contact consult with

6   people, can't talk to people's lawyers about better strategies.

7   He was never told those things.

8            So, pivoting away from probation and the court, he

9   knew that there were other people doing this.  There was -- we

10  saw one website related to it.  There wasn't a single question

11  in cross on this.  What would be the answer have been?

12           There was something called the National Paralegal

13  Center.  And this, again -- yeah, it's better to get an

14  expensive lawyer.  But if you can't, you hire someone like the

15  National Paralegal Center.  And if you look -- I mean, I'll go

16  through this quickly -- but if you look at the details, they do

17  exactly what he's doing, free case breakdown.  And this was

18  done openly.  And I suspect they don't do it as well as he did.

19           Appellate services, writing appellate brief in New

20  York.  Openly advertised.  Openly advertised.  Look, I mean,

21  whether or not that's unauthorized practice of law is not

22  really the issue.  The issue is whether he thought it was at

23  the time that he was doing these things.  And the answer is he

24  didn't.  Part of the reason he didn't was because he was aware

25  of these other services that openly engaged in the same

1    activities, as long as they don't call themselves a lawyer.

2    There wasn't a shred of evidence, not an iota, that he ever

3    told anyone that he was a lawyer.

4            And that's exactly what he told the agents.

5            I hope this works.

6            You know, at six o'clock in the morning, Mr. Smyth,

7    Mr. Connolly, six or seven other agents wake him up.  He's

8    groggy.  He's texting Assata, Oh, shit.  I'm getting arrested.

9    You know, he knew this was coming, all devices had been

10   searched and the investigation was ripe by this time.  But he

11   still gives a statement to Agent Smyth and Agent Connolly.

12           And let's just listen to the salient part.  It says

13   exactly what he's been saying all along, which is that his

14   understanding was that he was allowed to do this.

15           (Audio played)

16           He's talking -- I screwed this up, I think.

17           He's talking about the bail hearing here.  He's

18   talking about -- which you have the transcript for -- where his

19   understanding was that Judge Marrero said it was legal for him

20   to do this kind if work.

21           (Audio played)

22           It was true he never told anyone he was an attorney.

23   He always said he was offering legal service in his agreements.

24           The question of what paralegals can and can't do is

25   pretty complicated.  And Jim Davis went on and on, if you

1    recall, about some of his paralegals writing briefs for him.

2    He submits them.  But, you know, and some legal secretaries are

3    even better than paralegals.  And paralegals check their work

4    and legal secretaries don't.  I mean, there is no definition of

5    it.

6            And Jim Davis gave us that.  His testimony, the reason

7    this is side by side is because Mr. Davis' testimony directly

8    contradicted the letter that he sent accusing Mr. Reese

9    incorrectly of unlawful practice of law in Mississippi.

10           Davis, and to a larger degree Maurer, the other lawyer

11   from Pennsylvania.  Mr. Reese went in and messed up both of

12   their cases.  Messed up their relationships with their clients

13   and annoyed them.  I understand it.  I get it.  I probably

14   would react the same way.

15           And, therefore, when they advised Mr. Reese that what

16   he was doing --

17           Would you like water?

18           -- when they told Mr. Reese in a threatening way that

19   what you're doing is not allowed, he didn't take them seriously

20   because he knew that they were annoyed that he was talking to

21   their clients behind their back.

22           So, I'm sorry, I don't think Mr. Maurer's testimony is

23   worthy of belief or should be credited in any way for anything.

24   He was just dead wrong about most of what he said.  He accused

25   Mr. Reese of misquoting a case.  Not that it is actually such a

P3JsREE1                    Summation - Mr. Margulis-Ohnuma

 1    big deal in the brief.

 2            And, remember, let's just play it out how this came

 3    out.  Craig Levin had gotten a felony to have sex with

 4    children, was facing decades and decades in prison, had hired

 5    Maurer.  So, the first thing Maurer did was quite manipulative,

 6    really, which is he took ten grand from Levin, and then with

 7    the understanding that he was going to go raise his hand and

 8    say, now I want my $160 CJA for you, the taxpayers, that the

 9    courts would to pay him.  So he did that in order to manipulate

10    himself into the case, when normally the guy would have just

11    gotten whoever the CJA duty was on duty that day.  That, by the

12    way, is the Pennsylvania panel, which I don't know anything

13    about.  I'm not vouching for it in any way.

14            So, so he gets this brief out of the blue.  And there

15    is this snippy e-mails back and forth that end with him

16    accusing Mr. Reese of unauthorized practice of law.  What

17    Mr. Reese sent him was just a brief by itself and said, you may

18    choose, you may elect -- which is too fancy a word, right --

19    you may elect to use these arguments that he has for Mr. Levin.

20    That's not practicing law.  It's having a conversation with

21    someone's lawyer when the person doesn't have that much faith

22    in the lawyer.  And for the lawyer, that's annoying.  I get it.

23    It's annoying.

24            But -- but -- but Maurer's response is completely,

25    utterly unacceptable.  Reese had just gotten out of jail.

P3JsREE1                    Summation - Mr. Margulis-Ohnuma

1   Maurer's client was in jail for a child sex crime. Do you know

2   what that means? Do you know what happens? And what did

3   Maurer say? My client went and admitted everything to the

4   government. Like, that is -- it's Ethics 101 that you don't

5   talk about your client's cases to anybody without permission,

6   whether they are a lawyer or not, whether you believe them or

7   not.

8           And it put Mr. Levin in grave harm. I would hire

9   Mr. Reese over Mr. Levin -- I mean, Mr. Maurer -- in a second.

10  So then he also, you know, nibbled and picked. And, you know,

11  they fault him six times he misspelled America because he used

12  the same format on the top of the page. Sorry, but that's

13  allowed. And the typo is not good, you know, but it happens.

14          Like I'm saying, he's not a lawyer, but he's a

15  phenomenal jailhouse lawyer. And typos are par for the course

16  when people file things pro se and they are jailhouse lawyers.

17          He doesn't misquote cases, though. They didn't find a

18  single example of that. And they tried to claim through Maurer

19  that he misquoted the *Schneider* case. But he didn't. I think

20  we showed you that on the -- on the cross-examination. It's

21  exactly the same thing. What he said, word for word, what's in

22  the case and what was in the brief.

23          So Reese -- this is the one piece of Reese's testimony

24  that I'm quoting. He got what was going on, that Maurer didn't

25  like that Reese was talking to Maurer's client and, therefore,

P3JsREE1                    Summation - Mr. Margulis-Ohnuma

1    was, you know, compounding the ethical violation of revealing

2    his client's confidences.  Maurer went and falsely accused

3    Reese of something that sounds like an unauthorized practice of

4    law.  That is completely non-probative to what Mr. Reese would

5    have thought.  The only reason Maurer was saying that was

6    because he wanted him to bug off and not bother him and

7    interfere with his relationship with Mr. Levin.

8            So that's, you know, if you need to go over that

9    again, I think we've been over it a lot, but it's Exhibit 460

10   is the e-mail exchange.

11           OK.  One or two more points.  I'm going to go faster

12   now.  I get that it's been a long morning already.

13           Government Exhibit 101 -- 1001 -- is a list of

14   25 cases that they say he lost.  Please do not take them at

15   their word on that.  This *Hibbert* case.  I mean, we found one

16   that he clearly didn't lose.  Hibbert was not in prison at the

17   time, based on the evidence that's in the case, the documents.

18   Mr. Hibbert was not in prison at the time.  He was trying to

19   get his sentence reduced anyway.  And Mr. Reese won the appeal.

20   So it was might have been ultimately denied.  Mr. Reese won the

21   appeal that he was hired -- that he was hired to take on, you

22   know, advise, help the client on.

23           The point here is that won and lost in law is not

24   often quite so clear what the objective is or what the outcome

25   is.  And Mr. Reese did phenomenally good, phenomenally good

jailhouse lawyering work, including on cases in Government

Exhibit 1001, which takes 1,000 briefs that they found and

their staff of five people pored through, and these are the 25

that they want to highlight for you.  And they gave you

footnotes.  Check the footnotes.  Check the footnotes, just

like, you know, just like Maurer checked the *Schneider* case.

Here's the grant of the appeal, Defense's C-2 in

*Hibbert* that shows that that chart is not worthy of

consideration.

Mr. Reese had other wins.  He told you about some of

them.  It's been a long morning.  Each one really takes ten

minutes to explain, so I'm not going to do it.  Suffice to say,

Jermaine Lightfoot got to take back his guilty plea.

Derrick Sanders is a free man all because of

phenomenally good jailhouse lawyering of Christopher Reese.

OK.  I think we did the law already.  I'm going to

just make a couple of important points that I skipped over

quickly and let you go.

For the conspiracies, there is no agreement.  Focus on

that.  When I say there is no agreement, I don't have to prove

that.  They have to prove beyond a reasonable doubt a meeting

of that man's mind and another person's mind to commit a crime.

They haven't done it because there is no evidence that

Mr. Reese led Assata Rhodes or anyone else in on any kind of

illegal scheme.  They may have agreed to let him use her

1    computer and sign in as her on Microsoft Word.  That is not a

2    crime.  The meeting of the minds has to be an agreement to

3    commit a crime, and they have to prove it beyond a reasonable

4    doubt.

5              Fraudulent intent, wire fraud, I think we have beaten

6    that one to death.

7              Willful violation, unauthorized practice of law.  We

8    went over the evidence.

9              Once again, though, I remind you, if you have a doubt,

10   a reasonable doubt, then you have to acquit him.  And that's a

11   tough thing to do, right.  If there is a doubt about whether he

12   engaged in the unauthorized practice of law, then he's not

13   guilty.

14             Conduct at 40 Foley Square.  The crime, the

15   unauthorized practice of law -- the judge will instruct you,

16   and you have to defer to what she says, just as what Mr. Pertz

17   says, about the law is what controls.  There is tricky legal

18   questions, and you'll ask her if you need to.  But the law is

19   that the conduct has to take place in the federal enclave

20   across the street at 40 Foley Square.  He has to have engaged

21   in the unauthorized practice of law, meaning he had a business.

22   Not just doing one thing or another thing, but having a

23   business for money to engage in the unauthorized practice of

24   law at 40 Foley Square.  Not at 500 Pearl Street.  Not in

25   Pennsylvania.  Not in California.  At 40 Foley Square.

P3JsREE1                    Summation - Mr. Margulis-Ohnuma

1                And there is no evidence of that.  There is no

2        evidence.  Again, the elevator ride.  But there is no evidence

3        that he step foot in 40 Foley Square.

4                So, with the false statements, this is important, and

5        tricky.  So all of those elements have to be proven beyond a

6        reasonable doubt.  So, if you find beyond a reasonable doubt

7        that he engaged in false statements to probation, then you have

8        to ask yourself, is this the right courthouse for that case.

9        And that's a different standard.  So, that's called venue, is

10       the courthouse where the case is brought.  And there has to be

11       venue.  That's a question for you all whether the venue is

12       proper here in the Southern District in Manhattan, as opposed

13       to in Brooklyn.

14               So every one of those -- Sorry.  So, the crime has to

15       have been committed in the Southern District of New York,

16       which, of course, includes Manhattan.  But all of the conduct

17       relating to the false statement, everything we've heard about

18       the false statement, was he was living in Long Island.  His

19       probation officers were in Brooklyn or Central Islip, Long

20       Island.  And had nothing to do with Manhattan, except that

21       later they decided to go to court here.

22               But the deception against probation, if there was

23       one -- and maybe there was -- but the deception against

24       probation because -- look, I kind of have to say that, because

25       there's a lot of texts back and forth with Assata where they

P3JsREE1                    Summation - Mr. Margulis-Ohnuma

 1    are moving money around.  And that has nothing to do with a

 2    fraud scheme or money laundering scheme, it has to do with

 3    probation.  I'm pretty much conceding that.

 4          So, if there was a false statement to probation, and

 5    it sure wasn't those things we looked at that disclosed his

 6    Cash App.  But if there was underreporting of the income in a

 7    way that is material to probation, in order for you to convict,

 8    that has to swim across the river to Manhattan.  And everything

 9    in the evidence, all the evidence you've seen, is that it's

10    Eastern District probation officers that he was trying to

11    influence.

12          All right.  I'm done.  There's a lot here.  I want to

13    say one thing, one last -- two last things.

14          The first is, Mr. Prussien is a brilliant lawyer also.

15    And he's going to get up and he's going to find things I

16    missed.  There is no question about it.

17          We have done a thorough analysis of the four

18    witnesses' cases.  I have talked about it.  Mr. Reese has

19    talked about it.  There has been time to examine it.  If he

20    comes up with an e-mail --

21          And let me say this, actually.  You know, I wouldn't

22    want someone to look through my phones, my e-mail accounts, my

23    iCloud accounts, and my laptop.  I don't know what they would

24    find.  They haven't -- you can't speculate that there is

25    anything else out there.  There is no further evidence.  There

P3JsREE1                        Summation - Mr. Margulis-Ohnuma

1    is no embarrassing e-mail where he says, Oh, we're going to get

2    $6,000 from this client.  All the bad stuff is there.  You've

3    seen it.

4            But what I'm worried about is that there is something

5    we've missed.  And I just want to submit to you that, standing

6    alone, a single e-mail Mr. Prussien is going to come up with

7    now or a single text message, standing alone, without a witness

8    to back it up, out of context, is never going to be proof

9    beyond a reasonable doubt of anything.  So whatever it is,

10   scrutinize it, consider it, and reject it, unless you have

11   adequate context to really understand it.

12           Mr. Reese is not on trial here for e-mails.  He's on

13   trial in our system for fraud, and that has to be proven beyond

14   a reasonable doubt.  We heard from some witnesses what they

15   said did not amount to fraud beyond a reasonable doubt.  Nobody

16   complained.  Mr. Reese had a good faith basis for every

17   decision he made and every statement he made with respect to

18   those witnesses.

19           There is only one verdict that's consistent with the

20   evidence here, if you apply the law as Judge Caproni gives it

21   to you, and that verdict is not guilty.

22           Thank you.

23           THE COURT:  Thank you, Mr. Margulis.

24           We're going to take a break and let you stretch your

25   legs for a few minutes.  Take a short break, less than ten

P3IsREE6                    Summation - Mr. Prussien

 1  minutes.

 2              We'll bring you back for the rebuttal summation.

 3              (Jury not present)

 4              Five minutes, everybody.

 5              Are you rebutting, or Mr. Prussien?

 6              MR. PRUSSIEN:  I am.

 7              THE COURT:  You didn't seem to be writing anything.

 8  Is it all in your head?

 9              MR. MARGULIS-OHNUMA:  No coaching my adversary, Judge.

10              MR. PRUSSIEN:  You'll see.

11              (Recess)

12              Are you ready?

13              MR. PERTZ:  We're just conferring.

14              THE COURT:  I'll give you another second.

15              MR. PERTZ:  Thank you.

16              (Counsel confer)

17              (Jury present)

18              Please be seated, everybody.

19              Mr. Prussien.

20              MR. PRUSSIEN:  Thank you, again, for your close

21  attention during this trial.  I'm just going to address some

22  arguments that you just heard.  And what you heard is this:

23  Distraction after distraction after distraction.  The defense

24  was designed to do one thing, distract you from the

25  overwhelming evidence that you heard during this trial.

1           Mr. Margulis is a great lawyer.  He's smart, he's

2   experienced, he's many good things.  But he's not a magician,

3   and he can't let all the evidence just disappear with a magic

4   wand.

5           The evidence is the testimony that you heard from the

6   victims, lawyers, probation officers, court staff, and others.

7   The documents you saw that showed Reese was committing the

8   crime.  And the recordings of Reese either overpromising

9   results he knew he couldn't deliver, like what he did with

10  Marco Caso, or admitting to the core substance of the charges

11  here, like he did with Agent Smyth.

12          The evidence is devastating to the defendant.  The

13  evidence clearly shows beyond a reasonable doubt that he's

14  guilty.  That is why the defense wants to distract you.

15          Now, I want to remind you that the defendant has

16  absolutely no burden whatsoever at this trial.  The burden of

17  proof is always on the government.  We embrace that.  The

18  defendant and his lawyers can simply sit there throughout the

19  trial.  They don't have to call any witnesses.  They don't have

20  to cross-examine any witnesses.  They don't have to make any

21  arguments to you.  The government always has the burden, and we

22  embrace that, and we carry it overwhelmingly in this case.

23          But if the defendant does make arguments to you

24  through his lawyers, like you just saw, you get to scrutinize

25  that.  You get to ask yourself, Does that make sense?  And when

P3IsREE6                         Summation - Mr. Prussien

1    the defendant testifies, like he did during this trial, you get

2    to scrutinize that testimony, too.  You don't have to believe a

3    lie just because someone told it on that stand.  You're the

4    judges of the facts, the facts to believe and the facts to

5    reject.

6            I'm going to spend some time speaking with you about

7    how you should scrutinize the arguments you just heard.  I'm

8    not going to address every point.  But I want you to ask

9    yourself a few questions about everything you just heard.

10           Does that really explain all the evidence you saw?  Is

11   that a reasonable understanding of what the testimony was, what

12   you saw with your own eyes?  What you heard with your own ears?

13   Or is it just a distraction?

14           I'll start with the first distraction, that Mr. Reese

15   was so confident because he got himself out on compassionate

16   release.  That is one of his many lies.

17           I'm going to ask Ms. Foote to pull up Government

18   Exhibit 7414.

19               (Continued on next page)

20

21

22

23

24

25

1          MR. PRUSSIEN:  It's the order from Judge Marrero on

2    Christopher Reese's compassionate release motion.

3          THE COURT:  Ut oh, is my tech gremlin back?

4          MR. PRUSSIEN:  Should we move on and come back to it?

5    That's fine.

6          That's not true.  You'll see that in the order.  The

7    defense has said that this case hinges on what's in Christopher

8    Reese's mind.  That he never lied to his customers, that he

9    just truly believed he would win when he said he had

10   100 percent certainty.  Then he would just later lose.  The

11   explanation for this is just overconfidence.  But you know that

12   what Reese says about what's in his own mind is not something

13   you should just believe.

14         He said all the right things to his clients to get

15   paid and he said all the right things during this trial for you

16   to believe him.  You don't have to rely on just Reese's claims

17   on his thoughts and motivations.  You have all the other

18   evidence to consider.  The evidence that Reese's papers failed

19   to do what he promised.  Courts denied his requests again and

20   again.  And maybe rarely a court would do what his papers asked

21   for, but by and large, courts dismissed his arguments, which

22   many courts refused to consider his papers at all.

23         Yet, he told his clients he had 100 percent

24   confidence.  Reese promised some of his victims a money-back

25   guarantee, but made an excuse when they asked for their money

P3JARee2                    Rebuttal - Mr. Prussien

back.  You saw Government Exhibit 412.  And what's that excuse

now?  Not the excuse he made back then, that I just worked so

hard, I deserve this money.  The excuse now is that a full

money-back guarantee doesn't mean full if you don't pay the

full fee.

        Ask yourself, why no partial money-back guarantee for

a partial fee?  Why does full only mean full once in that

sentence?  That doesn't make sense, and you don't have to

believe that.  And what about all the other guarantees you read

in the e-mails?  The e-mails saying you can just pay me when

your loved one is out because they will be.  I know how Chicago

is.  Peter Misiolek is still serving his 45-year sentence.

He's not out.  All of these guarantees were used to convince

his clients to pay him.

        Reese never told the people who gave him money that it

was illegal to practice in the first place and he cannot simply

decide that his own understanding of the law was correct and

that he believed his motions were likely to succeed in the face

of overwhelming evidence that he saw to the contrary, that you

have now also seen.  The defense cannot credibly argue that

Reese simply didn't know he was overpromising results he knew

he could not deliver.

        You heard Reese's own words for yourself.  You heard

the recorded phone calls of him committing the crime, speaking

to Marco Caso, overpromising results he could not deliver and

P3JARee2                              Rebuttal - Mr. Prussien

1    he knew he could not deliver.

2              Yes, Teresa said she was skeptical, Teresa Kardoulias,

3    but she still sent $5,000 of her hard earned money for a motion

4    that was not even considered by the judge.  Caso wasn't capped

5    at ten years as he was told.  He wasn't going to get a sentence

6    of maybe less than five years, as he was told by Reese.  He

7    didn't walk out on sentencing day as he was told by Reese.  He

8    got sentenced to 12 years and he's still in prison, with just

9    $5,000 less money.

10             You saw the e-mails of Reese and his victims doing the

11   same thing, convincing them to pay thousands of dollars by

12   overpromising results he couldn't deliver.  Reese is not on

13   trial for losing motions.  That's a distraction.  He's on trial

14   for lying to people and taking their money.

15             Now, this unauthorized practice of law, we all know

16   that Reese looked up the law.  You know that Reese looked up

17   the law, that he wrote briefs and that he submitted those

18   briefs to the Court.  The defense agrees.  They disagree about

19   whether that counts as a crime.  And again, the defense's

20   argument is that what Reese believed in his own head is all

21   that matters.  That he had no clue he was practicing law in New

22   York.  No hint he was practicing law in New York.

23             You learned that Reese sent these legal papers to

24   courts, including this courthouse and 40 Foley.  He sent

25   filings there.  The servers are there.  You heard all that

P3JARee2                    Rebuttal - Mr. Prussien

1    testimony.  Judge Caproni is going to instruct you on the law,

2    and what she says goes, but you won't hear that Reese had to

3    set up his laptop in 40 Foley and collect cash in 40 Foley for

4    him to commit a crime in 40 Foley.

5            In fact, Reese's defense on this count required you to

6    believe two things that you know cannot be true.  Reese is

7    essentially claiming that the law on unauthorized practice of

8    law is so complicated that even he could not believe it.  The

9    genius, defense called him.  He could not know he was

10   practicing law.  And at the same time, he knew the law better

11   than federal judges, or a federal judge, Judge Marrero, who

12   told him that he couldn't do this.  So he knows the law well

13   enough to be a great jailhouse lawyer, but he doesn't know the

14   law well enough to know that he's even practicing law; does

15   that make any sense to you?

16           He admitted that Marrero's order was binding on him

17   unless he appealed.  And he didn't.  This is Reese just using

18   his usual tactics to sell you on the version of the story he

19   wants to tell regardless of the truth.

20           It is clear and obvious that there's a difference

21   between helping a friend with their homework and then starting

22   a business to get paid to take the SATs for other people.

23   Promising a perfect score, yet getting a terrible score every

24   time.  It's clear and obvious that there's a difference between

25   an inmate helping another inmate submit a court filing and

1    someone who was not in jail getting paid to submit, by his own

2    estimate, thousands of court documents across the country,

3    including in this district.  It's clear and obvious that

4    someone who's not a lawyer cannot practice law, and that

5    includes legal advice and filing briefs for people and getting

6    paid to do that.

7         Reese convinced his victims to pay him for legal

8    services.  But Reese was never a lawyer.  He never took the bar

9    exam.  He never went to law school.  He never passed a legal

10   ethics exam.  Instead, Reese went to prison.  That's his

11   credential?  That's his explanation?  He went to prison and

12   figured out how to do it so well that he started a legitimate

13   business that is so successful that while on probation from

14   another criminal case and supposed to be making payments on

15   that case, he was bringing in hundreds of thousands of dollars

16   that he just so happened to forget to report to probation.

17   Does that sound right to you?

18        The defense argues that the defendant wasn't even in a

19   conspiracy with his niece.  Does that make sense to you?  They

20   were obviously part of a conspiracy.  The charges in this case

21   involve conspiracy, which often include multiple people working

22   together in different roles with different parts to play.

23   That's the whole point of a conspiracy.  Some folks make the

24   pitch.  They lie to the clients.  They get people to pay.

25   Others handle the money and handle the logistics.

P3JARee2                    Rebuttal - Mr. Prussien

1          The scheme is not complicated.  The scheme is not

2    unique.  I expect Judge Caproni will instruct you that the

3    manner or extent of participation in a conspiracy doesn't

4    matter.  What matters is that members deliberately joined the

5    criminal conspiracy.  And on that point, the evidence is

6    overwhelming that the defendant and his niece did so.  You saw

7    not even all the chat messages between the defendant and his

8    niece about how much money she was holding for him, what her

9    cut was, and when they could meet up so that he could get his

10   cut.  Reese wants you to believe that she didn't know that he

11   was lying to people or taking money from desperate people for

12   legal services that he was not allowed to provide.  But that

13   defies common sense.

14         Reese said in the chat messages that Assata Rhodes

15   should send messages on his behalf to inmates in prison via

16   CorrLinks.  That's in Government Exhibit 2 and you can read

17   that.  But on the stand, he told you, with no uncertainty, that

18   was just none of her business.  She didn't know anything.  That

19   was none of her business.  But then the chat showed that was a

20   lie.  He directly instructed her to speak with his clients, and

21   told her exactly what to say at times.

22         The defense argument on venue boils down to something

23   else that your common sense tells you cannot be true.  That

24   Reese could lie to his probation officers on Long Island,

25   basically as much as he wanted, and it had no impact or would

1    have no impact on the probation department in the Southern

2    District of New York, even if the entire purpose and effect of

3    the lie is so he would not have to pay money on court-ordered

4    restitution and not get in trouble in this district for his

5    failure to pay.  But you know now that that's not true.

6           The probation officers testified that they took his

7    statements, transmitted it to the Southern District, and they

8    filed a violation report with the supervising judge.  That's

9    all you need to know.  Those are the facts.  That's what the

10   evidence taught you.

11          So don't be distracted by all of these defenses that

12   focus on collateral issues.  Don't be distracted by the

13   successful motions.  Reese is not on trial for losing motions.

14   He's on trial for overpromising desperate people that he can

15   get their family and friends out of jail when he had no good

16   faith belief to believe what he was saying.

17          The entire part about the government investigation,

18   that was a distraction.  The government is not on trial here.

19   Reese is.  And, unsurprisingly, cases that go to trial are

20   investigated.  It's a distraction that Reese may have

21   supposedly benefited from compassionate release.

22          So I'm not going to pull up that exhibit.  It's a

23   distraction that Reese supposedly benefited from compassionate

24   release.  The issue is not that he did not believe they would

25   all be successful.  The issue is that, in his mind, he did not

believe that he could get all of his clients out on

compassionate release as he was telling his clients.  He was

confident or certain they would be getting out.  You heard what

he told to Marco Caso.  He explicitly says I don't like making

the argument that relies on a judge's compassion.  But that's,

in its sense, in its core, what a compassionate release motion

is.  So he's telling you here now, I thought I could do it for

everyone.  He told Marco Caso, I don't even like to make the

arguments, judges believe that jail should be rough.

Now, I want to touch on a point about whether he got

himself out on compassionate release.  So Judge Marrero denied

that order, but about a month later, Reese was released on

compassionate release by a different judge in the Eastern

District.  So he did get himself out, but that's no reason for

him to believe that clients would subsequently get out and that

he can guarantee results that the other lawyers told you they

would never do.

This "other people were doing it" defense is a

distraction.  It's probably an obvious one because it's a

lesson that parents teach their children that it's no excuse

for bad behavior.  That's no excuse here.  The defense claims

that Reese was helping people.  But does that make sense?

Helping people is the biggest distraction.  He twice admitted

on the stand that his clients were better off with a real

lawyer.  When Reese took people's money for legal services that

1    he guaranteed, but he knew wouldn't work, he lied to them.  He

2    cheated them.  And he committed several federal crimes.

3            Reese lied to people in their most desperate moments

4    to make hundreds of thousands of dollars.  And he lied to hide

5    that money from probation.

6            You know that Reese targeted the friends and family of

7    people serving prison sentences.  He told them exactly what

8    they wanted to hear.  If he could tell that they couldn't pay

9    the full amount, gave them a discount, but asked them to pay in

10   full immediately.  The rest, worry about it later when they're

11   out.  Because they will be.

12           You learned that lawyers, probation officers, and a

13   federal judge told Reese that it was illegal for him to

14   practice law without a license, but he kept doing it anyway.

15           You heard the testimony from some of his victims.

16   Annette Velazco, Debbie Recinos, Teresa Kardoulias, Tony

17   Stasieluk, from Texas, California, New Jersey, Illinois, all

18   separately came and told you essentially the same story.  That

19   Reese promised he could get their loved ones out of jail fast,

20   that he took their money, and that his legal documents didn't

21   work like he told them they would.

22           You heard that testimony yourself.  You heard the

23   testimony from the real lawyers who represented people that

24   Reese targeted.  Richard Maurer and Jim Davis testified that

25   Reese tried to offer legal advice to their clients and they

P3JARee2                    Rebuttal - Mr. Prussien

1  warned him to stop.  They testified that they would never make

2  the promises to their clients that Reese made to his.

3            There is no legitimate business here.  There's crime.

4            Now, the defense talked about the burden of proof, and

5  again, we embrace that burden.  But there's nothing mystical or

6  magical about the beyond a reasonable doubt standard.  It's the

7  burden of proof that's applied in every criminal courtroom

8  across the United States just about every single day.  It's the

9  same burden that's been applied since the founding of this

10  country.

11            You have seen and heard the evidence for yourselves.

12  You now know that Reese ran a scheme to defraud vulnerable

13  people and hide the money he made, that he performed legal

14  services that he was not allowed to do and not qualified to do.

15  The old adage goes:  A little information is a dangerous thing.

16  That's true here.

17            Reese took that information and used it to lie and

18  cheat and make hundreds of thousands of dollars.  And you know

19  that Reese lied to make money.  You know that he lied to cover

20  it up.  You know that's serious.

21            So soon you'll deliberate, and you should reach the

22  only conclusion that's consistent with the evidence, the law,

23  and your common sense.  Christopher Reese is guilty.

24            Thank you.

25            THE COURT:  Thank you, Mr. Prussien.  Okay.  We're

P3JARee2                          Rebuttal - Mr. Prussien

1    going to take a little quick five-minute break.  Just stretch

2    your legs and then I'm going to bring you back and charge you.

3            (Continued on next page)

P3JARee2                         Rebuttal - Mr. Prussien

1              (In open court; jury not present)

2              THE COURT:  Five minutes, everybody.

3              MR. PERTZ:  Judge, can we -- there was one brief thing

4     we wanted to put on the record there.

5              THE COURT:  Okay.

6              MR. PERTZ:  And this stems from a mistake of mine

7     really.

8              THE COURT:  Please be seated, everybody.  Go ahead.

9              MR. PERTZ:  So I was unaware of the Eastern District

10    order.

11             THE COURT:  Who would have been aware of that?  How

12    did the Eastern District decide they had authority over a

13    compassionate release for a Southern District defendant?

14             MR. PERTZ:  I'll leave it to the defense.  I didn't

15    know.  He showed us a copy and we made the correction

16    immediately so just wanted to --

17             THE COURT:  I figured it out.  Figured out that was

18    what happened.

19             MR. MARGULIS-OHNUMA:  Yeah.  Judge, I think this was

20    my mistake.  We should have offered that into evidence.  The

21    answer is he had an Eastern District case that I guess was

22    running concurrently or consecutively.  There may have been a

23    jurisdictional error there for all I know.  There was a

24    compassionate release we shared with -- there was a

25    compassionate release order from Judge Donnelly from the dates

P3JARee2                    Rebuttal - Mr. Prussien

1    that I said.  There was testimony about it.  I guess the

2    problem is going to be if the jury asks for paperwork about it.

3              THE COURT:  It's not in evidence.

4              MR. MARGULIS-OHNUMA:  And that's my error.

5              THE COURT:  Be that as it may, it's not in evidence.

6              MR. MARGULIS-OHNUMA:  I want to make clear that that

7    was not a strategic decision.  That was an error.

8              THE COURT:  I totally understand that.

9              Okay.  Five minutes.

10             (Recess)

11             THE COURT:  Mr. Pertz had it?

12             He's coming?

13             THE DEPUTY CLERK:  I would assume he went to the

14   bathroom when I went back there to get you, so.

15             THE COURT:  Probably.

16             Okay.  We're ready.  You have your thumb drives ready?

17   Have you given them to Angela?

18             MR. MARGULIS-OHNUMA:  One.

19             THE COURT:  Everything is on one, okay.

20             (Continued on next page)

21

22

23

24

25

P3JARee2                              Charge

1            (In open court; jury present)

2            THE COURT:  Please be seated, everybody.

3            Members of the jury, you've now heard all of the

4    evidence.  I am now going to instruct you on the law that

5    governs the case.  There are three parts to these instructions:

6            First, I will provide you with some general

7    instructions about your role and about how you are to decide

8    the facts of the case.  These instructions would apply to just

9    about any trial.

10           Second, I will give you specific instructions about

11   the legal rules applicable to this particular case.

12           And third, I will give you instructions on the general

13   rules governing your deliberations.

14           I will read most of this.  It's not my favorite way to

15   communicate with a jury, but because there is a need for

16   precision, it's important that I get the words just right, and

17   so that's why I will be reading.

18           I have provided each of you with a copy of the charge.

19   That's the black binder that was on your seat.  If you find it

20   easier to listen and understand while you're reading along,

21   please do so.  I am currently on page three if you would like

22   to find where we are.  If would you prefer, you can just

23   listen.  Either way, you're going to have a copy of the charge

24   with you in the jury room so you can consult it if you want to

25   reread any portion to facilitate your deliberations.  You will

P3JARee2                        Charge

1    also have it in the jury room a verdict form on which to record

2    your verdict.  That's in the pocket of your binder.

3            It is my duty to instruct you on the law, just as it

4    has been my duty to preside over the trial and decide what

5    testimony and evidence is relevant for your consideration.

6    It's your duty to accept my instructions on the law and to

7    apply them to the facts as you determine them.

8            On legal matters, you must take the law as I give it

9    to you.  You may not substitute your own notions or opinions of

10   what the law is or ought to be.  You should not be concerned

11   about the wisdom of any rule of law that I state.  Regardless

12   of any opinions that you may have as to what the law is or

13   should be, it would violate your sworn duty to base a verdict

14   upon any view of the law other than that which I give you.

15           If a party has stated a legal principle different from

16   what I tell you, you must follow my instructions.  You should

17   not single out any particular instruction as alone stating the

18   law.  You should consider my instructions as a whole as you

19   deliberate.

20           You should not infer from anything I have said or done

21   during this trial that I have any view on the credibility of

22   the witnesses or any view about how you should decide the case.

23   I have no opinion as to the facts or the verdict that you

24   should render in this case.

25           You are the sole and exclusive judges of the facts.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P3JARee2                          Charge

1    You determine the credibility of the witnesses.  You resolve

2    any conflicts that might exist in the evidence.  You draw

3    whatever reasonable inferences you decide to draw from the

4    facts as you have determined them, and you determine the weight

5    to give the various pieces of evidence.

6              You must base your discussions and decisions solely on

7    the evidence presented to you during the trial and that

8    evidence alone.  You may not consider or speculate on matters

9    not in evidence or matters outside the case.

10             As I told you at the outset of the case, it is the

11   duty of the parties to object when one side offers testimony or

12   evidence that the other party believes is not properly

13   admissible.  Therefore, you should draw no inference if there

14   was an objection to certain evidence.  Nor should you draw any

15   inference from the fact that I may have sustained or overruled

16   the objection.

17             You are required to evaluate the evidence calmly and

18   objectively, and you must be completely fair and impartial.

19   Your verdict must be based solely on the evidence introduced at

20   this trial, or the lack of evidence.  The parties in this case

21   are entitled to a trial free from prejudice or bias for or

22   against either side.  Our judicial system works only if you

23   reach your verdict through a completely fair and impartial

24   consideration of the evidence.

25             In deciding the facts of the case, it would be

P3JARee2                    Charge

improper for you to consider any personal feelings you may have

about any party or any witness, any punishment that might be

imposed, or any other such irrelevant factor.  This case must

be decided by you as an action between parties of equal

standing in the community and of equal worth.  All parties are

entitled to the same fair trial.  The government and the

defendant stand as equals before the law and are to be dealt

with as equals in this Court.

          Mr. Reese is charged with more than one crime.  Please

bear in mind that a charge is not evidence of anything and that

Mr. Reese is presumed innocent of each charge.

          The government has the burden of proving every element

of each charge beyond a reasonable doubt.  If the government

succeeds in meeting its burden on a particular charge, your

verdict must be guilty on that charge; if it fails, your

verdict must be not guilty on that charge.  The burden of proof

never shifts to the defendant.  The law presumes every

defendant to be innocent and therefore never imposes upon a

defendant in a criminal case the burden of duty or calling any

witness or producing any evidence.

          In other words, as to each charge, the defendant

starts with a clean slate and is presumed innocent until such

time, if ever, that you as a jury are satisfied that the

government has proven beyond a reasonable doubt, that he is

guilty of that crime.

1          The question then becomes:  What is reasonable doubt?

2          The words almost define themselves.  It is a doubt

3     based on reason and common sense.  It is a doubt that a

4     reasonable person has after carefully weighing all of the

5     evidence.  It's a doubt that would cause a reasonable person to

6     hesitate to act in a matter of importance in his or her

7     personal life.  Proof beyond a reasonable doubt must,

8     therefore, be proof that is so convincing that a reasonable

9     person would not hesitate to rely upon it in making an

10    important decision in his or her own life.

11         Proof beyond a reasonable doubt is not, however, proof

12    beyond all possible doubt.  A reasonable doubt is not a doubt

13    based on caprice or whim.  Nor is it a doubt based on

14    speculation or suspicion.  Reasonable doubt is also not an

15    excuse to avoid the performance of an unpleasant duty.

16         If, after a fair and impartial consideration of all of

17    the evidence, you have a reasonable doubt as to Mr. Reese's

18    guilt as to a particular charge, you must find him not guilty

19    on that charge.  On the other hand, if after a fair and

20    impartial consideration of all of the evidence, you are

21    satisfied beyond a reasonable doubt of Mr. Reese's guilt on

22    that charge, then you must find him guilty of that charge.

23         I want to take a moment to describe to you what is and

24    is not evidence in this case.  As I have said, you must rely

25    only on evidence in your deliberations.  The evidence in this

P3JARee2                         Charge

1    case is the sworn testimony of the witnesses, the exhibits, and

2    the stipulations that were received in evidence.  Other things

3    are not evidence.

4           A question is not evidence.  The witnesses' answers

5    are the evidence, not the questions.  Similarly, documents

6    shown to a witness to refresh their recollection are not

7    evidence; only the witnesses' answers are evidence.

8           Arguments by the parties are not evidence.  What the

9    parties said in their opening statements and in their

10   summations was intended to help you understand the evidence and

11   to reach a verdict.  If your recollection of the evidence

12   differs from what any party said, it is your recollection that

13   controls.

14          Statements that I may have made concerning the

15   evidence are not evidence.

16          Testimony that has been stricken or excluded is not

17   evidence, and it may not be considered by you in rendering your

18   verdict.

19          Anything you may have seen or heard outside the

20   courtroom is not evidence.

21          Now I will discuss what is evidence.  Evidence may

22   come in several forms:

23          The sworn testimony of witnesses, regardless of who

24   calls the witness, is evidence.  This is true of the witnesses'

25   answers on both direct and cross-examination.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P3JARee2                    Charge

1          The exhibits that were admitted during the trial are

2   evidence.

3          The stipulations that the parties agreed to and that

4   were read during the trial are evidence.  You must accept as

5   true the facts to which the parties stipulated.  Some of the

6   stipulations were about what a witness would have said if he or

7   she had been called to testify.  You must accept as true the

8   fact that the witness would have given that testimony, but it's

9   up to you to determine the weight or importance of that

10  testimony.

11         Generally, there are two types of evidence you may

12  consider in reaching your verdict:  Direct and circumstantial.

13         Direct evidence is testimony by a witness about

14  something he or she knows by virtue of his or her own

15  senses — something that he or she has done, seen, felt,

16  touched, or heard.  For example, if a witness testified that on

17  the day in question she was in her office, and she could see

18  that it was raining all day, that would be direct evidence

19  about the weather on that day.

20         Circumstantial evidence is evidence of one fact from

21  which you infer the existence of other facts.  For example,

22  assume a witness testified that his office does not have a

23  window.  On the day in question, however, he saw numerous

24  people coming into the office with wet raincoats and carrying

25  dripping umbrellas.  That testimony about wet raincoats and

P3JARee2                    Charge

dripping umbrellas is circumstantial evidence that it was

raining that day.  So even though you have no direct evidence

regarding the weather, you have circumstantial evidence that it

was raining.

        With circumstantial evidence, you must be careful to

draw reasonable inferences that reflect all of the evidence.

For example, if you live in the city and you wake up in the

morning and you see that the sidewalk is wet but the street is

dry, it is not reasonable to infer that it rained last night.

Instead, a more reasonable inference would be that the building

staff has hosed down the sidewalk.

        That's all there is to circumstantial evidence.  You

infer on the basis of reason and common sense from one fact (in

my first example, dripping raincoats and umbrellas) the

existence or nonexistence of some other fact (in that case

rainy weather).  When circumstantial evidence is presented it

is of no less weight than direct evidence.

        You have had the opportunity to observe the witnesses.

You are the sole judges of the credibility of each witness and

of the importance of his or her testimony.  Decide what

testimony to believe and what not to believe.  Consider each

witness's demeanor and manner of testifying; the witness's

opportunity to see, hear, and know about the events described;

the witness's ability to recall and describe those things; and

the reasonableness of the testimony in light of all the other

P3JARee2                        Charge

 1    evidence in the case.  Consider whether part of a witness's

 2    testimony was contradicted or supported by other testimony, by

 3    what the witness said or did on a particular occasion, or by

 4    the testimony of other witnesses or by other evidence.

 5            You should consider whether the witness had an

 6    opportunity to observe the facts he or she testified about.

 7    You should also consider whether the witness's recollection of

 8    the facts stands up in light of the other evidence in the case.

 9            If you find that a witness has willfully testified

10    falsely as to an important matter, you may disregard the

11    witness's entire testimony, or you may accept as much of the

12    testimony as you find to be true and disregard what you find to

13    be false.  A witness may have been mistaken or may have lied in

14    part of his or her testimony while having been accurate and

15    truthful in other parts.

16            You heard testimony from two licensed attorneys,

17    Richard Maurer and James Davis.  They each testified about

18    various rules, laws, and statements that they believe

19    Mr. Reese's conduct violated.  You may not consider their

20    opinion that Mr. Reese's conduct violated the law of

21    Mississippi or Pennsylvania for any reason.  You may consider

22    the warnings those attorneys gave to Mr. Reese to the extent

23    you find them relevant to Mr. Reese's state of mind, and for no

24    other reason.

25            In deciding whether to believe a witness, you should

P3JARee2                          Charge

1    specifically note any evidence of hostility or affection that

2    the witness may have had for or against Mr. Reese.  Likewise,

3    you should consider evidence of any other interest or motive

4    that the witness may have in cooperating with or helping either

5    party.

6         It's your duty to consider whether the witness has

7    permitted any such bias or interest to color his or her

8    testimony.  If you find that a witness is biased, you should

9    view his or her testimony with caution, weigh it with care, and

10   subject it to close and searching scrutiny.

11        Of course, the mere fact that a witness is interested

12   in the outcome of the case does not mean the witness has not

13   told the truth.  It is for you to decide based on your

14   observations, your common sense, experience, and all the other

15   considerations mentioned whether the possible interest of a

16   witness in the outcome of the case has intentionally or

17   otherwise colored or distorted his or her testimony.  You are

18   not required to believe or disbelieve an interested witness.

19   You may accept as much of the testimony as you deem reliable

20   and reject as much as you deem unworthy of belief.

21        You have heard evidence during the trial that certain

22   witnesses met with the government or the defense before that

23   witness appeared in court.  There is nothing either unusual or

24   improper about a witness meeting with a party that is calling

25   the witness before testifying.  These meetings allow the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P3JARee2                        Charge

1    witness to know the subjects that that he or she will be

2    questioned about, focus on those subjects, and have an

3    opportunity to review relevant exhibits before being questioned

4    about them.  Such consultation makes the trial process more

5    efficient.  In fact, it would be unusual for a party to call a

6    witness without such consultation.

7              What weight, if any, you give to the fact or nature of

8    the witness's preparation for his or her testimony, and what

9    inferences you draw from such preparations, are matters

10   completely within your discretion.

11             Going back to witnesses generally, what you must try

12   to do in deciding credibility is to size up a person just as

13   you would in any important matter in your own life where you

14   are trying to decide if a person is truthful, straightforward,

15   and accurate in his or her recollection.

16             There are several persons whose names you've heard

17   during the course of the trial who did not testify.  I instruct

18   you that each party had an equal opportunity or lack of

19   opportunity to call those witnesses.  Therefore, you should not

20   draw any inference or reach any conclusions as to what such

21   witnesses would have said had they been called.  Their absence

22   should not affect your judgment in anyway.

23             Some of the people who may have been involved in the

24   events at issue in this trial are not on trial.  You may not

25   draw any inference from the fact that persons other than

1  Mr. Reese were not defendants in this trial.  Nor may you

2  speculate as to the reasons why other persons are not on trial.

3  Those matters are wholly outside your concern and have no

4  bearing on your function as jurors.

5          Under our Constitution, a defendant has no obligation

6  to testify or to present any evidence.

7          Mr. Reese testified in this case, and he was subject

8  to cross-examination like any other witness.  You should

9  examine and evaluate his testimony just as you would the

10 testimony of any other interested witness.

11         The government has presented exhibits in the form of

12 charts and summaries.  These exhibits purport to summarize the

13 underlying evidence that was used to prepare them.

14         I decided to admit these charts and summaries in order

15 to save time.  They are no better evidence than the testimony

16 or documents upon which they're based.  You should consider

17 these charts and summaries as you would any other evidence.

18         Among the exhibits admitted into evidence were

19 documents or transcripts that were redacted.  "Redacted" means

20 that part of the document was removed or blacked out.  You are

21 to concern yourself only with the part of the item that's been

22 admitted into evidence.  You should not consider any possible

23 reason why the remainder has been redacted or speculate as to

24 what may have been redacted that was not introduced into

25 evidence.

P3JARee2                        Charge

1              You have heard reference to certain investigative

2      techniques were or were not used by the government and to the

3      timing of the prosecution.  There is no legal requirement that

4      the government prove its case through any particular means nor

5      requirement that they bring a prosecution at any particular

6      time.  While you must carefully consider the evidence adduced

7      by the government, you should not speculate as to why they used

8      the techniques they did, or why they did not use other

9      techniques.  The government is not on trial.  Law enforcement

10     techniques and the timing of the prosecution are not your

11     concern.  Your concern is to determine whether, based on the

12     evidence or lack of evidence, the government has proven the

13     defendant's guilt beyond a reasonable doubt.

14             Now let's discuss the specific charges against

15     Mr. Reese.

16             Mr. Reese is charged with wire fraud, conspiracy to

17     commit wire fraud, unauthorized practice of law in a federal

18     enclave, making false statements to a United States Probation

19     Officer, and conspiracy to commit money laundering.  There is

20     no significance to the order in which I discuss the counts or

21     the order in which they are presented on the verdict sheet.

22             I'm going to start with wire fraud.  Mr. Reese is

23     charged with one count of wire fraud.  In order to sustain its

24     burden of proof on wire fraud, the government must prove,

25     beyond a reasonable doubt, the following three elements:

First, that the charged scheme to defraud existed;

Second, that Mr. Reese knowingly participated in that scheme with the intent to defraud; and

Third, that Mr. Reese used or caused the use of interstate wire communications in furtherance of the scheme to defraud.

The first element that the government must prove, beyond a reasonable doubt, is that, from at least 2020 through at least 2023, there was a scheme to defraud federal inmates and their friends and family of money or property.

A "scheme" is simply a plan, device, or course of conduct to accomplish an objective. "Fraud" is a general term that includes all possible means by which a person seeks to gain an unfair advantage over another by making false representations, false suggestions, false presentences, or by concealing material facts. Thus, a "scheme to defraud" is a plan or a course of action to deprive another of money or property by making false representations concerning material facts. Deceitful statements of half-truths or involving the concealment of material facts or the expression of an opinion not honestly entertained may also constitute false or fraudulent statements.

A fact is "material" if it is a fact that a reasonably prudent person would consider to be important. In order to be material, a misrepresentation must relate to an essential

1    element of the transaction.  A misrepresentation is about an

2    essential element of the transaction if it creates a

3    discrepancy between the benefits reasonably anticipated because

4    of the misrepresentation and the actual benefits which the

5    defendant delivered or intended to deliver.  False statements

6    or misrepresentations that are merely collateral to the

7    transaction are not material.

8            The second element that the government must prove,

9    beyond a reasonable doubt, is that Mr. Reese participated in

10   the scheme to defraud knowingly and with an intent to defraud.

11           To act "knowingly" means to act voluntarily and

12   deliberately, rather than mistakenly or inadvertently.

13           To act "intentionally" means to act deliberately and

14   purposefully; that is, Mr. Reese's actions must have been his

15   conscious objective rather than the product of mistake,

16   accident, negligence, or some other innocent reason.  Thus, to

17   act "knowingly and with an intent to defraud" means to act

18   knowingly and with the specific purpose of wrongfully obtaining

19   money or property of another person or entity through

20   fraudulent means.

21           It's not necessary for the government to prove that

22   Mr. Reese was motivated solely by improper considerations.  The

23   government will have satisfied its burden of proof on this

24   element if you find that Mr. Reese had an intent wrongfully to

25   obtain funds of another, even if he had other proper or neutral

P3JARee2                          Charge

1    reasons for his actions.

2            That said, good faith is a complete defense to a

3    charge of wire fraud.  Under the law, false representations or

4    statements, or omissions of material facts, do not amount to

5    fraud unless done with fraudulent intent.  However misleading

6    or deceptive a plan may be, it is not fraudulent if it was

7    devised or carried out in good faith.  An honest belief in the

8    truth of the representations made by a defendant is a defense,

9    even if the statements turned out to be inaccurate.

10           In this case, Mr. Reese has presented evidence that he

11   actually believed that the means he used to obtain funds were

12   legal.  If Mr. Reese honestly believed that the statements he

13   made to others in connection with his business were true and he

14   honestly believed that his conduct was lawful, that is a

15   complete defense to the fraud charge.  I want to caution you,

16   however, that the defense of good faith is not available to

17   Mr. Reese if he, directly or through another, deliberately made

18   a representation that he knew to be false, even if he

19   reasonably believed that he was legally entitled to the money

20   he received because he provided legal advice and services in

21   exchange.

22           Mr. Reese has no burden to establish good faith.  The

23   burden is on the government to prove intent to defraud, and the

24   consequent lack of good faith, beyond a reasonable doubt.

25           The final element that the government must prove,

1    beyond a reasonable doubt, is that Mr. Reese used or caused the

2    use of interstate wire communications to further the scheme to

3    defraud.  Telephone calls, text messages, e-mails, and

4    electronic transfers of money that pass between two or more

5    states are all examples of interstate wire communications.  The

6    wire communication itself need not be fraudulent, but the

7    government must prove that the wire communication in some way

8    furthered or advanced the scheme to defraud.  It is not

9    necessary for the government to prove that Mr. Reese was

10   directly or personally involved in the wire communication, as

11   long as it was reasonably foreseeable to Mr. Reese that the

12   execution of the scheme would involve wire communications.

13           In this case, you have heard about a number of

14   different wire communications that the government argues were

15   in furtherance of the scheme to defraud.  In order to satisfy

16   its burden of proof on this element, the government need only

17   prove one wire communication that satisfies this element, but

18   in order to conclude that this element was proven, the jury

19   must unanimously agree on at least one wire communication that

20   satisfies this element.

21           If you find that the government has proven all three

22   elements of wire fraud, beyond a reasonable doubt, then you

23   must find Mr. Reese guilty of wire fraud.  On the other hand,

24   if you find that the government failed to prove one or more

25   elements of wire fraud, then you must find Mr. Reese not guilty

 1    of wire fraud.

 2            Mr. Reese is charged with conspiracy to commit wire

 3    fraud.  In order to sustain its burden of proof on this charge,

 4    the government must prove, beyond a reasonable doubt, each of

 5    the following elements:

 6            First, a conspiracy to commit the crime of wire fraud

 7    existed; and

 8            Second, Mr. Reese knowingly and willfully joined the

 9    conspiracy.

10            The first element that the government must prove,

11    beyond a reasonable doubt, is that from at least 2020 through

12    at least 2023, there was a conspiracy to commit wire fraud.

13            There are two parts to the first element of the crime

14    of conspiracy:  An agreement, and an illegal goal.

15            A "conspiracy" is just an agreement among two or more

16    persons to violate the law.  To establish the existence of a

17    conspiracy, the government is not required to prove that people

18    sat around a table and entered into a formal agreement.  It is

19    sufficient if two or more people, in some way or manner,

20    reached a common understanding to violate the law.

21            In this case, the indictment alleges that the goal of

22    the conspiracy was to commit wire fraud.  The government must

23    prove that there was an unlawful agreement to achieve that

24    goal.

25            In deciding whether the goal of the conspiracy was to

1    commit wire fraud, you should consider my previous instructions

2    on wire fraud.

3            If you conclude that the government has established

4    that the charged conspiracy to commit wire fraud existed, then

5    you must consider whether the government has proven, beyond a

6    reasonable doubt, that Mr. Reese knowingly and willfully joined

7    that conspiracy.

8            I've previously charged you on what it means to act

9    "knowingly" and you should apply that definition here.  To act

10   "willfully" means to act knowingly and purposefully, with an

11   intent to do something that the law forbids, that is, with a

12   bad purpose to disobey or disregard the law.  The government

13   does not have to prove that Mr. Reese knew that he was breaking

14   any particular law or any particular statute.  It need only

15   prove that he was aware of the generally unlawful nature of his

16   act.

17           To find that a person knowingly joined the conspiracy

18   you need not find that the person was fully informed of all of

19   the details of the conspiracy or knew all of its participants.

20   The person need only know one other member of the conspiracy

21   and only one of its goals.  If you find that the person was

22   unaware of the goal of the conspiracy but acted with a

23   conscious purpose to avoid learning the goal of the conspiracy,

24   that is also sufficient.  If, however, the evidence shows only

25   that the person was negligent or mistaken for failing to learn

P3JARee2                        Charge

1    the goals of the conspiracy, that is not sufficient.

2            The conspirator can join the conspiracy at any point

3    and need not have received any benefit in return.  A

4    conspirator need not have been a member of or actively

5    participated in the conspiracy for the entire time that the

6    conspiracy existed.  On the other hand, merely associating with

7    a member of the conspiracy is not sufficient, even if the

8    person knows that the conspiracy exists.

9            I want to caution you that although you may consider

10   whether a conspirator consciously avoided learning what the

11   goal of the conspiracy was, you cannot use conscious avoidance

12   in deciding whether at least two members knowingly and

13   willfully joined the conspiracy.

14           Because the crime charged is conspiracy, the

15   government does not have to prove that the goal of the

16   conspiracy was realized.  Thus, it does not matter whether wire

17   fraud was actually committed.  The crime of conspiracy is

18   complete when an unlawful agreement is made to commit a crime,

19   even if no member of the conspiracy actually commits the crime

20   that is the goal of the conspiracy.

21           If you find that the government has proven both

22   elements of conspiracy to commit wire fraud, beyond a

23   reasonable doubt, then you must find Mr. Reese guilty of

24   conspiracy to commit wire fraud.  On the other hand, if you

25   find that the government failed to prove one or more elements

P3JARee2                    Charge

1   of conspiracy to commit wire fraud, then you must find

2   Mr. Reese not guilty of conspiracy to commit wire fraud.

3           Mr. Reese is charged with the unauthorized practice of

4   law.  In order to sustain its burden of proof on this charge,

5   the government must prove, beyond a reasonable doubt, each of

6   the following elements:

7           First, that Mr. Reese practiced for another as an

8   attorney in a federal court in New York State;

9           Second, that Mr. Reese made his practice a business;

10          Third, that Mr. Reese falsely held himself out as a

11  person who can provide services that only attorneys are

12  authorized to provide;

13          Fourth, that Mr. Reese's conduct caused another person

14  to suffer monetary loss or damages exceeding $1,000 or other

15  material damage resulting from impairment of a legal right to

16  which he or she is entitled;

17          Fifth, that Mr. Reese's conduct was knowing and

18  willful; and

19          Sixth, that Mr. Reese's conduct occurred within or

20  upon a federal enclave.

21          The first element that the government must prove,

22  beyond a reasonable doubt, is that Mr. Reese practiced for

23  another as an attorney in a federal court in New York State.

24  "Practicing for another as an attorney" does not mean that the

25  defendant held himself out as an attorney.  Instead,

1    "practicing for another as an attorney" means providing

2    services for another person that only an attorney is legally

3    authorized to provide.  In New York, only attorneys are legally

4    authorized to provide legal advice and render legal opinions

5    directed to particular clients for compensation.  Only

6    attorneys can appear in court on behalf of another person,

7    whether the appearance is in person or through written

8    submissions.  When legal documents are prepared for a client by

9    a person who is in the business of preparing such documents,

10   the document preparer is engaged in the practice of law.  A

11   person practices "in a federal court" when they provide

12   services for another person that only an attorney is authorized

13   to provide in connection with proceedings in federal court.

14        The second element that the government must prove,

15   beyond a reasonable doubt, is that Mr. Reese made his practice

16   a business.  This means that the government must prove that

17   Mr. Reese's provision of services was part of a commercial

18   enterprise carried on for profit.

19        The third element that the government must prove,

20   beyond a reasonable doubt, is that Mr. Reese held himself out

21   as a person who can provide the sort of services that, in fact,

22   only attorneys are authorized to provide.  I explained what

23   services only attorneys are authorized to provide when I

24   instructed you on element one of this offense.  Accordingly, to

25   sustain its burden on this element, the government must prove

P3JARee2                        Charge

1    that Mr. Reese represented to other people that he could

2    provide the type of services that only attorneys are authorized

3    to provide.  The government is not required to prove that

4    Mr. Reese held himself out to be an attorney.

5          To sustain its burden on this element, the government

6    must also prove that Mr. Reese is not, in fact, authorized to

7    practice as an attorney in New York State.

8          The fourth element that the government must prove,

9    beyond a reasonable doubt, is that Mr. Reese's unauthorized

10   practice of law caused another person to suffer monetary loss

11   or damages exceeding $1,000 or caused another material damage

12   resulting from impairment of a legal right to which he or she

13   is entitled.  "Monetary loss or damages" simply means money

14   that a person would have had but for Mr. Reese's unauthorized

15   practice of law.  "Material damage" means damage that a

16   reasonably prudent person would consider to be important.

17   "Impairment of a legal right" means loss or diminishment of

18   something that a person is entitled to under the law.

19         The fifth element that the government must prove,

20   beyond a reasonable doubt, is that Mr. Reese acted knowingly

21   and willfully.  I have previously defined "knowingly" and

22   "willfully," and you should apply those definitions here.

23         If you find that Mr. Reese acted with a conscious

24   purpose to avoid learning the truth about whether the business

25   he was conducting was lawful, then the requirement that the

P3JARee2                    Charge

1   government must prove that the defendant acted knowingly will

2   have been satisfied.  The law does not permit a defendant to

3   avoid responsibility for criminal conduct by intentionally

4   closing his eyes to relevant facts that otherwise would have

5   been obvious to him.  If, however, the evidence shows only that

6   Mr. Reese was negligent or mistaken about whether the business

7   he was conducting was lawful, that is not sufficient to prove

8   that he consciously avoided the truth.  Furthermore, if you

9   find that Mr. Reese actually believed that he was not engaging

10  in unlawful behavior, then you must find that the government

11  has not met its burden of proving that Mr. Reese acted

12  knowingly.

13          Mr. Reese has argued that he did not act willfully

14  because he was not aware that his conduct was unlawful; that

15  is, he asserts that he did not know that his provision of legal

16  services was unlawful in New York State.  Lack of willfulness

17  is a complete defense:  If you conclude, based on all of the

18  evidence, that the government has failed to prove, beyond a

19  reasonable doubt, that Mr. Reese acted knowingly and willfully

20  then you must find him not guilty.

21          The sixth and final element that the government must

22  prove, beyond a reasonable doubt, is that Mr. Reese's

23  unauthorized practice of law occurred within or upon a federal

24  enclave.  A federal enclave is a piece of land reserved or

25  acquired for the use of the United States or under the

P3JARee2                    Charge

1    exclusive or concurrent jurisdiction of the United States.  I

2    instruct you as a matter of law that the Thurgood Marshall

3    United States Courthouse located at 40 Foley Square, New York,

4    New York, is a federal enclave.

5            To sustain its burden of proof on this element, the

6    government must prove that all or part of Mr. Reese's

7    unauthorized practice of law occurred in a federal enclave.

8            If you find that the government has proven all of the

9    elements of the crime of unlawful practice of law beyond a

10   reasonable doubt, then you must find Mr. Reese guilty of

11   engaging in the unauthorized practice of law.  On the other

12   hand, if you find the government has failed to prove one or

13   more elements of the unlawful practice of law, then you must

14   find Mr. Reese not guilty of the unlawful practice of law.

15           Mr. Reese is charged with making a false statement to

16   a United States Probation Officer.  Specifically, the

17   government claims that Mr. Reese made false statements

18   regarding his monthly income and financial assets.

19           In order to sustain its burden of proof on this

20   charge, the government must prove, beyond a reasonable doubt,

21   each of the following elements:

22           First, that Mr. Reese either (i) made a statement

23   regarding his monthly income or financial assets, or (ii)

24   concealed or covered up a fact about his monthly income or

25   financial assets;

P3JARee2                        Charge

 1              Second, either (i) that the statement was false, or

 2     (ii) that a fact was concealed or covered up by means of a

 3     trick, scheme, or device;

 4              Third, that the statement Mr. Reese made, or the fact

 5     he concealed or covered up, was material;

 6              Fourth, that Mr. Reese acted knowingly and willfully;

 7     and

 8              Fifth, that the statement Mr. Reese made, or the fact

 9     he concealed or covered up, related to a matter within the

10     jurisdiction of the United States Government.

11              The government may sustain its burden of proof as to

12     the first element in either of two ways.  First, it may prove,

13     beyond a reasonable doubt, that at some point between 2022 and

14     2023, Mr. Reese made at least one statement, orally or in

15     writing, in which he reported his monthly income or financial

16     assets.

17              Alternatively, the government may sustain its burden

18     of proof on the first element if it proves, beyond a reasonable

19     doubt, that at some point between 2022 and 2023, Mr. Reese

20     concealed or covered up a fact about his monthly income or

21     financial assets.  These words almost define themselves.  To

22     "conceal" means to take some act to prevent detection of a fact

23     that Mr. Reese was required to reveal.  To "cover up" means to

24     hide a fact from another.

25              The government alleges that Mr. Reese made several

P3JARee2                    Charge

1    false statements to a United States Probation Officer.  It is

2    not necessary that the government prove that each and every

3    statement constituted a material false statement.  The

4    government satisfies its burden if it proves, beyond a

5    reasonable doubt, that's at least one specified statement

6    satisfies each element of the crime.  In order to convict, you

7    must be unanimous as to at least one statement that does so.

8           The second element that the government must prove

9    differs depending on whether you find that Mr. Reese made a

10   false statement or concealed or covered up a fact.

11          If you find that Mr. Reese made a false statement,

12   then the second element that the government must prove, beyond

13   a reasonable doubt, is that the statement was false,

14   fictitious, or fraudulent.  A statement is false or fictitious

15   if it was untrue at the time it was made, and the person who

16   made the statement knew at the time that it was untrue.  A

17   statement is "fraudulent" if it was untrue at the time it was

18   made and was made with the intent to deceive the person to whom

19   it was made.

20          If you find that Mr. Reese concealed or covered up a

21   fact, then the second element the government must prove, beyond

22   a reasonable doubt, is that Mr. Reese concealed or covered up

23   the fact by means of a trick, scheme, or device.  A scheme is a

24   plan for the accomplishment of an objective.  A trick or device

25   is a deceptive act or strategy calculated to deceive people.

P3JARee2                        Charge

1          The third element that the government must prove,

2    beyond a reasonable doubt, is that the statement that Mr. Reese

3    made, or the fact he concealed or covered up, was material.  As

4    I have explained, something is "material" if it is something

5    that a reasonably prudent person would consider to be

6    important.  In this context, a statement or fact is "material"

7    if it has a natural tendency to influence or was capable of

8    influencing the decisions or activities of the probation

9    office, or if it was capable of distracting the attention of

10   the probation office from a critical matter.  Proof of actual

11   reliance on the statement is not required.

12          The fourth element that the government must prove,

13   beyond a reasonable doubt, is that Mr. Reese acted knowingly

14   and willfully.  I have already defined for you "knowingly" and

15   "willfully," and you should apply those definitions here.

16          The fifth and final element that the government must

17   prove, beyond a reasonable doubt, is that the statement

18   Mr. Reese made, or the fact he concealed or covered up, related

19   to a matter within the jurisdiction of the United States

20   Government.  A matter is within the jurisdiction of the United

21   States Government if it concerns an authorized function of the

22   United States.  The United States Probation Office and the

23   United States District Court for the Southern District of New

24   York are part of the judicial branch of the United States

25   Government.

1    If you find that the government has proven all of the

2    elements of the crime of making a false statement, beyond a

3    reasonable doubt, then you must find Mr. Reese guilty of making

4    a false statement.  On the other hand, if you find the

5    government has failed to prove one or more elements of making a

6    false statement, then you must find Mr. Reese not guilty of

7    making a false statement.

8         Finally, the government has charged Mr. Reese with

9    conspiring to commit money laundering.

10        The government must prove, beyond a reasonable doubt:

11   (1) the existence of a conspiracy and (2) that Mr. Reese

12   knowingly and willfully joined the conspiracy.  I have already

13   instructed you on those two elements, and my earlier

14   instructions on those elements apply here as well.

15        For this charge, the object of the alleged conspiracy

16   is money laundering.  This means that, in order to sustain its

17   burden of proof for this charge, the government must prove,

18   beyond a reasonable doubt, that the goal of the conspiracy was

19   to commit money laundering.  To prove that the goal of the

20   conspiracy was money laundering, the government must prove:

21        First, that Mr. Reese agreed that he or a member of

22   the conspiracy would engage in a financial transaction;

23        Second, that Mr. Reese knew that the funds in the

24   agreed-upon transaction would involve the proceeds of some form

25   of unlawful activity; and

1          Third, that Mr. Reese knew that the agreed-upon

2    transaction was designed, in whole or in part, to conceal or

3    disguise the nature, location, source, ownership or the control

4    of the proceeds of the specified unlawful activity.

5          The first element that the government must prove,

6    beyond a reasonable doubt, is that Mr. Reese agreed that he or

7    a member of the conspiracy would conduct a financial

8    transaction.

9          A financial transaction is either a transaction that

10   affects interstate or foreign commerce by moving funds by wire

11   or by other means or by use of one or more monetary

12   instruments; or a transaction involving the use of a financial

13   institution that is engaged in, or the activities of which

14   affect, interstate or foreign commerce.  A "monetary

15   instrument" is anything that represents money, such as coins or

16   currency, personal checks, cashier's checks, bank checks, or

17   money orders.  A "financial institution" includes a bank that

18   is insured by the Federal Deposit Insurance Corporation, or

19   FDIC, a commercial bank, a foreign bank, or an issuer,

20   redeemer, or cashier of checks or money orders.

21         The term "interstate or foreign commerce" means

22   commerce between states, territories or possessions of the

23   United States, or between the United States and a foreign

24   country.  The government must prove that the agreed-upon

25   transaction would have affected interstate or foreign commerce

P3JARee2                          Charge

1    in some way, however minimal.  There are several ways a

2    transaction can affect interstate or foreign commerce.  First,

3    any transaction by or through a financial institution insured

4    but the FDIC affects interstate commerce.  Therefore, if you

5    find that any financial institution that was or would have been

6    involved in the agreed-upon transaction was insured by the

7    FDIC, that aspect of this element will have been proven.

8    Second, if you find that the source of the funds in the

9    agreed-upon transaction would affect interstate or foreign

10   commerce, that's also sufficient to satisfy this element.

11   Finally, if you find the agreed-upon transaction itself would

12   involve an interstate or international transfer of funds, that

13   would also be sufficient.

14          The second element the government must prove, beyond a

15   reasonable doubt, is that (i) Mr. Reese knew that the

16   transaction he agreed would be conducted would involve funds

17   that were the proceeds of some form of unlawful activity; and

18   (ii) that the agreed-upon transaction would involve funds that

19   were, in fact, proceeds of "specified unlawful activity" that

20   is a felony.

21          The government does not have to prove that Mr. Reese

22   knew that the proceeds would come from any specific offense,

23   but it does have to prove that Mr. Reese knew that the funds

24   involved were the proceeds of some form of illegal activity.

25          Additionally, the government must prove that the funds

1    involved were, in fact, the proceeds of "specified unlawful

2    activity" that is a felony.  In this case, the government

3    charges that the funds at issue in the agreed-upon transaction

4    were proceeds of wire fraud.  I charge you as a matter of law

5    that wire fraud is a "specified unlawful activity" and it is a

6    felony.  If you find that the funds at issue were proceeds only

7    of the unauthorized practice of law and were not the proceeds

8    of wire fraud.  Then this element will not have been proven.

9         The third and final element that the government must

10   prove, beyond a reasonable doubt, is that Mr. Reese knew that

11   the agreed-upon transaction was designed, in whole or in part,

12   to conceal or disguise the nature, location, source, ownership,

13   or control of the proceeds of specified unlawful activity,

14   specifically wire fraud.

15        If you find, beyond a reasonable doubt, that the

16   government has proven all of the elements of conspiracy to

17   commit money laundering beyond a reasonable doubt, then you

18   must find Mr. Reese guilty of conspiracy to commit money

19   laundering.  On the other hand, if you find that the government

20   failed to prove one or more elements of conspiracy to commit

21   money laundering, then you must find Mr. Reese not guilty of

22   conspiracy to commit money laundering.

23        The indictment alleges that certain acts occurred on

24   or about various dates.  The government does not have to prove

25   that an act occurred during a specific time period or on a

P3JARee2                    Charge

1  specific date.  I instruct you that it does not matter if a

2  specific event is alleged to have occurred on or about a

3  certain date but the testimony indicates that, in fact, it

4  occurred on a different date.  The law requires only a

5  substantial similarity between the dates alleged in the

6  indictment and the dates and months established by the

7  evidence.

8          In addition to proving the elements of each crime

9  beyond a reasonable doubt, as to the false statement charge,

10  the government must also establish what is called

11  "venue" — that is, that some act pertaining to the crime

12  occurred in the Southern District of New York.  The Southern

13  District of New York includes all of Manhattan and the Bronx,

14  as well as Westchester, Rockland, Putnam, Dutchess, Orange, and

15  Sullivan Counties.

16          The government does not have to prove that the

17  complete crime was committed within the Southern District of

18  New York or that the defendant was ever in the Southern

19  District of New York.  Venue is proper on the false statement

20  charge in any district in which the charged false statement was

21  made or into which the false statement was conveyed.  Venue is

22  also appropriate in any district in which the false statement

23  had an effect on the federal government agency in question,

24  which in this case is the Court and the probation office.

25          You are about to begin your deliberations.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P3JARee2                        Charge

1          We will send into the jury room all of the exhibits

2    that were admitted into evidence.  The exhibits will be loaded

3    on the computer that is available to you in the jury room.  If

4    you have any difficulty operating the computer or finding what

5    you want, please send me a note and I will send in someone to

6    help you.

7          If you want any further explanation of the law or if

8    you want to hear any testimony read back, you may also request

9    that.  If you ask for any testimony to be reread, please be as

10   specific as possible so we can identify exactly what you want

11   read and not waste time reading testimony that you do not want

12   to hear.  If there is any doubt or question about the meaning

13   of any part of the instructions that I have given you, you

14   should not hesitate to send me a note asking for clarification

15   or further explanation.

16         It is very important that you not communicate with

17   anyone outside the jury room about your deliberations or about

18   anything touching on this case.  There is only one exception to

19   this rule.  If it becomes necessary during your deliberations

20   to communicate with me, you should send me a written note

21   signed by your foreperson, by giving it to the marshal, who

22   will be available to you outside the jury room throughout your

23   deliberations.

24         You're going to be outside that door, right.

25         THE MARSHAL:  Yes.  Yes, ma'am.

P3JARee2                          Charge

1           THE COURT:  Outside the door towards the elevators.

2           Let me try that again.  Now you know where the marshal

3      is going to be.

4           If it becomes necessary during your deliberations to

5      communicate with me, you should send me a written note signed

6      by your foreperson, by giving it to the marshal, who will be

7      available outside the jury room throughout your deliberations.

8      No member of the jury should ever attempt to communicate with

9      me except by a signed writing, and I will never communicate

10     with a member of the jury on any subject touching on the merits

11     of the case other than in writing or orally here in open court.

12     If you send any notes to the Court, do not disclose anything

13     about your deliberations.  Specifically, do not disclose to

14     anyone -- not even to me -- how the jury stands, numerically or

15     otherwise, until after you have reached a unanimous verdict or

16     have been discharged.

17          Some of you have taken notes throughout this trial.  I

18     want to emphasize to you that notes are simply an aid to

19     memory.  Your notes may not be given any greater weight or

20     influence in the determination of the case than the

21     recollections of other jurors.  Any difference between a

22     juror's recollection and another juror's notes should be

23     settled by asking to have the court reporter read back the

24     transcript, because it is the Court record that the jury must

25     rely on when making a determination of the facts and rendering

1    a verdict.

2              You will shortly retire to decide your verdict.  As I

3    have already explained, for the government to prevail on any

4    charge, it must prove each essential element of the charge

5    beyond a reasonable doubt.  If the government carries its

6    burden, you must find Mr. Reese guilty on that charge.

7    Otherwise, you must find Mr. Reese not guilty on that charge.

8              Your verdict on each charge must be unanimous.  Each

9    juror is entitled to his or her opinion, but you are required

10   to exchange views with your fellow jurors.  That is the very

11   essence of jury deliberation.  If you have a point of view,

12   and, after discussing it with the other jurors, it appears that

13   your own judgment is open to question, then of course you

14   should not hesitate to yield your original point of view if you

15   are convinced that the other view is one that satisfies your

16   judgment and conscience.  But do not give up a point of view

17   that you conscientiously believe simply because you are

18   outnumbered.  You should vote with the others only if you are

19   convinced on the evidence, the facts, and the law that it is

20   the correct way to decide the case.

21             After any breaks or when you arrive in the morning, if

22   your deliberations last more than one day, do not begin to

23   discuss the case until all jurors are present.

24             The first thing you should do when you retire to

25   deliberate is to select one of you to act as your foreperson.

1    Traditionally, Juror No. 1 is the foreperson, but that is only

2    a tradition.  You are free to select any of your members as

3    your foreperson.  Although I urge you not to spend a lot of

4    time on that issue.

5            Once you have reached your verdict, you must record it

6    on the verdict form that I have prepared for you.  The

7    foreperson should fill in the verdict sheet, date it, and sign

8    it.  The foreperson should then give a note to the marshal

9    outside your door stating that you have reached a verdict.  Do

10   not specify what the verdict is in the note.  The foreperson

11   should keep the verdict sheet until I ask for it.  You must all

12   be in agreement with the verdict that is announced in court.

13           I'm going to have the parties come up here for just a

14   second.  Your lunch should be back there.  So you're going to

15   have lunch as soon as you deliberate.  We're also going to have

16   lunch as soon as you deliberate.  So feel free to have your

17   lunch.  If you send us a note before a quarter to 1:00, we're

18   not going to respond -- I'm sorry.  It's a quarter to 1:00 now.

19   Until a quarter to 2:00, we won't respond to after we're back

20   from lunch, which will be around 2:00.  Please remain seated

21   while I confer.

22               (Continued on next page)

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1           (At sidebar)

2           MR. MARGULIS-OHNUMA:  Judge, there is an issue.  It's

3   very possible I misunderstood your ruling on the record on

4   Monday night.  I thought that you were not going to instruct

5   relating to the false statements charge venue, that it could

6   effect the Court.  That it was only going to be the probation

7   office.

8           And I'm looking at the transcript now.  I guess it was

9   my reading of what you said, but it was a little -- it was the

10  government's objection to add the Court, and then we objected

11  to their objection.  And then you said objection overruled.  So

12  it wasn't quite clear which one you were overruling.  We would

13  like it to be made clear that it's just the probation

14  department.

15          Let me find where it was in the instruction.  In the

16  venue, right before the final instructions at page 29.

17          THE COURT:  Do you want to be heard?

18          MR. PERTZ:  So to get the line here:  Venue is also

19  appropriate in any district in which the false statement had an

20  effect on the federal government agency in question, which in

21  this case is the Court and the probation office.

22          And the defense wants a statement that, which in this

23  case, is the probation office?

24          MR. MARGULIS-OHNUMA:  Correct.

25          MR. PERTZ:  We're fine with that.

P3JARee2                          Charge

 1                THE COURT:  Okay.  I'll make that correction.

 2      Anything else?

 3                MR. MARGULIS-OHNUMA:  That's all.

 4                (Continued on next page)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P3JsREE3

 1              (In open court)

 2              THE COURT:  Ladies and gentlemen, I'm going to ask you

 3    to make one change to the charge that I read to you.

 4              Turn to page 29, line eight.  In line eight, where it

 5    says "which in this case is the court and the probation

 6    office." I want to you scratch the court.  And so let me read

 7    you that sentence in its entirety again.

 8              "Venue is also appropriate in any district in which

 9    the false statement had an effect on the federal government

10    agency in question, which in this case is the probation

11    office."

12              OK.  All right.  Angela, can you please swear in the

13    marshal.

14              (Court Security Officer sworn)

15              All right.  Ladies and gentlemen, I remind you that at

16    the very beginning of the case, you took an oath.  Your oath

17    sums up your duty.  You must well and truly try the matters in

18    issue and render a true verdict according to the law and the

19    evidence.

20              Everybody, except Alternate No. 1, may now return to

21    the jury room and begin your deliberations.

22              Take all your stuff with you this time.

23              THE DEPUTY CLERK:  All rise.

24              (At 12:51 p.m., the jury retired to deliberate)

25              THE COURT:  OK.  Please be seated, everyone.

P3JsREE3

1          All right.  Ms. Sesay, with thanks from the court, you

2     are excused for the rest of the day.  You're not yet excused

3     from jury duty.  It is exceedingly rare, but every once in a

4     while something will happen to one of the sitting jurors.  If

5     that happens, we will call you and ask you to come in and they

6     will begin deliberations with you.

7          All of my directions to you every other night I've

8     seen you, don't discuss the case, are in full force and effect.

9     if we need you, Angela has your phone number.  We'll call you.

10    If you don't hear back, assume you're done.

11          I think she's going to take your swipe card as well.

12    With thanks from the court, you are free to go about your

13    business.

14          ALTERNATE JUROR NO. 1:  Thank you.

15          THE COURT:  Leave everything on your chair, except

16    your swipe card, which you gave to Angela.

17          THE DEPUTY CLERK:  She gave it to me.

18          Thanks so much.

19          THE COURT:  You can't go that way.  Go out the other

20    way.

21          OK.  You guys are free until 2:00 o'clock.  Make sure

22    Angela has your phones.

23          Give her time to clear the elevator, if you would,

24    please.

25          (Recess pending verdict)

P3JsREE3

                              AFTERNOON SESSION

1                             AFTERNOON SESSION

2            (Jury note at 4:15 p.m.)

3            THE COURT:  OK.  Got a note from the jury, which we

4    marked as Court Exhibit 1, reading:

5            Does the second person in a conspiracy need to have

6    known that they were being involved in an illegal act?

7    Referencing page 17, lines five through eight of the charge.

8            Who wants to be heard?

9            (Counsel confer)

10           Can I make a suggestion since nobody seems to be

11   jumping up?

12           Mr. Reese wants to jump up.

13           MR. MARGULIS-OHNUMA:  We think the answer is yes.

14           THE COURT:  Of course, the answer is yes.  I think we

15   can all agree to that.  That's first-year conspiracy law.

16           MR. MARGULIS-OHNUMA:  Well, I think it's different.

17           Yes, yes, yes.  Agreed.

18           THE COURT:  But I think just saying yes is not going

19   to scratch the itch.

20           MR. PERTZ:  I think this raises a couple issues.

21   Because it's a conspiracy, it's the agreement that matters.

22   They do not need to be involved in an illegal act at all.  They

23   have to agree, and that agreement also has this conscious

24   avoidance point as to the object.

25           So that's why we're struggling here.  We think you

P3JsREE3

1    know, while yes is the easy knee jerk, it's actually, I think,

2    not speaking correct.

3            THE COURT:  How about the following?

4            MR. PERTZ:  Yes.

5            THE COURT:  Each member has to agree to violate the

6    law.  OK.  That's the essence.  This not what I'm saying to

7    them, this is what I'm saying to you.  That's the essence of

8    the conspiracy.  It's an agreement to violate the law.

9            So first sentence:  Each member has to agree to

10   violate the law.  That said, each member need not know all the

11   details of the conspiracy.

12           MR. MARGULIS-OHNUMA:  Could you read the question out

13   again?

14           THE COURT:  Does the second person in a conspiracy

15   need to have known that they were being involved in an illegal

16   act?

17           Referencing page seven, lines five through eight,

18   which actually answers their question because it says:

19           It's sufficient if two or more people in some way or

20   manner reached a common understanding to violate the law.

21           And the first sentence of that section is:  Conspiracy

22   is just an agreement among two or more persons to violate the

23   law.

24           MR. MARGULIS-OHNUMA:  Yeah, I think --

25           Well, I think the answer should start with yes, that

P3JsREE3

 1    they have articulated it correctly.

 2                (Counsel confer)

 3                THE COURT:  It's a funny issue because it sort of

 4    depends on what is in their head when they say "being involved

 5    in an illegal act."

 6                Like, I'm not entirely sure what that means.

 7                MR. MARGULIS-OHNUMA:  I mean...

 8                THE COURT:  Well, that's why I was thinking, sort of,

 9    yes is the answer to the question.  Well --

10                MR. MARGULIS-OHNUMA:  I learned something today.  I

11    guess under state law it's different.  If they -- if the

12    requirement is that both parties are in the conspiracy, I

13    always thought -- again, I don't know where that is from.  I

14    just thought that you can conspire with an undercover.

15                THE COURT:  No, you can't.  Not under federal law.

16                MR. MARGULIS-OHNUMA:  Again, I learned something

17    today.

18                THE COURT:  Did Mr. Reese know that?

19                THE DEFENDANT:  Yes.

20                THE COURT:  You're just a fount of knowledge,

21    Mr. Reese.

22                MR. MARGULIS-OHNUMA:  So, but that means the

23    government had the obligation to prove the content of

24    Ms. Rhodes' mind also, didn't they?

25                THE COURT:  They have to prove that she agreed to

P3JsREE3

```
 1   violate the law.  There has to be at least two people agreeing
 2   to violate the law.
 3            MR. MARGULIS-OHNUMA:  Yeah, that's what I think they
 4   should be told.  That's what they're asking.
 5            THE COURT:  That was my first sentence.
 6            Yes.  I believe now would be my second sentence,
 7   because we start with the first sentence is yes.  Each member
 8   has to agree to violate the law.  Has to agree to violate the
 9   law.
10            But I think that the third sentence is necessary to
11   keep that from being misleading, which is:  That said, each
12   member need not know all the details of the conspiracy.
13            And even to do an act that would itself violate the
14   law, which, sort of, right?
15            MR. MARGULIS-OHNUMA:  I don't think that last sentence
16   is necessary because they are just asking about knowledge.
17            (Counsel confer)
18            MR. PERTZ:  It sounds like they are confused as to the
19   act and think there is an act requirement, when there isn't.
20            THE COURT:  Maybe.
21            MR. PERTZ:  The last sentence is necessary to make
22   that, the other sentence, not misleading.
23            MR. MARGULIS-OHNUMA:  I see.  Oh, I see.
24            THE COURT:  OK.  Let's try again.
25            So it will be:  Yes.  Each member has to agree to
```

P3JsREE3

1  violate the law.  That said, each member need not know all the

2  details of the conspiracy and need not commit any act that

3  would itself be illegal.

4          Right, because the essence of the crime is conspiracy.

5          MR. MARGULIS-OHNUMA:  Can we say overt act?

6          THE COURT:  That would be a new -- I mean, there is no

7  overt act requirement in this crime.  I mean..

8          MR. MARGULIS-OHNUMA:  You're still telling them there

9  need not be any overt act, not that there not need be any act.

10          THE COURT:  Well, there also has to be an agreement,

11  so I guess that's right.  So any overt act.

12          MR. PERTZ:  I'm sorry.  I'm confused why is the word

13  "overt" is needed.

14          THE COURT:  Because there does need to be an act that

15  was illegal, which is specifically agreeing to be part of the

16  conspiracy.  Right?

17          (Counsel confer)

18          MR. PERTZ:  It sounds --

19          THE COURT:  Do you want to hear it again?

20          MR. PERTZ:  Usually the act, an act is different than

21  an agreement.  It doesn't -- I don't know.  Overt does seem to

22  just -- well, what's an overt act?  What's a covert act?

23          It seems like any act is correct and, you know, the

24  overt act requirement is a thing that's in 371 and not the wire

25  fraud conspiracy.  And it's just pointless and confusing.

P3JsREE3

1              (Counsel confer)

2              THE COURT:  I'm reconsidering the yes.  I think the

3    yes is problematic because their question is mushing together a

4    couple of concepts.  So I don't think yes does it.

5              So, I don't know that the first piece of what I was

6    going to say we need, because I don't think that's what they

7    are getting at.  I think what they are getting at is whether,

8    maybe, because the "being involved in some illegal act," makes

9    me think that they are wrapped around the act alone, whether

10   each conspirator has to do something that is itself illegal,

11   which is not true.  What is true is that they have to agree to

12   violate the law.

13             So, now I'm thinking:  Each member has to agree to

14   violate the law.  That said, each member need not commit any

15   act that would itself be illegal.

16             MR. MARGULIS-OHNUMA:  Your Honor, I think that loses

17   the gist of their question, which is what's the knowledge

18   requirement for the other person.

19             We have to -- I think we have to tell them something

20   about what the other person had to have known, and they do need

21   to know they were being involved in an illegal -- they do have

22   to know that the object is something illegal, that the object

23   of the agreement is something illegal.

24             THE COURT:  Correct.

25             MR. MARGULIS-OHNUMA:  Put it another way, if we're not

P3JsREE3

1  going to say yes, I think the answer has to say something about

2  what they have to know, what the other person has to have

3  known.

4          THE COURT:  So each member has to know that the object

5  of the agreement is to violate the law.

6          MR. MARGULIS-OHNUMA:  Yes.

7          THE COURT:  Each member need not commit any act that

8  would itself be illegal.

9          MR. MARGULIS-OHNUMA:  That's fine.  The word "commit"

10  captures what I was concerned about.

11          THE COURT:  All right.  You want to hear it one more

12  time?

13          MR. MARGULIS-OHNUMA:  Yes.

14          THE COURT:  OK.  Each member has to know that the

15  object of the agreement is to violate the law.  Each member

16  need not commit any act that would itself be illegal.

17          MR. MARGULIS-OHNUMA:  Yes.

18          THE COURT:  Maybe an act.

19          Each member need not commit an act that would itself

20  be illegal.

21          MR. PERTZ:  We have no objection to that language.

22          THE COURT:  OK.  Mr. Margulis, no objection?

23          MR. MARGULIS-OHNUMA:  Just one second.

24          (Counsel confer)

25          THE DEPUTY CLERK:  Are you going to bring them out?

P3JsREE3

1    THE COURT:  Hang on.  We need to get an agreement, but

2    yes.  If you want to wander over, getting your steps in.

3    MR. PERTZ:  While they are considering, is the jury

4    going to come back in?

5    THE COURT:  Yes.  I'm going to bring them back in

6    because I don't have this typed up and my handwriting is awful.

7    MR. PERTZ:  All right.

8    THE COURT:  Do you want me to put something, to

9    mention that Mr. Prussien is not here?

10    MR. PERTZ:  That is what we are going to ask for, yes.

11    If you can say he is excused with the court's permission.

12    THE COURT:  That's fine.

13    MR. MARGULIS-OHNUMA:  If we can set up to say the same

14    for Ms. Ayotte?

15    THE COURT:  OK.

16    MR. MARGULIS-OHNUMA:  Under far less dramatic

17    circumstances.

18    THE DEPUTY CLERK:  Ready, Judge?

19    THE COURT:  Yes.

20    (Jury present)

21    You don't have to go all the way down.  You can sit

22    right there.  Everybody's, like, you know, you got your chair

23    and you think you're supposed to stay in it forever.

24    First off, let me note, in case you have noticed, that

25    Mr. Prussien and Ms. Ayotte are not here.  They were excused by

P3JsREE3

1    the court to attend to other business.

2              So I have your note, which we marked as Court

3    Exhibit 1.  It reads as follows:

4              Does the second person in a conspiracy need to have

5    known that they were being involved in an illegal act?

6              Page 17, lines five through eight.

7              Each member has to know that the object of the

8    agreement is to violate the law.  Each member need not commit

9    an act that would itself be illegal.

10             That is the answer to your question.

11             Please continue to deliberate.

12             (Jury deliberations resumed at 4:37 p.m.)

13             OK.  See you later.

14             (Recess pending verdict)

15             (Jury present)

16             THE COURT:  So, ladies and gentlemen, it's 6:00

17   o'clock.  I asked you if you would stay until 6:00 o'clock

18   tonight, and it's 6:00 o'clock.  But I also heard that you

19   asked the marshal for five minutes.

20             So the question is, if I give you five minutes, will

21   you be done, or do you think you have more to talk about?

22             More to talk about.

23             OK.  Then I don't think five  minutes is going to make

24   a difference, so you have to come back tomorrow.

25             So please be back tomorrow morning not later than

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P3JsREE3

1    9:30.  As I told you before, you cannot start discussing the

2    case until everybody's there, because up until then, you're

3    just a random collection of people.  Once all 12 of you arrive,

4    then you're a jury.  So start deliberating once everybody is

5    here.

6          Don't discuss the case.  Have a wonderful evening and

7    I will see you all in the morning.  To be clear, I will not

8    bring you out in the morning before you start.  Just once you

9    have everybody here, you can start deliberating.

10          THE JURY:  OK.  Do we leave our notebooks?

11          THE COURT:  Leave everything in the jury room.

12          (Jury not present)

13          OK.  Be available starting at 9:30.  If you could

14   just hang out in the courtroom to let them clear through the

15   elevator lobby before you leave.

16          (Adjourned to March 20, 2025, at 9:30 a.m.)